IN THE DISTRICT COURT OF THE FOURTH JUDICIAL DISTRICT OF

THE STATE OF IDAHO, IN AND FOR THE COUNTY OF ADA

| | |
|---|---|
| REED J. TAYLOR, an individual;<br><br>Plaintiff,<br><br>vs.<br><br>RICHARD A. RILEY, an individual; HAWLEY TROXELL ENNIS & HAWLEY LLP, an Idaho limited liability partnership; ROBERT M. TURNBOW, an individual; and EBERLE, BERLIN, KADING, TURNBOW & McKLVEEN, CHARTERED, an Idaho corporation,<br><br>Defendants. | Case No. CV-OC-2009-18868<br><br>MEMORANDUM OPINION AND ORDER RE: DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT AND RECONSIDERATION AND PLAINTIFF'S MOTION FOR RECONSIDERATION |

## I. BACKGROUNG AND STATEMENT OF FACTS

Before the Court is Defendant Richard Riley's ("Riley") Motion for Summary Judgment, which Defendant Cummings (Personal Representative of the Estate of Robert M. Turnbow) and Eberle, Berlin, Kading, Turnbow & McKlveen, Chartered (hereinafter collectively "Eberle Berlin") partially joined; Defendant Eberle Berlin's Third Motion for Summary Judgment; Plaintiff's Motion for Reconsideration, and Plaintiff's Motion to Pursue Alternative or Additional Claims. The background of this case is set out in this Court's earlier decision dated

**MEMORANDUM OPINION AND ORDER RE: DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT AND RECONSIDERATION AND PLAINTIFF'S MOTION FOR RECONSIDERATION – PAGE 1**

Exhibit - P

May 7, 2010 (filed May 10, 2010) on Defendants' Motion for Summary Judgment this case an abbreviated version of the facts follows. This case has its origins in 1995 in a Stock Redemption Agreement between Reed Taylor ("Taylor") and AIA Services ("AIA") as where AIA agreed to purchase all of Taylor's shares in the company for a $1.5 million down payment promissory note, a $6 million promissory note due in 10 years, and other consideration. In the course of that transaction Defendants Riley, Robert Turnbow ("Turnbow"), and their firm Eberle Berlin represented AIA. Taylor was represented by separate counsel. Eberle Berlin is a party because it was Riley and Turnbow's firm at the time. There is no suggestion that the firm Eberle Berlin is liable to Taylor for any reason apart from the acts of Riley and Turnbow. Defendants Riley and Turnbow[1] signed an opinion letter issued on Eberle Berlin letterhead and addressed to Taylor. The letter opines, in essence, that the transaction was legal and the documents constituted a valid, binding obligation of AIA. The transaction closed in August 1995. AIA defaulted almost immediately. Taylor and AIA entered into negotiations which resulted in a Stock Redemption Restructure Agreement dated July 1, 1996. By its terms the restructure agreement superseded the Stock Redemption Agreement. Under the restructure agreement the $6,000,000 note continued in force. The Note matured on August 1, 2005. When the Note was not paid, Taylor filed suit in Nez Perce County in January 2007 against AIA, its subsidiary AIA Insurance, and several officers, directors, and employees of AIA, together with their spouses. In the course of that lawsuit, the stock redemption agreement was found by the trial court to be illegal. The ruling was upheld on appeal. *Taylor v. AIA Services Corp.*, 151 Idaho 52, 261 P.3d 829 (2011).

Meanwhile, Taylor sued Defendant Riley and his new firm, Hawley Troxell, along with others, in Nez Perce County for activities undertaken by them in representing defendants in the

---

[1] Defendant Turnbow is recently deceased and his estate is represented by Sharon Cummings.

**MEMORANDUM OPINION AND ORDER RE: DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT AND RECONSIDERATION AND PLAINTIFF'S MOTION FOR RECONSIDERATION – PAGE 2**

Exhibit - P

AIA case. That case was dismissed by the trial court and upheld on appeal. *Taylor v. McNichols,* 149 Idaho 826, 243 P.2d 642 (2010). In the present case, filed in October 2009, Taylor sued Riley, Turnbow, Eberle Berlin, and Hawley Troxell. This Court issued partial summary judgments in favor of defendants in May of 2010 and April 2012 which dismissed some of Taylor's claims but allowed his negligence claim to remain.

On August 15, 2012 Riley filed the current motion for summary judgment based on the arguments that plaintiff's negligence claim is barred by *res judicata*; plaintiff waived the current claim when he signed the 1996 restructure agreement; plaintiff caused the current harm to himself because he changed the facts on which the Opinion Letter was based when monies owed to his former spouse were subordinated to the note; and under *Harrigfeld v. Hancock,*[2] Reed Taylor lacks standing to sue Riley. Defendants Cummings and Eberle Berlin joined in this motion and filed their own motion for summary judgment based on many of the same arguments. Defendants also filed for reconsideration of this court's earlier decision that plaintiff was owed a duty of due care by defendants when they authored the opinion letter. This motion is based on the argument that subsequent cases citing *Harrigfeld*, stand for the proposition that outside the estate context a lawyer owes no duty to one not a client. Consequently Defendants owed no duty to Mr. Taylor. Defendants Cummings and Eberle Berlin also filed a third motion for summary judgment based on the argument that the 1996 redemption restructure agreement supersedes the 1995 Agreement. They joined Riley's summary judgment motion based on res judicata and the subordination between the plaintiff and his former spouse. In response to the Defendants' motions, Mr. Taylor filed his opposition, motion to reconsider the decision on the accrual date of his cause of action, and a motion to permit him to pursue alternative and/or additional claims

---

[2] 140 Idaho 134, (2004),

**MEMORANDUM OPINION AND ORDER RE: DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT AND RECONSIDERATION AND PLAINTIFF'S MOTION FOR RECONSIDERATION – PAGE 3**

Exhibit - P

against the defendants. The hearing for all of these motions was held on September 13, 2012. Taylor's motion to allow pursuit of alternative and/or additional claims was withdrawn at the hearing. The theories and arguments of the defendant's motions overlap in many respects so they will be treated together.

## I. DISCUSSION

Any party may move for full or partial summary judgment during the pendency of the case, with or without supporting affidavits. I.R.C.P. 56(a), (b). A party opposing summary judgment may, but is not required to, file affidavits in opposition to summary judgment. Supporting and opposing affidavits are to be made "on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." I.R.C.P. 56(e).

Summary judgment is proper if "the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." I.R.C.P 56(c). Disputed facts should be construed in favor of the non-moving party, and all reasonable inferences that can be drawn from the record are to be drawn in favor of the non-moving party. *Armstrong v. Farmers Ins. Co. of Idaho*, 147 Idaho 67, 69, 205 P.3d 1203. When a party moves for summary judgment on an affirmative defense, the party asserting the defense bears the "burden of demonstrating the absence of a genuine issue of fact material to... [the] defense." *Mason v. Tucker and Associates*, 125 Idaho 429, 437, 871 P. 2d 846 (Ct. App. 1994).

### 1. Motions for Summary Judgment
#### a) *Res Judicata*

The doctrine of *res judicata* covers both claim preclusion (true *res judicata*) and issue preclusion (*collateral estoppel*). *Hindmarsh v. Mock*, 138 Idaho 92, 94, 57 P.3d 803, 805 (2002).

**MEMORANDUM OPINION AND ORDER RE: DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT AND RECONSIDERATION AND PLAINTIFF'S MOTION FOR RECONSIDERATION – PAGE 4**

Exhibit - P

Claim preclusion bars a subsequent action between the same parties upon the same claim or upon claims "relating to the same cause of action ... which might have been made." *Id.* Issue preclusion protects litigants from litigating an identical issue with the same party or its privy. *Rodriguez v. Dep't of Corr.*, 136 Idaho 90, 92, 29 P.3d 401, 403 (2001). Riley urges that Taylor's malpractice claim[3] is barred under true *res judicata* – claim preclusion.

Claim preclusion entails three requirements to bar a subsequent action: (1) same parties or their privies; (2) same claim; and (3) final judgment. *Ticor Title Co. v. Stanion*, 144 Idaho 119, 124, 157 P.3d 613, 618 (2007); *Diamond v. Farmers Group, Inc.*, 119 Idaho 146, 804 P.2d 319 (1990). Same claim includes not only "the matters offered and received to defeat the claim, but also as to 'every matter which might and should have been litigated in the first suit.'" *Ticor Title Co. v. Stanion*, at 126, 157 P.3d at 620 (citing *Magic Valley Radiology, P.A. v. Kolouch*, 123 Idaho 434, 437, 849 P.2d 107, 110 (1993) (Magic Valley III). Thus, "when a valid, final judgment is rendered in a proceeding, it extinguishes all claims arising out of the same transaction or series of transactions out of which the cause of action arose." The transactional concept of a claim is broad and claim preclusion may apply even where there is not a substantial overlap between the theories advanced in support of a claim, or in the evidence relating to those theories. "Whether a factual grouping constitutes a transaction is to be determined pragmatically, giving weight to such considerations as whether the facts are related in time, space, origin, or motivation, whether they form a convenient trial unit, and whether their

---

[3] This Court and the parties refer, somewhat loosely, to the negligence claim that survives as the "malpractice claim." Strictly speaking, the elements of attorney malpractice as outlined by our Supreme Court require that the claimant prove the existence of an attorney-client relationship in addition to the elements of an ordinary negligence action. *Compare Jones v. Starnes*, 150 Idaho 257, 245 P.3d 1009 (2011) with *Lamb v. Manweiler*, 129 Idaho 269, 923 P.2d 976 (1996). In the present case this Court held the attorneys have a duty to plaintiff notwithstanding the lack of attorney client relationship.

**MEMORANDUM OPINION AND ORDER RE: DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT AND RECONSIDERATION AND PLAINTIFF'S MOTION FOR RECONSIDERATION – PAGE 5**

Exhibit - P

treatment as a unit conforms to the parties' expectations or business understanding or usage." Section 24, Restatement (Second) of Torts as quoted in *Diamond v. Farmers Group, Inc.* 119 Idaho 146, 150, 804 P.2d 319, 323 (1990).

In the current case, Defendants assert that the malpractice claim should have, and could have, been brought in August of 2008 when Mr. Riley brought suit against Richard Riley and others in *Taylor v. Babbitt*, et. al, CV-2008-01765. Eberle Berlin and Turnbow were not previous parties in *Taylor v. Babbitt* case but nonetheless claim the benefit of *res judicata* to defeat Taylor's claim. They state, without discussion or citation to authority that "to the extent that Taylor's claim is barred against Defendant Riley, it is similarly barred against Defendants Turnbow and Eberle Berlin.

*Babbitt* arose out of Richard Riley's and others' defense in the trial court of AIA in *Taylor v. AIA*, 261 P. 3d 829 (2011) and the contemporaneous defense of AIA and John Taylor. Judge Brudie put it best when he wrote, "the gravamen of [Reed Taylor's] Complaint is that Defendants aided and abetted John Taylor and others in committing torts against Reed Taylor and acted to deprive Reed Taylor of money and property to which he is entitled" in 2007. At this point, Reed Taylor believed that his stock redemption agreement was legal and fully enforceable.

Riley maintains that since *Babbitt* was related to the stock redemption agreement, Taylor should be barred from asserting the current suit, since it is also relates to the stock redemption agreement through the 1995 opinion letter. Riley emphasizes statements made in Taylor's complaint and attempted amended complaint in *Babbitt* that referred to the opinion letter. The factual grouping that constitutes a transaction in *Babbitt*, is the thwarted efforts of Reed Taylor to gain control of AIA and collect the money due on the note. Reed Taylor was suing Riley and the other attorneys for their behavior in representing John Taylor and AIA in that action. His

**MEMORANDUM OPINION AND ORDER RE: DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT AND RECONSIDERATION AND PLAINTIFF'S MOTION FOR RECONSIDERATION – PAGE 6**

Exhibit - P

references to the opinion letter were in the context of his unsuccessful effort to convince Judge Brudie that he had a tort cause of action for the lawyer conduct in *Babbitt*. He was claiming that Riley's new firm, Hawley Troxell, and its lawyers owed a duty to not represent AIA or John Taylor because Riley earlier represented Reed Taylor in authoring the opinion letter. While the opinion letter played a role in the AIA suit and in *Babbitt*, the issuance of the opinion letter arose from an entirely separate set of facts and circumstances.

In this case, factual grouping that constitutes the transaction is the issuance of the opinion letter and events surrounding its issuance. This is 10 years remote in time from the events that led to the *Babbitt* case. The claim originates in Turnbow's and Riley's alleged malpractice in drafting the 1995 opinion letter. This is wholly unrelated to the alleged conduct in Babbitt. The two cases do not form a convenient trial unit. While they may have overlapping witnesses, the testimony in *Babbitt*, had it gone to trial, would focus on the events in 2007 and 2008 regarding Taylor's suit against AIA and the steps AIA took to defend that suit. The testimony in this case, if it goes to trial, will be focused on the events surrounding the negotiation of the stock redemption and issuance of the opinion letter. The events that led to the filing of the AIA litigation and the outcome of the AIA litigation will certainly figure in the present case, but the conduct of the attorneys as such in the AIA litigation is not relevant to the present action. The opinion letter was not central, or even important, in the outcome in *Babbitt*. What Mr. Riley did, or did not do, while drafting the 1995 opinion letter has nothing to do with him helping John Taylor and AIA commit torts in 2007. Although, this current case and Babbitt have a common tie in the 1995 stock redemption agreements, the two cases deal with wholly separate transactions.

In summary, the *Babbitt* case and current case are not sufficiently related in time, space, origin, motivation or trial evidence to arise from the same transaction. Because the two cases do

**MEMORANDUM OPINION AND ORDER RE: DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT AND RECONSIDERATION AND PLAINTIFF'S MOTION FOR RECONSIDERATION – PAGE 7**

Exhibit - P

not arise out of the same transaction or related transaction, Taylor's claim against Riley is not barred by *res judicata* (claim preclusion).

### b) 1996 Agreement as Waiver

Riley, Eberle Berlin, and Turnbow all argue that Taylor waived any claim to sue the defendants based on the 1995 opinion letter when he entered into the 1996 Stock Restructure Agreement ("1996 agreement"). The 1996 agreement superseded the 1995 agreement. By its terms the 1996 agreement provides that it supersedes and replaces the 1995 agreement. When Taylor sued AIA he sued on the 1996 restructure agreement, not the 1995 agreement. The 1996 agreement contains provisions expressly waiving certain claims arising out of AIA's default on the 1995 agreement. *See* Stock Redemption Restructure Agreement ¶4.3. The parties to the 1996 agreement were AIA Services Corporation, Reed Taylor, and Donna Taylor. Riley, Turnbow and Eberle Berlin were not parties to the contract and not mentioned in the contracts waiver provision. Reed Taylor and Donna Taylor's waived claims against AIA, not claims against the defendants in the current suit. Reed Taylor's express waiver in the 1996 agreement did not waive attorney malpractice claims against Riley, Turnbow, and Eberle Berlin because they were not the parties to that agreement. The case cited by defendants, *Isaak v. Idaho First Nat. Bank* 119 Idaho 988, 812 P.2d 295 (Ct. App.1990), simply does not apply.

Defendants argue the 1995 opinion letter ceased to apply because there was nothing to which it could apply after restructure of the agreement in 1996. Defendants overlook the promissory note. When Judge Brudie found the redemption illegal, this necessarily included a finding that the promissory note was illegal. The 1995 letter opines, among other things, that the transaction documents, including the promissory note, are enforceable according to their terms. The promissory note was not superseded or replaced, but continued in effect. Just as there is no opinion letter addressed to the 1996 transaction, there is nothing withdrawing the opinion as it

**MEMORANDUM OPINION AND ORDER RE: DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT AND RECONSIDERATION AND PLAINTIFF'S MOTION FOR RECONSIDERATION – PAGE 8**

Exhibit - P

relates to the promissory note. In *Taylor v. AIA Services Corporation*, 151 Idaho 552, 261 P. 3d 829 (2011) the Idaho Supreme Court upheld Judge Brudie's determination that the stock redemption was illegal. The Supreme Court characterized the 1996 agreement as only a restructure of the payment of the 1995 agreement because the 1996 agreement did not itself provide for repurchasing shares. *Id.*, 151 Idaho 552, 559, 261 P.3d 829, 836 (2011). At the time of the 1996 agreement the shares had already been redeemed. The claimant this case is that the plaintiff tendered his shares for redemption based upon the 1995 opinion letter. The 1996 agreement did not attempt to undo that transaction. This argument by defendants is actually a disguised argument that the opinion letter did not cause plaintiffs damage. Causation is discussed more fully below.

Finally, the 1996 agreement, which included the wavier, grew out of the illegal 1995 agreement. The 1996 agreement is void as a document in furtherance of the illegal 1995 agreement. To give effect to the 1996 agreement would be to give effect to the 1995 agreement. In other words, the 1996 agreement is carrying out the illegal redemption of Reed Taylor's stock. If the stock redemption is illegal, and the Idaho Supreme Court said it is, then the 1996 agreement is illegal. The 1996 agreement cannot effectively waive any causes of action. Even if the waiver was in reference to the defendants and the current malpractice claim, it would not be effective, because it is void.

The defendants also argue that since Taylor signed the 1996 agreement, and the defendants did not write an opinion letter for the 1996 agreement, that the 1996 agreement was the agreement that caused Taylor's injury. In a legal malpractice action, one of the key elements that a plaintiff must prove is the attorney's action was a "proximate cause of the injuries suffered by the client." *Marias v. Marano*, 120 Idaho 11, 13, 813 P. 2d 350, 352. "Proximate cause consists of two factors, cause in fact and legal responsibility." *Id.* Proximate cause is a cause

**MEMORANDUM OPINION AND ORDER RE: DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT AND RECONSIDERATION AND PLAINTIFF'S MOTION FOR RECONSIDERATION – PAGE 9**

Exhibit - P

which, "in natural and probable sequence, produced the complained injury, loss or damage, and but for that cause the damage would not have occurred...It is sufficient if it is a substantial factor in bringing about the injury, loss or damage." *Id.*

In this case, the Taylor's signing the 1996 agreement did not relieve the defendants from being the proximate cause of his injuries as a matter of law. A jury could certainly find that if Taylor had not entered into the 1995 agreement, then he would have entered into the 1996 agreement. In fact, had Taylor not entered into the 1995 agreement there could not be a 1996 agreement because the 1996 agreement presupposes the stock redemption that occurred in 1995. Taylor claims he relied on the defendants' advice in entering into the 1995 agreement. When AIA couldn't pay on the 1995 agreement a jury could certainly conclude restructuring the payment under the 1996 agreement was part of the "natural and probable sequence," of events arising from issuance of the opinion letter. Merely because the defendants did not write an opinion letter for the 1996 agreement, does not insulate them from being found to be the proximate cause of Taylor's injuries.

### c) *Agreement Subordinating Payment for Preferred Stock As in Eliminating Negligence Claim*

In 2006 Reed Taylor entered into an agreement with his ex-wife subordinating payment of her preferred stock to payment of his promissory note. This reversed what had been the circumstance before the agreement. Defendants argue that this fundamentally changed the underlying facts upon which the opinion letter was based. Defendants argue that the result of this agreement was to cause Reed Taylor's note become due and payable where it otherwise would not have been. According to defendants this stripped the 1995 agreement of the protection

**MEMORANDUM OPINION AND ORDER RE: DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT AND RECONSIDERATION AND PLAINTIFF'S MOTION FOR RECONSIDERATION – PAGE 10**

Exhibit - P

of the "fail-safe clause." The unenforceability of the 1995 stock redemption agreement was caused, according to defendants, by the loss of this protection.[4]

The subordination agreement between Donna Taylor and Reed Taylor is irrelevant. Judge Brudie determined that the stock redemption agreement was illegal because AIA Services had no earned surplus at the time the 1995 agreement was signed. The agreement was already in violation of Idaho Law, despite any later subordination agreement. See *Taylor v. AIA*, 151 Idaho 552, 559-560. Idaho Code § 30-1-6, as in force at the time, provided that a corporation can only repurchase its shares with "earned surplus;" with "capital surplus" if allowed by the articles of incorporation; or with a shareholder vote specifically addressing use of capital surplus to redeem stock. Since none of these conditions were met at the time the parties signed the 1995 repurchase agreement, at the moment the agreement was signed, it violated I.C. §30-1-6. The Supreme Court in its opinion affirming Judge Brudie makes the point that the existence of the qualifying condition is determined at the time of the agreement to redeem the stock.

> Nothing in I.C. § 30–1–6 suggests that the timing of payment has any bearing on the statute's applicability, and given the statute's purpose, it would be an absurd result to allow a corporation to get around these restrictions by simply paying on a later date.
> *Taylor v. AIA Services Corp.* 151 Idaho 552, 563, 261 P.3d 829, 840 2011)

Simply put, the agreement made between Reed Taylor and his ex-wife in 2006 had nothing to do with the finding that the redemption agreement was illegal. The 2006 subordination agreement could not relieve the defendants of any liability they have for issuance of the 1995 opinion letter.

---

[4] Defendants overlooked that portion of Judge Brudie's decision that notes the preferred stock was to have been retired within 10 years from 1995. This calls into question the underlying assumption of this argument that Reed Taylor's note was not otherwise due.

**MEMORANDUM OPINION AND ORDER RE: DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT AND RECONSIDERATION AND PLAINTIFF'S MOTION FOR RECONSIDERATION – PAGE 11**

Exhibit - P

### d) *Harrigfeld Revisited*

This Court previously ruled, in its Memorandum Decision of May 10, 2010, that although there was no attorney client-relationship between the defendants and the plaintiff, the defendants, nevertheless, owed the plaintiff a duty in tort. Defendants now ask the Court to revisit its earlier determination based on the two cases that have been decided since that ruling. The defendants argue that *Taylor v. McNichols*, 149 Idaho 826, 243 P. 3d 642 (2010) and *Soignier v. Fletcher*, 151 Idaho 322, 256 P. 3d 730 (2011) strongly reaffirm prior holdings of the Supreme Court that an attorney owes no duty to one not the attorneys client. The sole exception previously recognized has been that "an attorney preparing testamentary instruments owes a duty to the beneficiaries named or identified therein to prepare such instruments, and if requested by the testator to have them properly executed, so as to effectuate the testator's intent as expressed in the testamentary instruments." *Harrigfeld v. Hancock* 140 Idaho 134, 138, 90 P.3d 884, 888 (2004). If the only exception to the rule that an attorney is not liable to anyone not the attorneys client is as stated in *Harrigfeld*, then Reed Taylor has no claim against these defendants because Reed Taylor was not their client.

Defendants make the argument that no cases since the decision in *Harrigfeld* have recognized any other exception, therefore no exception should be recognized here. They suggest that the Supreme Court in *Taylor v. McNichols*[5] expressly declined an invitation by Reed Taylor to expand the universe of persons entitled to sue a lawyer beyond the lawyer's clients. In that case Reed Taylor was attempting to sue the attorneys for the opposing party in his lawsuit on the theory that he was a third party beneficiary of the attorney-client contract. "…. it is incredulous that Reed would attempt to assert that attorneys hired by the AIA Entities, to fight off Reed's

---

[5] Defendants note in passing that *Taylor v. McNichols* cites *Taylor v. Maile* 142 Idaho 253, 127P. 3d 156 (2005) is reaffirming the doctrine in *Harrigfeld*.

**MEMORANDUM OPINION AND ORDER RE: DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT AND RECONSIDERATION AND PLAINTIFF'S MOTION FOR RECONSIDERATION – PAGE 12**

Exhibit - P

litigation against those entities, were being retained for Reed's benefit." *Taylor v. McNichols,* 149 Idaho 826, 845, 243 P.3d 642, 661 (2010). While this is a reaffirmation of *Harrigfeld,* it is hardly a statement that there can be no other circumstance leading to attorney liability for negligence.

Whether a duty was owed to a non-client plaintiff was not a contested issue in *Soignier.* While the Court did discuss *Harrigfeld,* it was in the context of whether or not there was a breach of the attorney's duty.[6] The Idaho Supreme Court affirmed the district court's grant of summary judgment based on its finding that there was no breach of the attorney's duty, not that there was no duty. *Soignier* does not impact this Court's earlier finding that the defendants owed a duty to plaintiff. Again, it is hardly a statement that there can be no other circumstance leading to attorney liability for negligence.

Defendants strenuously argue that if any court is going to change existing case law in this state, then it is up to the Idaho Supreme Court not the trial courts. This Court does not disagree. The difference is in the framing of the question presented. As this Court discussed in its earlier opinion, the Court views this not as a change in Idaho law, but an issue of first impression not previously decided by our appellate courts. When that circumstance presents itself it is up to the trial court to determine as best it can how the Idaho Supreme Court would rule based on existing cases and reasoning. The general rule of no liability to a non-client as announced in *Harrigfeld* is based in large part on the notion that the scope of the duty owed by the attorney is defined by the contract between attorney and client as to what is being undertaken. This is bolstered by the

---

[6] "There are four elements to a legal-malpractice claim: (1) there is an attorney-client relationship between the plaintiff and defendant; (2) the defendant lawyer owed a duty of care to the plaintiff; (3) the lawyer breached the duty; and (4) the lawyer's negligence was a proximate cause of the client's damage. Johnson v. Jones, 103 Idaho 702, 706, 652 P.2d 650, 654 (1982). Here, *the parties do not dispute that the first two elements are present in this case.*" *Soignier v. Fletcher,* 151 Idaho 322, 324, 256 P.3d 730, 732 (Idaho,2011) (emphasis added).

**MEMORANDUM OPINION AND ORDER RE: DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT AND RECONSIDERATION AND PLAINTIFF'S MOTION FOR RECONSIDERATION – PAGE 13**

Exhibit - P

strong policy that the attorney should be free to give advice and perform work, including the drafting of documents, to the client without fear of liability to a third party. This, in turn, is grounded in the strong policy in Idaho that the attorney's loyalty should be to the client and no one else.[7] Another underlying principle limiting third party liability is a concern that there could be a large, unpredictable class of persons purporting to rely on advice rendered by the lawyer. This could lead to virtually unlimited liability.

In the case of an opinion letter, such as we have here, those concerns do not prevail. The lawyer issuing the letter is specifically aware of the reliance by the non-client. The universe of potential injured parties is limited to those to whom the letter is addressed. The rule proposed by defendants is tantamount to a grant of Immunity to the attorney.

This Court continues to adhere to the earlier decision. The motion for summary judgment is denied.

### 2. Plaintiff's Motion to Reconsider:

Plaintiff requests this Court to reconsider its determination on the commencement of the running of the statute of limitations. In an earlier opinion denying Defendants' motion for summary judgment, this court decided the statute commenced running when the issue of the legality of the 1995 transaction was first questioned. This reconsideration is requested to support some of the arguments made by Plaintiff in his opposition to the current motion for summary judgment. The request by plaintiff is probably better characterized as a motion to reconsider the Court's reasoning rather than the decision itself. The court declines to do so and adheres to the earlier decision.

---

[7] "The attorney's duty to his or her client must remain paramount." *Harrigfeld v. Hancock,* 140 Idaho 134, 139, 90 P.3d 884, 889 (2004).

**MEMORANDUM OPINION AND ORDER RE: DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT AND RECONSIDERATION AND PLAINTIFF'S MOTION FOR RECONSIDERATION – PAGE 14**

Exhibit - P

**3. Plaintiff's Motion to Pursue Alternative And/or Additional Claims.**

As stated above this motion was withdrawn at the hearing.

## III. CONCLUSION

Defendants' motions for summary judgment are denied. Defendant's motion for reconsideration is denied. Plaintiffs motion for reconsideration is denied.

IT IS SO ORDERED.

Dated this ____ day of October, 2012.

Richard D. Greenwood
District Judge

MEMORANDUM OPINION AND ORDER RE: DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT AND RECONSIDERATION AND PLAINTIFF'S MOTION FOR RECONSIDERATION – PAGE 15

Exhibit - P

## CERTIFICATE OF MAILING

I hereby certify that on this _____ day of October, 2012, I mailed (served) a true and correct copy of the within instrument to:

RODERICK C BOND
RODERICK BOND LAW OFFICE, PLLC
800 BELLEVUE WAY NEW, SUITE 400
BELLEVUE, WA 98004

MICHAEL D. GAFFNEY
BEARD ST. CLAIR GAFFNEY PA
2105 CORONADO ST.
IDAHO FALLS, ID 83404-7495

JACK S. GJORDING
GJORDING & FOUSER, PLLC
121 NORTH 9TH ST., SUITE 600
PO BOX 2837
BOISE, ID 83701-2837

JAMES D. LARUE
ELAM BURKE
251 E. FRONT ST., SUITE 300
PO BOX 1539
BOISE, ID 83701-1539

CHRISTOPHER D. RICH
Clerk of the District Court
Ada County, Idaho

Date: _____      By _____
                                          Deputy Clerk

**MEMORANDUM OPINION AND ORDER RE: DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT AND RECONSIDERATION AND PLAINTIFF'S MOTION FOR RECONSIDERATION – PAGE 16**

Exhibit - P

RODERICK C. BOND, ISB No. 8082
MICHAEL S. BISSELL, ISB No. 5762
CAMPBELL, BISSELL & KIRBY, PLLC
7 South Howard Street, Suite 416
Spokane, WA 99201
Tel: (509) 455-7100
Fax: (509) 455-7111

Attorneys for Plaintiff-Petitioner Donna J. Taylor

IN THE DISTRICT COURT OF THE SECOND JUDICIAL DISTRICT OF THE STATE OF
IDAHO, IN AND FOR THE COUNTY OF NEZ PERCE

| | |
|---|---|
| DONNA J. TAYLOR, an individual;<br><br>Plaintiff-Petitioner,<br><br>v.<br><br>AIA SERVICES CORPORATION, an Idaho corporation;<br><br>Defendant-Respondent. | Case No.: CV 09-02470<br><br>FIRST AMENDED VERIFIED COMPLAINT/PETITION FOR DAMAGES, FOR DECLARATORY RELIEF, AND FOR APPOINTMENT OF A RECIEVER FOR AIA SERVICES CORPORATION |

Plaintiff-Petitioner Donna J. Taylor ("Donna Taylor"), by and through her attorneys of record, Campbell, Bissell & Kirby, PLLC, submits this Verified First Amended Complaint/Petition requesting the following relief:

## I.  FACTUAL BACKGROUND

1.     Plaintiff-Petitioner Donna J. Taylor is a resident of Clarkston, Asotin County, Washington.

2.     Defendant-Respondent AIA Services Corporation ("AIA Services"), a closely held Idaho corporation, with its principal place of business located in Lewiston, Nez Perce County, Idaho.  AIA Insurance, Inc. ("AIA Insurance") is a wholly owned subsidiary of AIA Services, with its principal place of business being located in Lewiston, Nez Perce County,

FIRST AMENDED COMPLAINT - 1

Exhibit - Q

Idaho.

3.      Jurisdiction and venue are appropriate in the Second Judicial District of Nez Perce County District Court in Nez Perce County, Idaho as AIA Services is an Idaho corporation with its principal place of business located in Lewiston, Nez Perce County, Idaho.

4.      Donna Taylor is the sole Series A Preferred Shareholder in AIA Services. Donna Taylor is also the beneficial owner of one-half of the 18,593 common shares in AIA Services owned by the estate of Sara Taylor.[1]

5.      Under the terms of AIA Services' Amended Articles of Incorporation, the Amended Articles may not be further amended or modified without the express written consent of the majority holders of the Series A Preferred Shares in AIA Services; and Donna Taylor, the sole Series A Preferred Shareholder, has never provided such consent.

6.      Under the terms of AIA Services' Amended Articles of Incorporation, Donna Taylor is required to be a member of the board of directors of AIA Services until all of her shares are redeemed. Despite demands by Donna Taylor's law firm, she has not been appointed to the board of AIA Services for years.

7.      Under the terms of certain letter agreements and the later executed Series A Preferred Shareholder Agreement, Donna Taylor was required to have all of her preferred shares in AIA Services redeemed no later than 2004. Donna Taylor is presently owed over $430,000 for the Series A Preferred Shares held by her in AIA Services, which such amount should have been paid in full and was required to be paid in full in or before 2004. AIA Services ceases all payments to Donna Taylor in 2008.

8.      From 1995 to the present, R. John Taylor ("John Taylor"), James Beck, Michael Cashman, Connie Taylor, JoLee Duclos, Bryan Freemen and/or other individuals (collectively

---

[1] Reed Taylor is the beneficial owner of the other one-half of the common shares.

FIRST AMENDED COMPLAINT - 2

Exhibit - Q

"Responsible Individuals") have engaged in unlawful acts utilizing the assets, trade secrets, business opportunities, funds, employees and other assets of AIA Services and AIA Insurance for the benefit of themselves and entities in which they hold substantial ownership interests.

9.      Under the terms of AIA Services' Amended Articles of Incorporation, AIA Services and its subsidiaries may not make or guarantee any loans to any entities not controlled by them. By and through John Taylor and the Responsible Parties, AIA Insurance guaranteed a $15,000,000 line-of-credit for CropUSA Insurance Agency, Inc. ("CropUSA") without receiving any compensation or benefit and in violation of AIA Services' Amended Articles of Incorporation. John Taylor and the Responsible Individuals are the majority shareholders in CropUSA.

10.     Under the terms of AIA Services and AIA Insurance's Amended Bylaws, the corporations' boards of directors are required to hold annual shareholder meetings to elect board members. AIA Services and AIA Insurance have not held annual shareholder meetings to elect directors for over five years.

11.     For over five years, the purported board of directors and officers of AIA Services has failed to provide any financial information to AIA Services' shareholders.

12.     John Taylor, Connie Taylor, and James Beck are the purported board members of AIA Services and AIA Insurance and have been the purported board members since 2007. John Taylor has been a purported board member of AIA Services for many years (including, without limitation, from 1995 to the present time). Any references to actions taken by them as board members does not constitute Donna Taylor's waiver that they have never been properly elected as board members of AIA Services or AIA Insurance.

13.     John Taylor has been a member of the board of Avista Corporation since 1985.

FIRST AMENDED COMPLAINT - 3

Exhibit - Q

John Taylor obtained this position by and through his employment with AIA Services. John Taylor is also an attorney licensed to practice law in the state of Idaho and he has been licensed as an attorney in the state of Idaho for over 20 years. John Taylor also has an accounting degree and briefly worked as an accountant. As a result, John Taylor is well versed with the law and the fiduciary duties owed to a corporation and its shareholders. John Taylor has intentionally breached his fiduciary duties to AIA Services, AIA Insurance and their shareholders. In his Avista Corporation bio on the corporation's website, John Taylor admits that he formed CropUSA and that he is Chairman of the Board of Pacific Empire Radio Corporation.

14. Connie Taylor is also an attorney licensed to practice law in the state of Idaho and she has been licensed in Idaho for over fifteen years. As a result, like John Taylor, Connie Taylor is well versed with the law and fiduciary duties owed to corporations and their shareholders. Connie Taylor, like John Taylor, has intentionally breached her fiduciary duties owed to AIA Services, AIA Insurance and their shareholders.

15. By the admission of John Taylor and other Responsible Individuals, AIA Services has not held annual shareholder meetings for over five years.

16. From 1995 to the present time, John Taylor and the Responsible Individuals have engaged in many acts that have violated the conflict of interest provisions set forth in AIA Services' Amended Articles of Incorporation and Amended Bylaws.

17. From 1995 to the present time, AIA Services and/or AIA Insurance have invested and lent hundreds of thousands of dollars to Pacific Empire Radio and Pacific Empire Communications, entities partially owned by John Taylor and Connie Taylor. All such loans were in violation of AIA Services' Amended Articles of Incorporation. AIA Services and/or AIA Insurance also invested hundreds of thousands of dollars in Pacific Empire Radio and

FIRST AMENDED COMPLAINT - 4

Exhibit - Q

Pacific Empire Communications and all such shares have been transferred to John Taylor and Connie Taylor. Even if the shares had not been transferred to John Taylor and Connie Taylor, the investments and loans were not in the best interests of AIA Services and AIA Insurance.

18. In 1995, John Taylor entered into an Executive Officer's Agreement with AIA Services after redeeming Reed Taylor's shares. Under the terms of the Executive Officer's Agreement, John Taylor was prohibited from operating any businesses that competed with AIA Services (selling insurance products) and from soliciting any employees from AIA Services and AIA Insurance, among other obligations. John Taylor has intentionally breached the terms of the Executive Officer's Agreement to the detriment of AIA Services and AIA Insurance.

19. From 1995 to the present time, John Taylor has paid himself and Connie Taylor millions of dollars in funds, assets, benefits and compensation from AIA Services and AIA Insurance, including, without limitation, during times in which John Taylor was intentionally breaching his Executive Officer's Agreement and fiduciary duties owed to AIA Services and AIA Insurance, among other obligations and the commission of torts.

20. From 1995 to the present time, John Taylor and Responsible Individuals have redeemed over $650,000 in common shares when Donna Taylor's Preferred A Shares had priority over such shares and when such funds should have been paid to redeem Donna Taylor's Preferred A Shares or otherwise be used for the benefit of AIA Services.

21. From 1995 through 1997, John Taylor and Responsible Individuals paid over $650,000 in dividends to Series C Preferred Shares when Donna Taylor's Preferred A Shares had priority over such shares and when paying such dividends were not in the best interests of AIA Services.

22. In 1999, John Taylor formed CropUSA. At that time, CropUSA was called "AIA

FIRST AMENDED COMPLAINT - 5

## Exhibit - Q

Crop Insurance, Inc." However, AIA Crop Insurance's name was later changed to CropUSA. CropUSA executed a board resolution stating that AIA Services has declined to continue operating CropUSA as a subsidiary, even though there are no such resolutions in the board meeting minutes or resolutions for AIA Services or AIA Insurance.

23.    John Taylor advised Donna Taylor and others that CropUSA was a subsidiary of AIA Services and/or AIA Insurance. Despite being formed and operated using AIA Services and AIA Insurance's funds, assets, trade secrets, employees and other assets, CropUSA is majority owned by John Taylor and the Responsible Individuals. AIA Services and AIA Insurance have never owned any shares in CropUSA according to the corporation's stock register and John Taylor's testimony. Forming, operating and making the ownership of CropUSA in the name of John Taylor, the Responsible Individuals and other persons was not in the best interest of AIA Services and AIA Insurance and also violated AIA Services Amended Articles of Incorporation, AIA Services' Amended Bylaws, John Taylor's Executive Officer's Agreement, the corporate opportunity doctrine, and the law. John Taylor represented to certain individuals (including Donna Taylor) that CropUSA was owned by AIA, despite the evidence that AIA never owned any shares or part of CropUSA.

24.    AIA Services and/or AIA Insurance formed and operated Growers National at significant expense to AIA Services and/or AIA Insurance for the purpose of selling crop insurance. Through AIA Services and AIA Insurance's efforts, Growers National obtained the right from the U.S. government to offer dividends to members for the sale of crop insurance. Growers National was formed and operated using AIA Insurance's funds and significant contractual relations with various growers associations and co-ops. Despite these facts, the contract with Growers National was with CropUSA and not AIA Services or AIA Insurance.

FIRST AMENDED COMPLAINT - 6

Exhibit - Q

25.    In 2004, John Taylor and the Responsible Individuals inappropriately transferred $1,510,693 to CropUSA, which such transaction was called a "stock redemption" by John Taylor (and which John Taylor advised AIA's CFO the shares should be canceled), although he later referred to the transaction as an "investment." Even today, AIA Insurance represents the value of its alleged investment in AIA Services (its parent corporation) as being worth $1,510,693 against the recommendation of AIA Insurance's auditors. The true worthless value of the Preferred C Shares held by AIA Insurance after the purported "investment" is demonstrated by the fact that the full value of the $1,510,693 alleged investment is eliminated on AIA Services' consolidated financial statements.

26.    In 2001, John Taylor and the Responsible Individuals issued hundreds of thousands of common shares in AIA Services to certain Responsible Individuals and others when they had not complied with their contractual obligations to guarantee a $1,000,000 loan for AIA Services (which was the consideration to be awarded the right to acquire the shares in the first place). In addition, John Taylor and the Responsible Individuals engaged in inappropriate acts of converting certain Responsible Individuals and other parties' Series C Preferred Shares in AIA Services into commons shares of CropUSA without shareholder approval or consent. John Taylor, through written letters, referred to this transaction as an "exit strategy" for certain Responsible Individuals and other investors in AIA Services who received preferential treatment to the detriment of AIA Services, its shareholders and its creditors.

27.    In 2001, John Taylor and Connie Taylor purchased a parking lot that was located near AIA Insurance's offices using AIA Insurance's line-of-credit. Shortly after purchasing the parking lot, John Taylor substantially increased the rent paid for the parking lot to $15,000 per year when such rent was not in the best interests of the corporations and a violation of AIA

FIRST AMENDED COMPLAINT - 7

Exhibit - Q

Services' Bylaws and fiduciary obligations owed by John Taylor and Connie Taylor to AIA Services and AIA Insurance. The yearly rent of $15,000 exceeded the purchase price paid for the parking lot. The parking lot should have been purchased by AIA Services or AIA Insurance and no rent paid. Instead, John Taylor and/or Connie Taylor have received over $60,000 in rent for a parking lot that should be owned by AIA Services or AIA Insurance and when such funds should have been used to pay creditors and preferred shareholders.

28.     In 2005, John Taylor and certain Responsible Individuals issued John Taylor 450,000 shares of common stock in AIA Services pursuant to John Taylor's Executive Officer's Agreement, which was the same agreement that John Taylor had not complied with his contractual obligations owed to AIA Services, including, without limitation, John Taylor's obligation to not compete with AIA or to solicit any of its employees.

29.     John Taylor and certain Responsible Individuals also issued hundreds of thousands of dollars in Series C Preferred Shares in AIA Services to its 401(k) plan. John Taylor and the Responsible Individuals transferred $1,510,693 to CropUSA to redeem/purchase Series C Preferred Shares when they were obligated under AIA Services' Amended Articles of Incorporation to equally purchase/redeem from all shareholders holding Series C Preferred Shares in AIA Services. John Taylor admitted that the $1,510,693 was transferred to CropUSA because the corporation badly needed capital, even though he also testified that AIA Services and AIA Insurance had never owned any shares in CropUSA.

30.     In 2008, CropUSA sold assets for $10,000,000. AIA Services and AIA Insurance did not receive a single dollar from this asset sale. Instead and in addition, John Taylor received $10,000 per month for a purported consulting agreement/non-compete agreement with Hudson Insurance (the buyer of the $10,000,000 in assets from CropUSA), which such funds should have

FIRST AMENDED COMPLAINT - 8

# Exhibit - Q

been paid by John Taylor to AIA Services and/or AIA Insurance for the benefit of the corporations and their creditors and shareholders.

31.    On November 16, 2009, the Lewiston Tribune published a list of parties who had failed to pay property taxes for the year 2006. Included in the list were multiple entries of unpaid taxes owed by AIA Insurance totaling over $55,000. Under the terms of AIA Insurance's lease of the premises known as the Lewis-Clark Plaza, AIA Insurance is contractually obligated to timely and fully pay all property taxes on the Lewis-Clark Plaza. The mortgage on the Lewis-Clark Plaza was obtained by AIA Services from litigation funded by AIA Insurance involving AIA Services' former subsidiary The Universe. The failure to pay property taxes impacts the value of the Lewis-Clark Mortgage and results in a default in AIA Insurance's lease with Washington Bank Properties for premises located at the Lewis-Clark Plaza. AIA Services and AIA Insurance have not paid property taxes from 2006 to the present time in an amount believed to exceed $150,000.

32.    From its incorporation in 2000, through the present time, CropUSA was funded and operated using AIA Services and/or AIA Insurance's funds, employees, trade secrets, contractual relationships with various growers associations and co-ops, office space, equipment and other assets; and AIA Services and AIA Insurance have never been paid a profit or interest for all such loans and the use of such assets and millions of dollars of funds and unallocated expenses borne by AIA Services/AIA Insurance have not been paid back to the corporations. AIA Services and AIA Insurance have paid, and not been reimbursed for, hundreds of thousands of dollars, if not millions of dollars, in unallocated expenses paid for CropUSA for which AIA Services and AIA Insurance have not been reimbursed and will likely never be reimbursed

FIRST AMENDED COMPLAINT - 9

Exhibit - Q

because significant amounts of such expenses were never allocated and charged to CropUSA.[2]

33.    In 2008, John Taylor sold Pacific Empire Holdings to CropUSA for $240,000. Pacific Empire Holdings[3] was formed and operated using AIA Services and/or AIA Insurance's funds, employees, office space, trade secrets and other assets to sell general insurance policies. Like other corporations formed by John Taylor such as CropUSA, John Taylor was prohibited from operating businesses that sold insurance products under his Executive Officer's Agreement. However, such obligations did not stop John Taylor and when Pacific Empire Holdings was sold, no funds or benefit was given to AIA Services or AIA Insurance, despite the corporation being derived from AIA.

34.    On July 21, 2008, Donna Taylor served a derivative demand upon the purported boards of AIA Services and AIA Insurance demanding for the corporations to take action. Despite her derivative demand letter, John Taylor and the Responsible Individuals have failed to take any action and have instead taken specific action in protecting their own individual interests instead of protecting the interests of the AIA corporations, their creditors and their shareholders.

35.    AIA Services and AIA Insurance's only substantial businesses are comprised of running off commissions and servicing insurance policies issued and/or sold over 10 years ago, and John Taylor admitted that AIA's ability to sell proprietary insurance products had ended many years ago.    Thus, instead of rightfully using the corporate opportunity to sell crop insurance through AIA Services and AIA Insurance as represented to Donna Taylor and others and in business plans, the corporate opportunity to sell crop insurance was inappropriately given

---

[2] In all of the millions of dollars of funds and expenses paid for CropUSA by AIA Services and/or AIA Insurance which was purportedly repaid by CropUSA, John Taylor and the Responsible Individuals never charged any interest, profit or overhead to benefit AIA Services and/or AIA Insurance for such loans and advanced funds/services.
[3] To clarify, Pacific Empire Holdings was a different corporation from Pacific Empire Radio and Pacific Empire Communications (which are also discussed in this Complaint), with the latter two corporations owning radio station assets (some of which were derived from AIA such as KATW FM in Lewiston).

FIRST AMENDED COMPLAINT - 10

Exhibit - Q

to CropUSA, an entity not partially or wholly owned by AIA Services or AIA Insurance, to the detriment of the AIA corporations, their creditors and their shareholders.

36. John Taylor has borrowed over $307,000 from AIA Services and/or AIA Insurance for his and Connie Taylor's benefit and such indebtedness has not been paid to AIA Services and/or AIA Insurance. John Taylor and Connie Taylor have done nothing to secure this obligation or take action to the benefit of AIA Services for this $307,000+ debt, let alone make any interest payments or even permit interest to accrue on such debt.

37. During relevant times, John Taylor has been paid over $2,500,000 in compensation for doing little, if anything at all, for the benefit of AIA Services and AIA Insurance, while he transferred and misappropriated millions of dollars of AIA Services and AIA Insurance's assets, funds, trade secrets, business opportunities, loan guarantees, employees and other assets to his benefit and to the determinant of AIA Services and AIA Insurance's shareholders and creditors. John Taylor has been a faithless fiduciary.

38. Since John Taylor and the Responsible Individuals have been and are in control of AIA Services and AIA Insurance, they have failed to take legal action against John Taylor for the sums owed by him, for John Taylor's breaches of his Executive Officer's Agreement with AIA Services, and for the torts that John Taylor and the Responsible Individuals have committed against AIA Services, AIA Insurance and their shareholders.

39. Over the course of the past 8 years, John Taylor has utilized funds from AIA Services and/or AIA Insurance to purchase vehicles from him for his benefit and to the determinant of AIA Services, AIA Insurance, their shareholders and their creditors.

40. From 2007 to the present time, John Taylor and the Responsible Individuals have permitted AIA Services and AIA Insurance to pay directors $20,000 per year to serve on the

FIRST AMENDED COMPLAINT - 11

Exhibit - Q

boards of AIA Services and AIA Insurance when such directors have not complied with the corporations' Articles of Incorporation, Bylaws, conflict of interest laws, fiduciary duties and the law (including, without limitation, failing to hold annual shareholder meetings for the common shareholders to elect directors and failing to appoint Donna Taylor or her representative to the board of AIA Services as required under the Amended Articles of Incorporation). These directors are being paid $20,000 per year to look after their own interests and to ignore their fiduciary obligations owed to AIA Services, AIA Insurance, their creditors and their shareholders.

41.    From 1995 to the present, John Taylor has utilized AIA Services and/or AIA Insurance's employees, without compensation or payment to AIA Services/AIA Insurance, to perform services for his and Connie Taylor's residences and properties and other entities owned by John Taylor and the Responsible Individuals (including CropUSA, Pacific Empire Radio, Pacific Empire Communications, and Radio Leasing).

42.    From 1995 to the present time, John Taylor and/or JoLee Duclos have been the trustees of AIA Services' 401(k) plan to the detriment of the plan participants who hold shares in AIA Services in the plan. John Taylor and JoLee Duclos have failed in their duties to the 401(k) plan.

43.    From 1995 to the present, John Taylor and the Responsible Individuals have misappropriated millions of dollars of funds and assets belonging to AIA Services and AIA Insurance. AIA Services and AIA Insurance have not and are not paying their debts as they become due. AIA Services is insolvent by way of the acts of John Taylor and the Responsible Individuals or in imminent danger of insolvency. AIA Insurance is also insolvent by way of the acts of John Taylor and the Responsible Individuals or in imminent danger of insolvency.

FIRST AMENDED COMPLAINT - 12

Exhibit - Q

44.    From 1995 to the present time, John Taylor and the Responsible Individuals have entered into millions of dollars of loans, transactions, advancing of funds, payment of expenses for non-AIA persons and entities, and other transactions or business arrangements which were not arms-length transactions, not in the best interests of AIA Services or AIA Insurance, and which did not provide any benefit or profit for AIA Services or AIA Insurance.

45.    All of the acts referenced above are not the sole acts subjecting John Taylor and the Responsible Individuals to liability or which supports the appointment of a receiver for AIA Services. All of the acts referenced above were not in the best interest of AIA Services and/or its wholly owned subsidiary AIA Insurance and were not in the best interests of the preferred and common shareholders of AIA Services and its creditors. All of the acts referenced above have been taken to benefit John Taylor and/or the Responsible Individuals, to the detriment of, and not in the best interests of AIA Services, AIA Insurance, their shareholders and their creditors. John Taylor and the Responsible Individuals have not operated AIA Services and AIA Insurance as corporate entities, but instead as their alter-egos and for their own personal benefit and gain. All of the above-referenced acts and/or omissions constitute John Taylor and the Responsible Individuals' intentional breaches of fiduciary duties, fraud, conversion, and breach of obligations owed to AIA Services and/or AIA Insurance and/or the commission of torts against AIA Services, AIA Insurance, their creditors and their shareholders.

46.    As a result of the above-referenced acts and/or omissions, it appears unlikely that Donna Taylor or any other preferred shareholders and creditors of AIA Services would receive the funds owed to them unless a receiver is appointed to safeguard the corporation's assets and appropriate and warranted legal action is successfully prosecuted against John Taylor, the Responsible Individuals and other persons and entities.

FIRST AMENDED COMPLAINT - 13

Exhibit - Q

47.     As a result of the above-referenced acts and/or omissions, a receiver should be appointed to safeguard AIA Services' assets, businesses and revenues, while ensuring that the interests of creditors and shareholders are also safeguarded and any distributions are only made to the appropriate parties as contractually or legally required and/or after obtaining any required consent and/or court order.

## II.  FIRST CAUSE OF ACTION—BREACHES OF CONTRACT

48.     Donna Taylor re-alleges all facts asserting in the preceding paragraphs necessary to support this cause of action and/or her requested relief.

49.     AIA Services owed Donna Taylor contractual obligations under the Series A Preferred Shareholder Agreement, the previously executed letter agreements between the parties in 1995 (alternative cause of action), and/or AIA Services' Amended Articles of Incorporation to redeem Donna Taylor Series A Preferred Shares in AIA Services and make certain payments to her and other obligations.  AIA Services has breached its contractual obligations owed to Donna Taylor, including, without limitation, the obligations to timely pay her and/or redeem her shares and appoint a person of her choice to the Board of AIA Services.

50.     As a direct and/or proximate result of foregoing breaches, Donna Taylor has been damaged and is presently owed in excess of $430,000, and, is therefore entitled to judgment and/or relief on this claim in an amount to be proven at trial.  Donna Taylor also requests specific performance of AIA Services' obligations owed to Donna Taylor.  To the extent no money judgment may be granted because of AIA Services' financial condition, for such other relief as may be requested by Donna Taylor to protect future payments should be ordered, including, without limitation, the appointment of a receiver as requested below.

///

FIRST AMENDED COMPLAINT - 14

Exhibit - Q

### III.  SECOND CAUSE OF ACTION—APPOINTMENT OF A RECIEVER

51.    Donna Taylor re-alleges all facts asserting in the preceding paragraphs necessary to support this cause of action and/or her requested relief.

52.    As a result of AIA Services' insolvency and/or imminent danger of insolvency and the acts of corporate fraud, malfeasance and other unlawful acts set forth above (together with the significant funds owed to Donna Taylor) the appointment of a receiver for AIA Services is necessary and warranted.

53.    As direct and/or proximate cause of all the acts set forth above and the over $430,000 owed to Donna Taylor, the Court should appoint a receiver for AIA Services in this action to manage its affairs and those of its wholly owned subsidiary AIA Insurance.

54.    AIA Services is expected to assert that it is unable to pay Donna Taylor and therefore she may not obtain judgment for the sums owed to her.  Under this rationale, the appointment of a receiver is even more appropriate and warranted in this action, and, consequently will be requested regardless of whether a money judgment is obtained.  To permit the present management to not pay Donna Taylor and continue siphoning away and/or unlawfully transfer or utilize the few remaining funds and assets of AIA Services and AIA Insurance for their benefit would defeat the purpose for appointing a receiver.

### IV.  THIRD CAUSE OF ACTION—DECLARATORY JUDGMENT/ SPECIFIC PERFORMANCE

55.    Donna Taylor re-alleges all facts asserting in the preceding paragraphs necessary to support this cause of action and/or her requested relief.

56.    Donna Taylor requests a declaratory judgment and/or specific performance, to the extent necessary, to grant her the relief requested in this Complaint (including, without limitation, a declaratory judgment ordering AIA Services comply with its Bylaws, Amended

FIRST AMENDED COMPLAINT - 15

Exhibit - Q

Articles of Incorporation, and contractual obligations) and/or such relief as may be requested at or before trial.

## V. PRAYER FOR RELIEF

WHEREFORE, Donna Taylor prays for the following relief:

1.      For a judgment in the amount to be proven at or before trial and/or a judgment in the amount permissible under the law;

2.      For a declaratory judgment, specific performance, preliminary injunction and/or permanent injunction ordering AIA Services and any of its actual or purported officers and directors to comply with all provisions of the corporation's Bylaws and Amended Articles of Incorporation. To the extent any part of such relief includes redeeming Donna Taylor's shares or making payment on such shares and there are insufficient funds available for those payments, then she requests that AIA Services and/or the receiver appointed to operate it be ordered to pay those funds when they become available and when approved by the Court and to safeguard the corporation and its assets in the interim.

3.      For an order and/or declaratory judgment finding that AIA Services is insolvent or in imminent danger of insolvency pursuant to I.C. § 8-601(5), Idaho law, and/or common law;

4.      For an order and/or declaratory judgment finding (in addition or in the alternative) the appointment of a receiver for AIA Services is warranted, based upon all of the acts of malfeasance, breaches of fiduciary duties, torts and other conflicted and/or inappropriate acts set forth above, pursuant to common law, Idaho law, and/or I.C. § 8-601(6);

5.      For an order and/or declaratory judgment appointing a receiver for AIA Services pursuant to I.C. § 8-601, *et seq.*, Idaho law, and/or under the common law;

///

FIRST AMENDED COMPLAINT - 16

Exhibit - Q

6.       For declaratory judgment and/or specific performance ordering AIA Services to appoint to its board of directors the person that Donna Taylor appoints to the board through the written vote of her shares, regardless of whether such vote occurs at any shareholder meetings or by Donna Taylor delivering her written vote to the management of AIA Services, and that AIA Services has no right to determine who she appoints to the board as there are no limiting factors in AIA Services' Amended Articles of Incorporation.

7.       For an order and/or declaratory judgment granting the receiver appointed for AIA Services the power and authority to do the following, including, without limitation: (1) control and operate AIA Services and its subsidiaries (including AIA Insurance), (2) to collect sums owed to AIA Services and AIA Insurance, (3) to administer and service AIA Insurance's few remaining insurance policies, (4) to pay AIA Services and AIA Insurance's bona-fide debts, (5) to marshal AIA Services and AIA Insurance's assets, (6) to pursue new business interests for AIA Insurance and AIA Services, (7) to protect, negotiate and extend AIA Insurance's contracts with growers associations, co-ops and insurance companies (including Trustmark), (8) to pursue causes of action against the appropriate persons and entities[4] and/or (9) be granted all other powers authorized under I.C. § 8-601, *et seq.*, Idaho law, and/or the common law or as may be reasonably necessary for the receiver to properly and efficiently carry out his duties;

8.       For specific performance, a declaratory judgment, preliminary injunction and/or permanent injunction ordering AIA Services and its subsidiary AIA Insurance (collectively "them" below) (including, without limitation, pending the appointment of a receiver): (1) barring them from transferring, selling or encumbering any assets without Court approval (including,

---

[4] Donna Taylor, through other counsel, will be pursing derivative claims against many persons and entities, including, John Taylor and the Responsible Individuals. In her Complaint, she will request that all funds and assets recovered, less attorneys' fees and costs, be paid to the receiver appointed for AIA Services. None of the claims in this Complaint are being asserted derivatively and all claims are being asserted solely against AIA Services.

FIRST AMENDED COMPLAINT - 17

Exhibit - Q

without limitation, the Lewis-Clark Hotel or the mortgage on such property; (2) barring them from loaning any money to John Taylor, the Responsible Individuals, CropUSA, Pacific Empire Radio and/or any other person or entity, including any entities partially or wholly owned by the Responsible Individuals without Court approval; (3) barring them from paying Connie Taylor, James Beck or any other person $20,000 or any other compensation (except for reasonable expenses attending properly noted board meetings) for purportedly serving on the board of AIA Services or its subsidiary AIA Insurance and instead order the corporation to obtain director's liability insurance with said funds; (4) ordering them to comply with all applicable Bylaws, Articles of Incorporation, and laws (including, without limitation, all provisions and laws dealing with conflicts of interest; (5) ordering them to provide financial information and specific details of all claims and lawsuits to all shareholders as required under the law to keep them reasonably information to be provided at least quarterly or when necessary; and (6) ordering them to stop providing funds, services, assets, labor and trade secrets to CropUSA; (7) ordering a full accounting of all funds, services, assets, labor and trades secrets utilized by, lent to, or provided to CropUSA and any other entity or person since 1995; and (8) such other action as is requested by Donna Taylor or required from time to time as deemed in the best interest of AIA Services and AIA Insurance.

9.    For an award of Donna Taylor's attorneys' fees and costs incurred in this action, as provided under Idaho law, including, without limitation, I.C. § 12-120 and/or I.C. § 12-121.

///

///

///

FIRST AMENDED COMPLAINT - 18

Exhibit - Q

10.    For such other declaratory relief, injunctive relief and/or general or specific relief and/or judgments as may be sought at or before trial by Donna Taylor and/or such other relief that the Court deems just and equitable.

DATED this 5th day of February, 2010.

CAMPBELL, BISSELL & KIRBY, PLLC

By:_____
Roderick C. Bond
Michael S. Bissell
Attorneys for Donna Taylor

VERIFICATION

STATE OF WASHINGTON    )
                       ) ss.
COUNTY OF ASOTIN       )

I, Donna J. Taylor, being first duly sworn on oath, deposes and says:

I am the Plaintiff-Petitioner in the above-entitled action. I have read the contents of this Complaint/Petition, know the contents of this Complaint/Petition, and believe that the facts in set forth in this Complaint/Petition are true and accurate to the best of my knowledge and belief.

_____
Donna J. Taylor

SUBSCRIBED AND SWORN to before me this 5th day of February, 2010.

_____
Notary Public for Washington
Residing at: _Clarkston, WA_
My commission expires: _____

FIRST AMENDED COMPLAINT - 19

Exhibit - Q

## CERTIFICATE OF SERVICE

I, Roderick Bond, declare that, on the date indicated below, I served a true and correct copy of the foregoing on the following party(ies) via the method(s) indicated below:

Gary D. Babbitt
D. John Ashby
Hawley Troxell Ennis & Hawley LLP
877 Main Street, Suite 1000
P.O. Box 1617
Boise, Idaho 83701-1617

**Via:**
( ) U.S. Mail, Postage Prepaid
( ) Hand Delivered
( ) Overnight Mail
( ) Facsimile
(**X**) Email (pdf attachment)

Signed this 5th day of February, 2010, at Clarkston, Washington.

_____
Roderick C. Bond

FIRST AMENDED COMPLAINT - 20

Exhibit - Q