RODERICK C. BOND, ISB NO. 8082
RODERICK BOND LAW OFFICE, PLLC
601 108th Ave. NE, Suite 1900
Bellevue, WA  98004
Telephone: (425) 591-6903
Fax: (425) 321-0343
Email: rod@roderickbond.com
Attorney for Plaintiffs

UNITIED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| DALE L. MIESEN, an individual; DONNA J. TAYLOR, an individual and the Personal representative of the Estate of Sarah Taylor; WHO ARE SHAREHOLDERS BRINGING THIS ACTION ON BEHALF OF AND/OR IN THE RIGHT OF AIA SERVICES CORPORATION AND ITS WHOLLY OWNED SUBSIDIARY AIA INSURANCE, INC.; | Civil No. 1:10-cv-00404-CWD SECOND AMENDED COMPLAINT DEMAND FOR JURY TRIAL |
| Plaintiffs, | |
| v. | |
| CONNIE TAYLOR HENDERSON, an individual; JOLEE K. DUCLOS, an individual; HAWLEY TROXELL ENNIS & HAWLEY LLP, an Idaho limited liability partnership; GARY D. BABBITT, an individual; D. JOHN ASHBY, an individual; RICHARD A. RILEY, an individual; MICHAEL W. CASHMAN SR., an individual; JAMES BECK, an individual; R. JOHN TAYLOR, an individual; CROP USA INSURANCE AGENCY, INC., an Idaho corporation; AIA SERVICES CORPORATION, an Idaho corporation; AIA INSURANCE, INC.; an Idaho corporation, | |
| Defendants. | |

SECOND AMENDED COMPLAINT - i

## TABLE OF CONTENTS

I.   STATEMENT OF JURISDICTION ....................................................................... 1

II.  STATEMENT OF VENUE ................................................................................... 1

III. PARTIES AND DEFINITIONS OF THE PARTIES ........................................... 1

IV.  FACTS ................................................................................................................. 5

A.   The Background Facts Regarding AIA Services and AIA Insurance ................................. 5

B.   John, Connie, Beck and Cashman Take Operational Control of AIA and AIA
     Authorizes the Issuance of Series C Preferred Shares and Additional Restrictions in
     Its Amended Articles of Incorporation ................................................................ 6

C.   AIA Forms CropUSA and the Controlling AIA Defendants Unlawfully Transfer
     CropUSA to Themselves ...................................................................................... 9

D.   The Hawley Troxell Defendants Aid and Abet the Controlling AIA Defendants
     in Taking CropUSA from AIA and Having AIA Fund CropUSA .................................. 13

E.   The Controlling AIA Defendants Steal $1,510,693 From AIA to Fund CropUSA
     and Then They Use $634,269 of Those Funds to Repay a Debt CropUSA Owed to
     AIA—thereby Resulting in a $2,144,962 Fraud Against AIA. ..................................... 15

F.   The Controlling AIA Defendants Continue to Unlawfully Fund, Subsidize and
     Operate CropUSA Using AIA's Funds, Assets, Labor and Financial Wherewithal ......... 19

G.   The Controlling AIA Defendants Continue to Unlawfully Use AIA's Funds and
     Financial Wherewithal with the Improper Assistance from the Hawley Troxell
     Defendants .......................................................................................................... 21

H.   The Controlling AIA Defendants Enter Into Tolling Agreements, but Those
     Tolling Agreements Do Not Save the Hawley Troxell Defendants from the
     Unwaivable Conflicts of Interest ......................................................................... 22

I.   The Controlling AIA Defendants Continue Unlawfully Using Funds from AIA
     and Intentionally Committing Torts against AIA with the Assistance of the Hawley
     Troxell Defendants—Even While this Lawsuit Was Pending ..................................... 27

J.     There Is a Laundry List of the Unlawful Acts, Self-Dealing, Malfeasance and Intentional Torts Committed by the Controlling AIA Defendants .................................... 31

V.     CERTIFICATE OF COMPLIANCE WITH IDAHO CODE SECTION 30-1-742 AND FEDERAL RULE OF CIVIL PROCEDURE 23.1 ................................... 35

VI.     COUNT I—BREACH OF FIDUCIARY DUTY ............................................... 38

VII.     COUNT II—AIDING AND ABETTING BREACHES OF FIDUCIARY DUTIES ....... 40

VIII.     COUNT III—LEGAL MALPRACTICE ......................................................... 41

IX.     COUNT IV—FRAUD/FRAUDULENT CONCEALMENT/ CONSTRUCTIVE FRAUD........................................................................... 42

X.     COUNT V—AIDING AND ABETTING FRAUD ........................................... 46

XI.     COUNT VI—BREACH OF CONTRACT....................................................... 47

XII.     COUNT VII—DECLARATORY JUDGMENT ................................................ 48

XIII.     COUNT VIII—EXCESSIVE COMPENSATION/CORPORATE WASTE ................... 49

XIV.     COUNT IX—ACCOUNT STATED ............................................................ 50

XV.     JURY DEMAND ................................................................................... 51

XVI.     PRAYER FOR RELIEF .......................................................................... 51

VERIFICATION OF DALE L. MIESEN ..................................................................... 53

VERIFICATION OF DONNA J. TAYLOR ................................................................... 54

CERTIFICATE OF SERVICE .................................................................................. 55

Plaintiffs Donna J. Taylor and Dale L. Miesen allege cumulatively and, when necessary and/or applicable, in the alternative, as follows:

## I.    STATEMENT OF JURISDICTION

**1.**    This Court has jurisdiction over the subject matter of this lawsuit under 28 U.S.C. § 1332(a)(1), as the amount in controversy exceeds $75,000 and the action, when filed, was between citizens of different states.

## II.    STATEMENT OF VENUE

**2.**    Venue is proper in the District of Idaho under 28 U.S.C. § 1391(b)(2), as a substantial part of the errors and omissions giving rise to the claims asserted in this Second Amended Complaint occurred in the District of Idaho.

**3.**    Venue is also proper in the District of Idaho under 18 U.S.C. § 1391(c), as certain of the defendants reside in the District of Idaho.

## III.    PARTIES AND DEFINITIONS OF THE PARTIES

**4.**    Plaintiff Dale L. Miesen ("Miesen") is a resident of Colleyville, Texas.  Miesen has been a common shareholder of AIA Services during all relevant times.

**5.**    Plaintiff Donna J. Taylor, as an individual and the Personal Representative of the Estate of Sara Taylor (collectively "Donna"), is a resident of Clarkston, Washington. Donna has been a Series A Preferred Shareholder of AIA Services during all relevant times. Donna has also been a common shareholder of AIA Services during all relevant times, through her beneficial ownership as the Personal Representative of the Estate of Sara Taylor.

**6.**    Plaintiffs Dale Miesen and Donna J. Taylor are collectively referred to as the "Plaintiffs" in this Second Amended Complaint, and they were innocent minority shareholders.

**7.**    Plaintiffs are bringing this derivative action on behalf of AIA Services Corporation ("AIA Services"). In addition, Plaintiffs are bringing this action as a double derivative action on

SECOND AMENDED COMPLAINT - 1

behalf AIA Insurance, Inc. ("AIA Insurance"), which is a wholly owned subsidiary of AIA Services. AIA Services and AIA Insurance are collectively referred to as "AIA" in this Second Amended Complaint. The definition of "AIA" includes AIA Services and/or AIA Insurance for purposes of pleading in the alternative, and includes the Plaintiffs to extent they are required to support any derivative cause of action set forth in this Second Amended Complaint.

8.     Defendant AIA Services is an Idaho corporation with its principal place of business at 111 Main Street, Lewiston, Idaho, 83501. At all times relevant to this lawsuit, AIA Services is or has been the parent corporation of AIA Insurance.

9.     Defendant AIA Insurance is an Idaho corporation with its principal place of business at 111 Main Street, Lewiston, Idaho, 83501. AIA Insurance is, or was at all relevant times, a wholly owned subsidiary of AIA Services.

10.     Defendant CropUSA Insurance Agency, Inc. ("CropUSA") is an Idaho corporation with its principal place of business at 111 Main Street, Lewiston, Idaho, 83501. CropUSA was formerly known as AIA Crop Insurance, Inc.

11.     Defendant R. John Taylor ("John") is an individual residing in the state of Idaho. At all times relevant to this lawsuit, John served on the Board of Directors of AIA Services, AIA Insurance, and CropUSA and continues to serve on those boards. John also served as President of each of these corporations during all times relevant to this lawsuit. John is also licensed to practice law in the state of Idaho. John is a common shareholder of AIA Services and a common shareholder of the CropUSA. John also owns shares or ownership interests in other entities that have engaged in inappropriate transactions with AIA and/or which have improperly benefitted from AIA during all relevant times.

///

SECOND AMENDED COMPLAINT - 2

12.     Defendant James Beck ("Beck") is an individual residing in the state of Minnesota. Beck served on the Board of Directors of AIA Services and AIA Insurance during certain relevant times until he resigned in 2014. Beck was a common and/or preferred shareholder of AIA Services during certain relevant times and a common shareholder of CropUSA.

13.     Defendant Michael Cashman, Sr. ("Cashman") is an individual residing in the state of Minnesota. Cashman served on the Board of Directors of AIA Services during certain relevant times. Cashman was a common and/or preferred shareholder of AIA Services during certain relevant times and a common shareholder of CropUSA.

14.     Defendant Connie Taylor Henderson ("Connie") is a resident of Vancouver, Washington. Connie served on the Board of Directors of AIA Services and AIA Insurance during certain relevant times until she resigned in 2014. Connie jointly owns with John the common shares of AIA Services held in John's name. Connie has actively asserted community ownership of those shares and specifically did so before the district court and on appeal in *Taylor v. AIA Services Corp.*, *et al*.

15.     Defendant JoLee K. Duclos ("Duclos") is a resident of Clarkston, Washington. Duclos has served as Secretary of AIA Services, AIA Insurance, CropUSA and other entities partially or wholly owned by John during certain relevant times. Duclos served on the Board of Directors of AIA Services and AIA Insurance during certain relevant times until she resigned in 2007. Duclos is a common shareholder of CropUSA. Duclos has knowledge of the law by and through her training and performing the duties of a paralegal. Duclos has served as John's "lieutenant" during all relevant times.

16.     John, Beck, Cashman, Connie and Duclos are collectively referred to herein as the "Controlling AIA Defendants." The Controlling AIA Defendants have acted in concert and

assisted one another in committing various torts described in this Second Amended Complaint and covering up and/or concealing those torts. The definition of "Controlling AIA Defendants" includes the acts and/or omissions of one or more of John, Beck, Connie, Cashman and/or Duclos for purposes of pleading in the alternative.

17.    Defendant Gary D. Babbitt ("Babbitt") is an individual residing in the state of Idaho and was an attorney practicing law in the state of Idaho with and for Hawley Troxell.

18.    Defendant Richard A. Riley ("Riley") is an individual residing in the state of Idaho and is an attorney in the state of Idaho with and for Hawley Troxell.

19.    Defendant D. John Ashby ("Ashby") is an individual residing in the state of Idaho and is an attorney in the state of Idaho with and for Hawley Troxell.

20.    Defendant Hawley Troxell Ennis & Hawley LLP ("Hawley Troxell") is an Idaho limited liability partnership in the business of practicing law, with its principal place of business in Boise, Idaho. Hawley Troxell has no office in the state of Washington. None of the individual partners of Hawley Troxell are residents of Washington. Hawley Troxell, though its attorneys, acted as counsel for AIA Services, AIA Insurance and CropUSA during certain relevant times and in certain lawsuits. Hawley Troxell is also named herein as it is vicariously liable for the acts and/or omissions of Babbitt, Riley, Ashby and its other attorneys.

21.    Babbitt, Ashby, Riley, other Hawley Troxell attorneys, and Hawley Troxell are collectively referred to as the "Hawley Troxell Defendants" in this Second Amended Complaint. The definition of "Hawley Troxell Defendants" includes the acts and/or omissions of one or more of Babbitt, Ashby, Riley, other attorneys at Hawley Troxell and/or Hawley Troxell for purposes of pleading in the alternative.

///

SECOND AMENDED COMPLAINT - 4

## IV.   FACTS

### A.  The Background Facts Regarding AIA Services and AIA Insurance

22.     In 1983, AIA Services was formed as a closely held Idaho corporation for the purpose of acting as a holding company for various other wholly owned subsidiaries. AIA's business model was to work with farmers and growers to form trusts and/or related cooperatives through various growers and farmers' associations and the members of those associates also becoming members of the trusts and/or cooperatives.

23.     AIA created the Grain Growers Membership & Insurance Trust, the National Contract Poultry Grower's Membership & Insurance Trust, and other, similar trusts. By way of its relationships with these various organizations, AIA held contracts for the exclusive right to market health insurance (*e.g.*, Group Universal Health Policies) and other insurance products to the members of the various trusts and associations.

24.     In 1987, Donna and Reed Taylor, a non-party to this suit, were issued Series A Preferred Shares in AIA Services in connection with their divorce. Pursuant to the dissolution of their marriage, Donna was issued the 200,000 shares of Series A Preferred shares on or about February 12, 1988, and has held those shares ever since, less those shares which have been redeemed in part over the years. (*See* Dkt. #67-1 and #67-2.)

25.     In connection with the issuance of the Series A Preferred Shares to Donna, AIA Services' shareholders adopted amendments to its articles of incorporation with restrictions on the manner in which AIA Services and its subsidiaries could conduct business. (*See* Dkt. #67-3.) AIA Services' amended articles of incorporation included, without limitation, the restrictions that: (a) barred AIA Services and AIA Insurance from guaranteeing any loans for any individual or entities which were not wholly owned subsidiaries; (b) barred certain transactions with shareholders and affiliates; and (c) required AIA Services to comply with certain financial covenants. (*Id.*)

SECOND AMENDED COMPLAINT - 5

26.     In addition, AIA Services' amended articles of incorporation also provided Donna with the unqualified right, as the Series A Preferred Shareholder, to appoint a person, to be determined in her sole discretion, to the Board of Directors of AIA Services. (*See* Dkt. #67-3.)

27.     The Controlling AIA Defendants and the Hawley Troxell Defendants were fully aware of the restrictions under AIA Services' amended articles of incorporation for the benefit of AIA Services and the Series A Preferred Shares.

28.     Donna's Series A Preferred Shares have not been fully redeemed to this day, and the restrictions under AIA Services' amended articles of incorporation remain in full force and effect to this day and fully applicable. (*See* Dkt. #67-42, pp. 10-11 ¶ 19.)

### B. John, Connie, Beck and Cashman Take Operational Control of AIA and AIA Authorizes the Issuance of Series C Preferred Shares and Additional Restrictions in Its Amended Articles of Incorporation

29.     In 1995, the Controlling AIA Defendants, other than Duclos (although she did assist the Controlling AIA Defendants as an employee and officer (assistant secretary) of AIA), spearheaded a transaction to redeem Reed Taylor's majority common stock interest in AIA Services. (*See* Dkt. 67-5 and #67-6.)

30.     As part of the redemption, Beck, Cashman and certain of their friends acquired Series C Preferred Shares in AIA Services. When AIA Services amended its articles of incorporation to allow the issuance of the Series C Preferred Shares, AIA Services included additional restrictions in its articles of incorporation. Riley assisted in drafting and/or approving these restrictions and he was fully aware of them.

31.     Under the new and additional restrictions in AIA Services' amended articles of incorporation (these restrictions were in addition to others adopted in connection with the issuance of Donna's Series A Preferred Shares), AIA Services was barred from engaging in a number of

corporate actions, including, but not limited to: (a) AIA Services could not acquire any common shares from any shareholders unless all dividends due on the Series C Preferred Shares has been paid (10% dividend per year) or those funds were set aside; (b) the Series C Preferred Shareholders had the right to elect one director to AIA Services' Board of Directors; and (c) if any Series C Preferred Shares are redeemed, such redemptions must be equally from all shareholders. (*See* Dkt. #67-3.)

32.     Although the Series C Preferred Shares held by Beck, Cashman and their friends were eventually unlawfully and effectively redeemed by AIA, other Series C Preferred Shares were later issued to the AIA Services 401(k) Plan and those shares remain issued and outstanding to this day and no dividends have been paid as required since approximately 1997. As a result, these new restrictions under AIA Services amended articles of incorporation were in place for the benefit of AIA Services and the Series C Preferred Shares, which have remained in full force and effect to this day.  The Controlling AIA Defendants and the Hawley Troxell Defendants were fully aware of the additional restrictions under AIA Services' amended articles of incorporation.

33.     Upon the redemption of Reed Taylor's majority common shares, Beck, Cashman, John and Connie directly or indirectly became the majority common shareholders of AIA Services. (*See* Dkt. #67-5.) In addition, Beck, Cashman and John entered into a Voting Agreement to ensure that they would maintain control of AIA Services' Board of Directors. As a result, the Controlling AIA Defendants have maintained operational control of AIA from 1995 through the present time.

34.     In connection with the redemption of Reed Taylor's shares, John entered into an Executive Officer's Agreement with AIA Services, which guaranteed him certain salary payments and other compensation for three years; that agreement also contained non-compete and non-solicitation provisions. (*See* Dkt. #67-8.) John's salary after the first three years was required to be

determined by AIA Services' Board of Directors, which was never done after the first three years.

35.     From 1999-2012, John improperly paid himself millions of dollars pursuant to his Executive Officer's Agreement for his and Connie's benefit (the amount of which in itself was improper based on AIA's business prospects and John's inability to do anything for the benefit of AIA), while he intentionally and repeatedly violated the non-compete and non-solicitation provisions of his Executive Officer's Agreement.

36.     In connection with the redemption of Reed Taylor's shares in August 1995, AIA Services contributed funds to The Universe Life Insurance Company, which was a wholly owned subsidiary of AIA Services, in order to make AIA Insurance, which was then a wholly owned subsidiary of The Universe Life Insurance Company, a subsidiary of AIA Services. After that transaction, AIA Insurance became a wholly owned subsidiary of AIA Services.

37.     As a result, from August 1995 through all relevant times, AIA Insurance was a wholly owned subsidiary through which AIA Services derived its commissions and administrative fees from insurance policies, which accounted the bulk of AIA's revenues and profits.

38.     From 1995 through 2005, AIA Insurance generated over $65 million in revenues from commissions (over $33 million) and administrative fees (over $27 million), and it continued to generate revenues thereafter.

39.     From 1995 through all relevant times, each of the Controlling AIA Defendants has served at various times on the Board of Directors for AIA Services, AIA Insurance and/or CropUSA, while John has continuously served as the President of AIA and Duclos has continuously served as a Secretary of AIA.

40.     From 1999 through certain relevant times, the Controlling AIA Defendants have also served from time to time on purported "advisory board" of CropUSA, which actually made

SECOND AMENDED COMPLAINT - 8

the decisions on behalf of AIA and CropUSA. Specifically, Cashman, Beck and John served on the "advisory board" of CropUSA from 1999 through certain relevant times.

41.     The Controlling AIA Defendants intentionally concealed from AIA and AIA Services' minority shareholders of the existence and authority of the "advisory board" of CropUSA.

**C.   AIA Forms CropUSA and the Controlling AIA Defendants Unlawfully Transfer CropUSA to Themselves**

42.     By 1998, AIA's ability to sell health insurance had been impaired by undercapitalization in its underwriting subsidiary the Universal Life. Accordingly, the company considered proposals to sell other forms of insurance, and in particular crop insurance, to be underwritten by other insurance companies. At a 1998 Board Directors of Meeting, AIA Services' Board of Directors specifically discussed selling crop insurance and elected to have AIA pursue selling crop insurance.

43.     In 1999, AIA, then under the control of Controlling AIA Defendants, began selling crop insurance through a wholly owned subsidiary of AIA Services formed under the name "AIA Crop Insurance, Inc."

44.     The first purported meeting of shareholders of AIA Crop Insurance, Inc. ("AIA Crop Insurance") was held on January 11, 2000. The first purported meeting of the AIA Crop Insurance's Board of Directors was held on the same day. The purported minutes of the shareholder's meeting indicate that John, not the true owner AIA Services, claimed to be the sole shareholder of AIA Crop Insurance at the time of incorporation; these facts were concealed from AIA and AIA Services' innocent minority shareholders.

45.     Upon information and belief, at or shortly after the time of its formation, the Hawley Troxell Defendants began providing legal services to AIA Crop Insurance.

SECOND AMENDED COMPLAINT - 9

46.     At a special meeting of the shareholders of AIA Crop Insurance held on November 13, 2000, AIA Crop Insurance was renamed CropUSA in an apparent attempt to conceal its corporate lineage and origins.

47.     The minutes of the November 13, 2000 special meeting of the shareholders also show that John continued to claim that he was the sole shareholder of CropUSA, while he was simultaneously representing in business plans provided to others that CropUSA was a subsidiary of AIA Insurance. (*See* Dkt. # 67-66.)

48.     At the time CropUSA was formed, John was employed by AIA Services under an Executive Officer's Agreement, dated August 1, 1995, Dkt. #67-8, which contained express covenants not to compete. Upon information and belief, John's Executive Officer's Agreement and AIA Service's amended articles of incorporation and restated bylaws were drafted and/or approved by Riley, and he had full knowledge of the restrictions under the terms of the foregoing documents.

49.     CropUSA held its purported annual shareholder's meeting on January 10, 2001. By this time, the illegal "spin off" of CropUSA had been accomplished by having AIA Service's Series C Preferred Shareholders (primarily Beck and Cashman) exchange their Series C Preferred Shares for common shares in CropUSA (if CropUSA were in fact an independent entity, these maneuvers would have been completely unnecessary).

50.     The minutes for the shareholder meeting held on January 10, 2001 for CropUSA revealed that CropUSA had retained Hawley Troxell as its advisor and SEC counsel and, upon information and belief, the Hawley Troxell Defendants have served continuously as CropUSA's attorneys in one form or the other ever since. According to the minutes, negotiations between AIA Services and CropUSA had resulted in an agreement whereby AIA Services would no longer

SECOND AMENDED COMPLAINT - 10

operate CropUSA as a subsidiary.

51.     However, the negotiations referred to in the January 10, 2001 shareholder meeting minutes for CropUSA did not in fact occur. There was no decision, nor has there ever been a decision, on the part of AIA Services to discontinue the subsidiary status of CropUSA. The January 10, 2001 meeting minutes for CropUSA were concealed from AIA.

52.     None of the preferred or common shareholders of AIA Services (other than those present at the January 10, 2001 meeting) were given notice of or the opportunity to approve or oppose this corporate action; instead, it was concealed from them and AIA.

53.     In spite the fact that John asserted on January 10, 2001 that CropUSA would no longer be a subsidiary of AIA Services, John wrote in a letter dated February 27, 2001, sent on behalf of AIA to Donna, that "AIA is developing a new crop insurance program through a new company called CropUSA." (The letter went on to state that "[t]he costs of putting the CropUSA program together have been paid. AIA now needs to launch five new territories next Month"). This January 27, 2001 letter constituted an unambiguous representation by John to AIA and Donna that CropUSA was a subsidiary of AIA and was being operated for the benefit of AIA and implicitly also for AIA Services' innocent minority shareholders (which included Donna). This representation to AIA and Donna was false, and John knew it was false. Upon information and belief, the other Controlling AIA Defendants were aware of this January 27, 2001 letter and the misrepresentations contained within the letter.

54.     Notwithstanding the fact that John was obligated under the terms of his Executive Officer's Agreement that required that he not compete with AIA Services, and notwithstanding the fact that he owed fiduciary duties to the AIA and AIA Services' shareholders, John set forth his plans to exploit the assets of AIA for the benefit of CropUSA (and himself as the majority

purported shareholder) in the purported minutes of the purported January 10, 2001 meeting.

55.     The January 10, 2001 meeting minutes reveal that CropUSA authorized its officers to execute a Master Marketing Agreement with AIA Insurance that would allow CropUSA access to all of AIA's customers and customer lists, as well as all of AIA's trade secrets. AIA received no consideration for conveying this access or to enter into these agreements.

56.     CropUSA's officers (including John) were also purportedly authorized to enter into a Management Agreement with AIA Insurance wherein AIA Insurance purportedly agreed to provide management and administrative support to CropUSA without charge. However, John has since testified under oath that AIA's Board of Directors never authorized this agreement, although the Board has acquiesced in the action.

57.     AIA itself was never given notice of the Master Marketing Agreement and the Management Agreement, nor was AIA given the opportunity to approve or reject these agreements or any subsequent ones. Each of these agreements, when executed, constituted a violation of John's Executive Officer's Agreement, which contains a strict non-compete clause. Each of these agreements also constituted a direct breach of fiduciary duty or the aiding and abetting on behalf of each of the Controlling AIA Defendants in the commission of torts against AIA.

58.     Meanwhile, in 2001, John and Connie acquired a parking lot for $8,000 using AIA's line-of-credit. Upon information and belief, AIA was required to maintain control of the parking lot as part of its lease with Washington Bank Properties. John then increased the rent that AIA paid to use the parking lot to benefit him and Connie. For example, although John and Connie paid only $8,000 for the parking lot, they subsequently charged AIA $60,750 in rent to use the parking lot from 2004 through 2006. These unfair and self-serving rental payments to John and Connie were concealed from AIA and AIA Services' innocent minority shareholders and were

never disclosed to either of them, as was John and Connie's purchase of the parking lot.

**D.** **The Hawley Troxell Defendants Aid and Abet the Controlling AIA Defendants in Taking CropUSA from AIA and Having AIA Fund CropUSA**

59.     Upon information and belief, the Hawley Troxell Defendants were providing legal services to CropUSA and/or its board of directors as of January 10, 2001, and such providing of legal services has continued through certain relevant times.

60.     Upon information and belief, from January 10, 2001, and continuing through the period relevant to this lawsuit, the Hawley Troxell Defendants had knowledge of John's Executive Officer's Agreement with AIA Services, had knowledge of the conflict of interest provisions in AIA's bylaws, and had knowledge of restrictions in AIA's amended articles of incorporation, but intentionally refused to comply with them and assisted John in violating them or covering up the violations.

61.     The Hawley Troxell Defendants knew or should have known that the purported Master Marketing Agreement and Management Agreement constituted breaches of John's Executive Officer's Agreement, violations of AIA Service' amended articles of incorporation, violations of AIA Services' restated bylaws, and constituted breaches of John and the other Controlling AIA Defendants' fiduciary duties owed to AIA and AIA Services' minority shareholders.

62.     Upon information and belief, the Hawley Troxell Defendants were also representing CropUSA from January 10, 2001, through certain relevant times, and by way of that representation they breached their fiduciary duties to AIA (including their undivided duty of loyalty owed to AIA) and took steps that materially assisted John and the Controlling AIA Defendants in the commission of the various torts described in this Second Amended Complaint and assisted in the concealment of those torts.

SECOND AMENDED COMPLAINT - 13

63.    Beginning in 1999 and continuing through the through the time CropUSA ceased operating, CropUSA was funded and operated with assets improperly transferred from AIA, including, but not limited to, operating capital, office space, customer lists and other trade secrets, agents and staff, goodwill and other assistance. CropUSA paid nothing for these assets.

64.    The Controlling AIA Defendants, except Duclos, were all shareholders of AIA at the time CropUSA was formed and later purportedly became shareholders of CropUSA.

65.    The Controlling AIA Defendants, except Duclos (although she improperly took part in the meetings and acted as the Secretary) and Connie, all served on a purported "advisory board" of CropUSA and/or AIA, and this advisory board exercised actual control over CropUSA and AIA. By exercising control over these entities and committing acts that benefitted CropUSA at the expense of AIA, the Controlling AIA Defendants engaged in a conspiracy to defraud AIA, which should have had the right and title to the property of CropUSA.

66.    Due to the fact that the Controlling AIA Defendants have complete control over AIA and would never assert claims against themselves on behalf of AIA, the adverse dominion doctrine applies to all claims asserted herein, thereby barring any defense based on a statute of limitations. *Freeland v. Enosis Corp.,* 540 F.3d 721 (7th Cir. 2008).

67.    On January 10, 2002, CropUSA purportedly entered into a Memorandum of Understanding with the Controlling AIA Defendants. Under the terms of this memorandum, Beck and Cashman were obligated to guarantee loans on behalf of CropUSA.

68.    Notably, Beck and Cashman had also been obligated to guarantee over $1,000,000 in loans on behalf of AIA since 1995, but they never did. Notwithstanding this obligation, the Controlling AIA Defendants subsequently arranged for AIA to guarantee CropUSA's lines of credit, even though the guarantees were barred by AIA's amended articles of incorporation and

SECOND AMENDED COMPLAINT - 14

bylaws.

69.      In 2004, the Controlling AIA Defendants attempted to raise capital for CropUSA by selling shares in CropUSA to private investors by way of a $10,000,000 private placement. The Hawley Troxell Defendants drafted the July 15, 2004 Private Placement Memorandum, despite their knowledge of the illegal "spin-off" of CropUSA and the fiduciary duties they owed to AIA.

70.      When CropUSA began distributing the Private Placement Memorandum in 2004, the company was experiencing financial difficulties that made it difficult, if not impossible, to attract investors to purchase shares pursuant to the private placement.

71.      In addition, in 2004, the CropUSA's lack of adequate funding threatened its ability to participate in the Federal Crop Insurance program. To alleviate these problems, the Controlling AIA Defendants would improperly turn to AIA to obtain the necessary funding.

E.   **The Controlling AIA Defendants Steal $1,510,693 From AIA to Fund CropUSA and Then They Use $634,269 of Those Funds to Repay a Debt CropUSA Owed to AIA— thereby Resulting in a $2,144,962 Fraud Against AIA.**

72.      In order to boost CropUSA's balance sheet for the purpose of operating the company, attracting investors and maintaining access to the Federal Crop Insurance program, the Controlling AIA Defendants devised a scheme to illegally transfer $1,510,693 from AIA Insurance to CropUSA.

73.      The Controlling AIA Defendants conspired with each other in the formation and execution of this scheme to unlawfully transfer $1,510,693 of AIA's funds to CropUSA, and aided and abetted one another in carrying out the scheme and ultimately covering it up.

74.      Upon information and belief, the Hawley Troxell Defendants provided counsel to CropUSA with respect to the unlawful transfer of funds and/or has at a minimum assisted in covering up the facts of this illegal transfer.

SECOND AMENDED COMPLAINT - 15

75.     The scheme involved money derived from AIA Insurance. In August 2004, AIA Insurance received a payment of $1,510,693 from Trustmark. (*See* Dkt. #67-59.) Rather than deposit the payment of $1,510,693 into the account of AIA Insurance, where it would have benefited AIA and its innocent shareholders, John deposited the funds into a new account entitled "AIA Insurance Inc. CropUSA." (*See* Dkt. #67-60.) The address for this account coincided with the address for John's personal residence at 2020 Broadview Drive in Lewiston, Idaho, rather than any address used by AIA. (*Id.*)

76.     Shortly after diverting the $1,510,693 into the "AIA Insurance Inc. CropUSA" account, the Controlling AIA Defendants illegally transferred the funds to CropUSA. The Controlling AIA Defendants attempted to disguise this conversion of AIA Insurance's funds by characterizing the transaction as an alleged purchase by AIA Insurance of Series C Preferred Shares in its parent corporation, AIA Services. (*See* Dkt. #67-59.) Then, the Controlling AIA Defendants carried AIA Insurance's alleged investment in the Series C Preferred Shares as having a purported value of $1,510,693 when that was not the true value of the shares.

77.     However, as the Controlling AIA Defendants acknowledged at the time, there was no market for the Series C Preferred Shares which were purportedly being repurchased. At the time the $1,510,693 in funds were converted by CropUSA, there was no authorization of any kind for the transaction, and the transaction was concealed from AIA.

78.     In order to create a plausible explanation for the transfer of the $1,510,693, CropUSA eventually produced a document designated as a Consent in Lieu of Meeting dated August 26, 2004. (*See* Dkt. #67-61.) However, this document itself is completely fraudulent, as it was retroactively created the following year in order to deceive auditors who questioned the validity of this transaction.

SECOND AMENDED COMPLAINT - 16

79.     In addition, this $1,510,693 purported repurchase of shares separately violated the terms of AIA Services' amended articles of incorporation, which required that all Series C Preferred Shares be redeemed equally and simultaneously from all shareholders. (*See* Dkt. #67-3.) Instead of repurchasing an equal portion of the Series C Preferred Shares from AIA Services' 401(k) Plan, the Controlling AIA Defendants intentionally only repurchased the Series C Preferred Shares held by CropUSA (which had been previously held by Beck, Cashman and their friends).

80.     CropUSA was carrying these Series C Preferred Shares in AIA Services on its books with a value of $21,693, which means that CropUSA realized a gain of $1,489,000 on this purported sale of shares. (*See* Dkt. #67-59.) At that time, although the Controlling AIA Defendants had not properly accounted for all funds, assets, labor and other costs advanced from AIA for CropUSA, they had actually accounted for there being a debt of $634,269 owed by CropUSA to AIA.

81.     After unlawfully transferring the $1,510,693 received by AIA Insurance to CropUSA, the Controlling AIA Shareholders had CropUSA repay the $634,269 debt owed to AIA, thereby committing a double fraud upon AIA, i.e., AIA should have the $1,510,693 in its bank account now and it should have never lent the $634,269 to CropUSA in the first place. In other words, those fraudulent transactions alone resulted in the loss of $2,144,962 in funds to AIA and thus damaged AIA in the amount of $2,144,962. The Controlling AIA Defendants have actively concealed, or covered up, these transactions from AIA with the assistance of the Hawley Troxell Defendants.

82.     AIA and the innocent shareholders of AIA Services were never given notice of the 2004 stock transaction, nor were any proper board or shareholder meetings held to approve the transaction. However, as with the fraudulent document prepared on behalf of CropUSA, a

fraudulent Consent if Lieu of Meeting, dated August 26, 2004, was prepared on behalf of AIA. This document was actually produced several months after the transaction and was created to deceive auditors.

83.     Upon information and believe, the Hawley Troxell Defendants provided legal services to both AIA and CropUSA at the time of the 2004 transaction or had actually knowledge of the 2004 transaction.

84.     The Hawley Troxell Defendants at various times, as purported counsel for AIA, failed to disclose to AIA the 2004 transaction to transfer $1,510,693 to CropUSA and that the acts of the Controlling AIA Defendants constituted an intentional breach of their fiduciary duties (including the duty of loyalty) owed to AIA and a concealment of a prohibited transaction. For this reason alone, the Hawley Troxell Defendants could not reasonably rely on a tolling agreement to represent AIA, CropUSA and the interest of the Controlling AIA Defendants in later litigation.

85.     The Hawley Troxell Defendants failed to disclose to AIA, or to anyone else, that this $1,510,693 transaction was unlawful on many levels, including but not limited to the fact that it did not comply with articles of incorporation and bylaws, caused a breach of AIA's other contracts, and could not be justified by the balance sheet of either AIA Insurance or CropUSA. Upon information and belief, the Hawley Troxell Defendants had knowledge of the back-dated Consent in Lieu of Meeting documents.

86.     On February 16, 2005, Beck sent an email to John and Cashman confirming the Controlling AIA Defendants' scheme to steal CropUSA in an effort to profit: "[Cashman] and I are so convinced that CropUSA is a winner that anything standing in the way of a good result will be a crime." (Dkt. #67-54.) The crime was stealing CropUSA from AIA and then to drain AIA of its funds and assets to pursue the Controlling AIA Defendants' scheme.

SECOND AMENDED COMPLAINT - 18

F. **The Controlling AIA Defendants Continue to Unlawfully Fund, Subsidize and Operate CropUSA Using AIA's Funds, Assets, Labor and Financial Wherewithal**

87.    After unlawfully taking $2,144,962 from AIA Insurance in 2004, the Controlling AIA Defendants continued to operate CropUSA with assets both tangible and intangible that rightfully belonged to AIA, continued to improperly subsidize CropUSA with AIA's assets and labor, and continued to conceal their actions from AIA and AIA Services' innocent minority shareholders.

88.    Under the management and direction of the Controlling AIA Defendants, AIA regularly failed to allocate costs to CropUSA and other entities and failed to charge markup, interest or profit on costs paid for other entities. For example, John's own salary of $250,000 was allocated entirely to AIA Services even though John's contractual right to salary from AIA Services had expired in 1998 and had never been renewed by an authorized board. (And, further, John performed no actual work for AIA during the time in question.)

89.    John, with the knowledge and complicity of the other Controlling AIA Defendants, also performed work for other entities owned in full or in part by him while on AIA's payroll, i.e., CropUSA, Pacific Empire Radio Corp., Pacific Empire Communications Corp., Pacific Empire Holdings Corp., Radio Leasing I LLC and Radio Leasing II LLC. John also had other AIA employees work for these entities without compensation to AIA. These facts, like virtually all of the others referenced in this Second Amended Complaint, were concealed from AIA and AIA Services' innocent minority shareholders.

90.    Between its founding in 1999 and the filing of this lawsuit, CropUSA and other entities generated tens of millions of dollars of revenue (including premiums) and other benefits that would have flowed to AIA but for the unlawful and unauthorized acts of the Controlling AIA Defendants.

SECOND AMENDED COMPLAINT - 19

91.     As of 2006, John owed AIA at least $307,000 for personal loans he had taken from AIA Services. For several years, John concealed these loans by engaging in false accounting whereby loans to him were treated as payments of principal on AIA Service' indebtedness due to Reed Taylor on his $6 million promissory note (which was later ruled to be illegal).  In 2006, John "corrected" the alleged accounting "error" by increasing the balance due on Reed Taylor's note to $6 million and reinstating John's $307,000 debt. John had still not repaid this personal loan.

92.     Over the years, John had AIA pay his personal maid, his personal credit card bills, donations, cash advances, family cell phone bills, and other personal expenses. John also had AIA purchase several vehicles from him, and he continued to drive these vehicles after the sales and purchase other vehicles with AIA's funds to use for his benefit when there was no reason to do so. John also had AIA employees perform work on his personal residence and on other real property not owned by AIA. These acts were all committed with the knowledge and complicity of the Controlling AIA Defendants and without paying AIA the fair value of the services or expenses.

93.     At year-end 2006, AIA had improperly lent $95,000 to Pacific Empire Radio Corp., a corporation partially owned by John and Connie and in which they both served as directors at certain times. The Controlling AIA Defendants transferred that $95,000 receivable from AIA to CropUSA. By the end of 2012, AIA would lend over $1,400,000 in additional funds to Pacific Empire Radio Corp., when all such loans violated AIA Services' amended articles of incorporation and were not authorized under the circumstances by AIA Services' restated bylaws.

94.     In August 2007, AIA settled litigation with the state of Idaho whereby AIA received a mortgage worth approximately $1.5 million for the amounts owed by Washington Bank

SECOND AMENDED COMPLAINT - 20

Properties on the real property where AIA's offices are located. Although AIA Insurance paid the costs of this litigation, the Controlling AIA Defendants, with the assistance of the Hawley Troxell Defendants, improperly titled the note in the name of AIA Services only, and then pledged the note to CropUSA so that the Controlling AIA Defendants could borrow money to pay their attorneys' fees and costs incurred defending in *Taylor v. AIA Services Corp., et al.* to the Hawley Troxell Defendants.

95.     As with the 2004 transactions, the transaction pledging the mortgage owned by AIA Services to CropUSA for purportedly paying the Hawley Troxell Defendants' attorneys' fees and costs incurred representing AIA, CropUSA and the Controlling AIA Defendants was a blatant misappropriation and/or illegal pledging of AIA's asset. The loan documents and the pledge agreement were drafted by the Hawley Troxell Defendants, although they later asserted that they were only "scriveners" for the transaction. This transaction was improper and barred by AIA's amended articles of incorporation and bylaws.

G. **The Controlling AIA Defendants Continue to Unlawfully Use AIA's Funds and Financial Wherewithal with the Improper Assistance from the Hawley Troxell Defendants**

96.     On October 26, 2007, the Hawley Troxell Defendants drafted and delivered an opinion letter falsely representing that AIA Insurance was authorized to guarantee a $15,000,000 line-of-credit on behalf of CropUSA, which carried a hard-money loan with an exorbitant interest rate.

97.     The Hawley Troxell Defendants' opinion letter was delivered for a loan guarantee which violated AIA Services' amended articles of incorporation, its restated bylaws and AIA Insurance's bylaws, and in violation of the duty of loyalty owed by the Hawley Troxell Defendants to AIA.

SECOND AMENDED COMPLAINT - 21

98.     Additionally, Lancelot, the lender for this $15,000,000 line-of-credit was subsequently exposed as a Ponzi scheme, and its founder, Gregory Bell, pleaded guilty to criminal charges in federal court. Mr. Bell was the signee for Lancelot on the $15,000,000 line-of-credit. These facts pertaining to the $15,000,000 loan for CropUSA and AIA Insurance's guarantee of that loan, along with other transactions, were never disclosed to AIA by the Hawley Troxell Defendants or the Controlling AIA Defendants and the payment of interest on that loan was detrimental to AIA because most of CropUSA's assets could be traced directly to AIA (and the depletion of CropUSA's funds resulted in less funds available to recover).

### H.   The Controlling AIA Defendants Enter Into Tolling Agreements, but Those Tolling Agreements Do Not Save the Hawley Troxell Defendants from the Unwaivable Conflicts of Interest

99.     In 2007, Reed Taylor filed suit against AIA and certain of the Controlling AIA Defendants, asserting claims for breaches of contract, breaches of fiduciary duties, conversion, fraud and other claims ("*Taylor v. AIA Services Corp., et al.*"). In 2007, the Hawley Troxell Defendants appeared as counsel for AIA Services and AIA Insurance in that lawsuit. Later, Reed Taylor amended his complaint and named CropUSA as a defendant, after recognizing that millions of dollars had been transferred to it from AIA, among other improper transactions (including some of those transactions described in this Second Amended Complaint). (*See* Dkt. #82-2.) The Hawley Troxell Defendants also appeared and represented CropUSA in that lawsuit. (*Id*.)

100.    As the purported attorneys for AIA, two entities, the Hawley Troxell Defendants owed duties of loyalty, care, and good faith to AIA and the Hawley Troxell Defendants breached their duties of care and fiduciary duties by engaging in the simultaneous representation of the Controlling AIA Defendants, AIA, CropUSA, and other parties (including Bryan Freeman) with interests adverse to the interests of AIA.

101.    In 2007, Connie and Beck were purportedly appointed the Boards of Directors of AIA Service and AIA Insurance by John. Connie and Beck were paid $5,000 per quarter to sit on the Boards of AIA and also were to receive common shares for their purported "service." Beck later testified that he serves on AIA's Boards to protect his own interests and those of his friends (the same friends who previously acquired Series C Preferred Shares in AIA Services and illegally exchanged them for common shares in CropUSA).

102.    In 2007 and 2008, the Controlling AIA Defendants entered into written tolling agreements in connection with the various litigation directly or indirectly involving AIA. The Hawley Troxell Defendants were improperly involved with and/or facilitated the Controlling AIA Defendants entering into such tolling agreements for the purpose of allowing the Hawley Troxell Defendants to continue to represent AIA, CropUSA and directly or indirectly certain of the Controlling AIA Defendants.

103.    By tolling the statute of limitation for claims against the Controlling AIA Defendants, the Hawley Troxell Defendants sought to use the tolling agreements to authorize the waiver of their conflicts of interest representing AIA, CropUSA and the interests of the Controlling AIA Defendants in litigation that could have and should have exposed the fraud and intentional breaches of fiduciary duties committed by the Controlling AIA Defendants.

104.    The purpose of a properly drafted and executed tolling agreement is to allow conflicts of interest to be waived under certain limited permissible circumstances in order to waive a conflict of interest so that an attorney or law firm can represent clients with diverging interests. Those limited permissible circumstances were not present here.

105.    The Hawley Troxell Defendants knew or should have known that the Controlling AIA Defendants had committed intentional acts of fraud and breaches of fiduciary duties

(including the duty of loyalty) owed to AIA. The Hawley Troxell Defendants knew or should have known that by allowing the Controlling AIA Defendants to continue to operate and control AIA that they would continue to conceal their past torts and likely continue to commit new torts, which is precisely what occurred here as demonstrated by the facts alleged in this Second Amended Complaint.

106.    Although these tolling agreements tolled the statute of limitations for claims AIA could assert against the Controlling AIA Defendants (which eliminates any defense they may have to assert any statute of limitations defenses), the facts set forth in this Second Amended Complaint provide a classic example of why such tolling agreements were improper under the circumstances as the agreements involved tolling intentional torts committed against AIA. While the claims were being tolled, the Controlling AIA Defendants' continued to unlawfully use AIA's cash, resources and ability to borrow to fund other businesses and pay compensation to themselves.

107.    During the course of the litigation in *Taylor v. AIA Services Corp.*, *et al.*, Reed Taylor attempted to negotiate a settlement, but he insisted that any settlement must include full disclosure to, and authorization by, AIA Services' minority shareholders and to allow them to participate in CropUSA common share ownership. (*See* Dkt. #67-18.) Not only did the Controlling AIA Defendants and Hawley Troxell Defendants reject Reed Taylor's offer, but they still refused and failed to provide full disclosure to AIA and AIA Services' innocent minority shareholders of the malfeasance and torts committed against AIA. The untenable position of the Hawley Troxell Defendants was confirmed when the only person seeking to require full and fair disclosure was a creditor, Reed Taylor. (*Id.*)

108.    During the course of *Taylor v. AIA Services Corp, et al.*, Connie and Beck represented to Judge Brudie, the Idaho Supreme Court and AIA that the redemption of Reed

Taylor's shares should be illegal to benefit AIA Services' minority shareholders. (*See* Dkt. #67-23 and #67-25.)

109.    After Judge Brudie ruled the redemption of Reed Taylor's shares was illegal, neither Connie, Beck nor any of the other Controlling AIA Defendants did anything to benefit the minority shareholders of AIA Services nor did they ever have any intention of helping them, contrary to what they had represented to Judge Brudie and the Idaho Supreme Court.

110.    Instead of sharing equally in AIA's assets with AIA Services' innocent minority shareholders, the Controlling AIA Defendants later sought to eliminate those minority shareholders for only ten cents per share, even though Connie and John both previously valued the shares much higher even after considering the over $6 million that AIA Services owed to Reed Taylor at the time of valuation (a debt that was later ruled to be illegal and void). (*See* Dkt. #67-24 and #67-50.)

111.    Riley was an attorney at the law firm of Eberle Berlin at the time of the redemption of Reed Taylor's shares in 1995 and he breached his duty of care by advising AIA Services and Reed Taylor[1] to enter into the illegal stock redemption transaction. *See Taylor v. AIA Servs. Corp.*, 151 Idaho 552, 261 P.3d 829 (2011).

112.    The illegal redemption of Reed Taylor's common shares ultimately led to AIA incurring over $1 million in attorneys' fees and costs litigating and resulted in AIA Services being required to report to the IRS a gain from the $6 million it never had to pay Reed Taylor.

---

[1] The Controlling AIA Defendants have brought bread to many defense attorneys. Notably, the Controlling AIA Defendants (except Cashman, who was not a party to the lawsuit) successfully asserted that the Stock Redemption Agreement was illegal. (*See* Dkt. #83-5.) Consequently, Reed Taylor sued Riley, Turnbow and Eberle Berlin for their incorrect third-party closing opinion letter. *Taylor v. Riley*, 157 Idaho 323, 336 P.3d 256, 261 (2014). He later settled his claims against Turnbow and Eberle Berlin, but his claims against Riley are on appeal as noted by the Ninth Circuit Court of Appeals. *Taylor v. Hawley Troxell Ennis & Hawley, LLP*, 628 Fed.Appx. 490 (9th Cir. 2015). Reed Taylor also sued his independent counsel. *Taylor v. Bell*, 185 Wn. App. 270, 273-79, 340 P.3d 951, 954-56 (2014), *review denied*, 352 P.3d 188 (2015).

113.     Upon information and belief, the Controlling AIA Defendants never reported the gain from the extinguished $6 million debt to Reed Taylor on AIA Services' tax return. If the Controlling AIA Defendants did not report the $6 million income to the IRS and AIA Services is obligated to pay taxes, penalties and interest on that gain, the Controlling AIA Defendants are liable for those sums as well for breaching their fiduciary duties owed to AIA.

114.     Based on the intentional acts of the Hawley Troxell Defendants, AIA has been decimated because the Controlling AIA Defendants remained in control of AIA through those tolling agreements. The end result of these tolling agreements was that the Hawley Troxell Defendants improperly ensured that the Controlling AIA Defendants would retain control over AIA to the detriment of AIA and for the improper benefit to the Hawley Troxell Defendants and the Controlling AIA Defendants.

115.     In or around 2007 or 2008, AIA Insurance received a settlement of approximately $800,000 for litigation that AIA Insurance had funded for certain policy holders. Instead of utilizing or retaining those funds exclusively for AIA, the Controlling AIA Defendants improperly used those funds, in full or in part, to continue their intentional acts of funding CropUSA, litigation caused by them or other unauthorized uses. Upon information and belief, the Hawley Troxell Defendants had knowledge of the receipt of those funds, yet they did nothing to protect the funds even though the funds were at issue in *Taylor v. AIA Services Corp., et al*.

116.     In 2008, the Controlling AIA Defendants and the Hawley Troxell Defendants permitted CropUSA to sell over $10,000,000 in crop insurance business to Hudson Insurance for the benefit of CropUSA when approximately 75% of the business had been derived directly from AIA's agency force (i.e., such agents as Larry Whitehead). The over $7.5 million should have been paid to AIA rather than to pay the debts incurred by the Controlling AIA Defendants through

SECOND AMENDED COMPLAINT - 26

CropUSA.

117.    Sometime after CropUSA sold the bulk of its assets to Hudson in 2008, which were derived primarily from AIA, the Controlling AIA Defendants obtained further funds from Hudson Insurance for Growers National Cooperative Insurance Agency, Inc. ("<u>Growers National</u>"), an entity formed and funded by AIA for purposed of selling crop insurance and providing a form of rebate to farmers.

118.    Upon information and belief, CropUSA received over $500,000 from Hudson for Growers National. These funds should have been paid to AIA and the receipt of the funds was concealed from AIA. Plaintiffs will establish the exact amount of funds that the Controlling AIA Defendants and/or CropUSA received from Hudson for Growers National at the time of trial.

**I.    <u>The Controlling AIA Defendants Continue Unlawfully Using Funds from AIA and Intentionally Committing Torts against AIA with the Assistance of the Hawley Troxell Defendants—Even While this Lawsuit Was Pending</u>**

119.    Upon information and belief, the Hawley Troxell Defendants have been paid the bulk of the over $2,000,000 in attorneys' fees and costs incurred and/or paid for the various lawsuits. Plaintiffs will establish the exact amount of funds paid to the Hawley Troxell Defendants by AIA and/or on behalf of AIA, which Plaintiffs are seeking to be disgorged and returned to AIA.

120.    From 2009 through the present time, Donna exercised her right under the amended articles of incorporation to appoint two different directors to AIA Services' Board of Directors, but the Controlling AIA Defendants and/or the Hawley Troxell Defendants refused to honor her unqualified right thereby resulting in all actions taken by AIA Services' Board of Directors during that period of time being unauthorized and thus a breach of the fiduciary duties of the Controlling AIA Defendants.

///

SECOND AMENDED COMPLAINT - 27

121.    In December 2009, Donna filed suit against AIA Services to exercise her unequivocal right to appoint her designee, Patrick Moran, to the Board of Directors of AIA Services and to appoint a receiver for AIA Services. The Hawley Troxell Defendants once again appeared in that lawsuit and successfully opposed Donna's designee being appointed to the Board of Directors or a receiver being appointed by improperly seeking a stay in the lawsuit.

122.    Had the Hawley Troxell Defendants joined Donna in having a receiver appointed for AIA Services, which the Hawley Troxell Defendants should have done in light of the countless intentional torts committed against AIA by the Controlling AIA Defendants, there is no doubt that they could have stopped the Controlling AIA Defendants from carrying out their ongoing fraud, intentional breaches of fiduciary duties and their ultimate decimation of AIA. At a minimum, the Hawley Troxell Defendants acts and/or omissions in this regard was a substantial factor of the improper transactions, unlawful acts, and the ultimate decimation of AIA, which occurred after 2009.

123.    This lawsuit was filed by Plaintiffs on August 11, 2010, and subsequently stayed at the request of the Controlling AIA Defendants and the Hawley Troxell Defendants. During that stay, inappropriate and unlawful transactions continued to occur.

124.    In March 2012, the Controlling AIA Defendants, with, upon information and belief, the improper assistance of new attorneys at the law firm of Randall & Danskin, improperly terminated AIA Services' ESOP and paid those shareholders three cents per shares for their hard-earned common shares and failed to disclose the facts pertaining to the malfeasance and torts described in this Second Amended Complaint to those shareholders. (*See* Dkt. #67-30-33, 34.)

125.    However, the Controlling AIA Defendants knew that AIA Services' amended articles of incorporation barred all stock redemptions, including any purchases of shares held by

SECOND AMENDED COMPLAINT - 28

the ESOP, until the Series A Preferred Shares were all fully redeemed and the Series C Preferred Shares had been paid the over $1,000,000 in dividends owed. The repurchase of the ESOP shares for three cents per shares was illegal, ultra-vires and improper.

126.   In 2012, the Controlling AIA Defendants, again with the improper assistance of Randall & Danskin (*See* Dkt. #67-48, 67-48), improperly sought to effectuate a reverse stock split and to only pay AIA Services' minority common shareholders ten cents per share to repurchase those common shareholders (including Plaintiffs) without disclosing any facts and without offering full and fair compensation for the value of the shares. (*See* Dkt. #66-3.) The notice to the shareholders was signed by Duclos and the improper and unlawful reverse stock split was approved by Beck, John and Connie. (*Id.*)

127.   Thirteen shareholders objected. (*See* Dkt. #67-41.) The ill-conceived reverse stock split violated AIA Services' amended articles of incorporation and the Controlling AIA Defendants did not even bother to comply with Idaho Code, including, by failing to provide the form for the shareholders to state the value that they believed should be paid for their common shares thereby further establishing the true improper purpose of the failed reverse stock split.

128.   In response to the thirteen shareholder objections and notices of demands for payment, the Controlling AIA Defendants, through Randall & Danskin and without regard to the fact that they would expend tens of thousands of dollars more in funds litigating the issue rather than simply paying the shareholders the true fair value of their shares, had AIA Services file suit against the thirteen shareholders. (*See* Dkt. #83-15.) Judge Carl Kerrick properly dismissed the lawsuit, and further noted that it was disingenuous to seek a reverse stock split until this lawsuit was resolved. (*See* Dkt. #86-1.)

///

SECOND AMENDED COMPLAINT - 29

129.     The failed reverse stock split fiasco drained AIA of significant and unnecessary attorneys' fees and costs (fees and costs which could have been paid to those shareholders or for other AIA obligations). This purported reverse stock split was approved and/or acquiesced in by the Controlling AIA Defendants. Upon information and belief, the Hawley Troxell Defendants were aware of the scheme to effectuate reverse stock split to eliminate AIA Services' innocent minority shareholders, which would in turn eliminate common shareholder standing for this lawsuit.

130.     After the Controlling AIA Defendants had AIA Services file suit against the thirteen objecting common shareholders who demanded fair payment, Nez Perce County District Court Judge Carl Kerrick dismissed the lawsuit and awarded those minority shareholders attorneys' fees and costs. That judgment in favor of those shareholders has still never been paid by the Controlling AIA Defendants or AIA, and the Controlling AIA Defendants should be required to pay that judgment on behalf of AIA.

131.     From 2009 through 2015, the Controlling AIA Defendants continued loaning money to, or allowed money to be lent to, Pacific Empire Radio Corporation in an amount exceeding $1,400,000 by year-end 2012 when that corporation had no ability to repay the sums owed and it benefitted John and Connie (who owned shares in that corporation at certain relevant times) as those were funds they would not have to personally provide to Pacific Empire Radio Corp.

132.     From 1999 through 2012, the Controlling AIA Defendants concealed their ownership interests in other entities from AIA, which were derived from and/or funded by AIA, including, without limitation, CropUSA, CropUSA Insurance Services, LLC, Pacific Empire Holdings Corp.

SECOND AMENDED COMPLAINT - 30

**133.** From 1995 through 2012, John received over $2,729,557 in cash compensation from AIA. This amount does not include any compensation, payments or other improper distributions he may have received from CropUSA and other entities funded or launched using AIA. At a minimum, John should be required to disgorge the over $2,038,657 he received from AIA from 1999 through 2012 and other compensation or funds received since 1999, which John received while improperly competing against AIA through CropUSA and other entities (including Pacific Empire Holdings Corp.).

**J.** **There Is a Laundry List of the Unlawful Acts, Self-Dealing, Malfeasance and Intentional Torts Committed by the Controlling AIA Defendants**

**134.** Since acquiring operational control of AIA Services in 1995, the Controlling AIA Defendants have engaged in repeated acts of faithless self-dealing, transactions detrimental to AIA, committed intentional torts (including fraud and breaches of fiduciary duties), breached their fiduciary duties (including their duties of loyalty), concealed, conspired to commit intentional torts, aided and abetted in the commission of intentional torts and to cover up those torts, to the detriment of AIA, including, but not limited to, the following specific examples: **(a)** controlling the Board of Directors and/or the decisions made by the Board and refusing to act in the best interests of AIA; **(b)** violating AIA Services' restated bylaws, including but not limited to, failing to hold annual shareholder meetings, failing to obtain proper shareholder approval for certain transactions, failing to comply with conflicts of interest provision in the bylaws and articles of incorporation which restricted many of the unlawful or improper transactions described herein, and failing to properly comply with applicable corporate governance; **(c)** violating AIA's amended articles of incorporation thereby allowing substantial funds and assets to be depleted from AIA and obligating AIA to be liable for loans or guarantees which were barred by those amended articles of incorporation; **(d)** diverting corporate opportunities belonging to AIA; **(e)** conveying,

encumbering, utilizing, and/or pledging corporate assets to themselves or other entities; **(f)** inappropriately redeeming, acquiring and/or issuing shares of stock and/or making payments on put options, including but not limited to, issuing shares to the Controlling AIA Defendants; **(g)** inappropriately paying dividends; **(h)** intentionally failing to comply with conflict of interest provisions in AIA's bylaws; **(i)** guaranteeing loans for CropUSA and failing to guarantee loans for AIA; **(j)** paying excessive compensation to officers and directors, including but not limited to, paying John $250,000 per year to purportedly act as CEO and President of AIA Services after his contractual entitlement to such salary had expired and John had represented that he would not take salary in certain years; **(k)** wasting corporate assets, including by paying Connie and Beck $20,000 per year to purportedly serve on the Board of Directors of AIA Services; **(l)** divulging and/or utilizing AIA's trade secrets for the benefit of themselves and other entities, including CropUSA; **(m)** soliciting and transferring AIA employees to work for CropUSA; **(n)** engaging in acts and/or decisions without making full disclosure and without obtaining the required approval of shareholders; **(o)** engaging in millions of dollars of transactions wherein AIA conveyed benefits without the receipt of any consideration or without being repaid; **(p)** forming and operating entities in direct competition with AIA in the insurance marketplace, including without limitation, CropUSA and Pacific Empire Holdings Corp.; **(q)** making false representations, including, without limitation, regarding share values, omitting material facts in AIA's financial statements, falsely certifying AIA's financial statements, and that AIA was being operated for the benefit of the corporation; **(r)** concealing and failing to disclose material facts to AIA pertaining to loans, transfers, and utilization of assets, including without limitation, concealing or omitting material facts, including all of the necessary facts related to virtually each and every transaction described in this Second Amended Complaint; **(s)** making false representations to AIA, including without

SECOND AMENDED COMPLAINT - 32

limitation, making and certifying false and misleading financial statements to AIA and representing that AIA was being properly operated when it was instead being used to fund the lifestyle, payments and other businesses owned or partial owned by the Controlling AIA Defendants; **(t)** inappropriately loaning AIA's funds, or guaranteeing loans, to themselves and to other entities under their control in violation of AIA's amended articles of incorporation, bylaws and fiduciary duties; **(u)** paying tens of thousands of dollars in yearly fees to purportedly serve on the Board of Directors of AIA and other compensation and benefits, when such amounts were excessive and they were violating their fiduciary duties owed to AIA and they were all acting as faithless fiduciaries; **(v)** paying attorneys' fees and costs in various legal proceedings on behalf of the Controlling AIA Defendants and others when it was clear that they had intentionally failed to act in good faith, were not entitled to indemnification or to have attorneys' fees and costs advanced on their behalf, and by failing to obtain security for repayment of said funds; **(x)** acquiring a parking lot with AIA funds and charging AIA, and making AIA pay, excessive rent for use of the parking lot even though AIA did not actually use the parking lot; **(y)** failing to seat the full and required Board of Directors for AIA Services, including, without limitation, by failing to honor Donna's appointment of Patrick Moran and Paul Durant to AIA Services' Board of Directors; **(z)** improperly purchasing and transferring shares held by AIA or which should have been held by AIA to themselves, including without limitation shares in Pacific Empire Radio Corp., Pacific Empire Communications Corp., and Pacific Empire Holdings Corp. (this entity was formed with AIA's assets by John, improperly competed against AIA, and was later sold for $240,000); **(aa)** allowing John to profit from CropUSA's sale of assets to Hudson by improperly allowing him to retain a monthly fee of $10,000 per month when those funds should have gone to AIA; **(bb)** failing to take appropriate legal action in the interests of AIA; **(cc)** removing a tenant from an AIA owned

SECOND AMENDED COMPLAINT - 33

building to another building owned personally by John and/or other Controlling AIA Defendants; **(dd)** improperly subsidizing CropUSA and other entities with AIA's funds, labor and assets, failing to properly allocate expenses to CropUSA and failing to have other expenses paid back at all (which have already been identified as being approximately $500,000 as of 2008); **(ee)** selling and/or transferring assets and or/contracts belonging to AIA to others (including the contract with Growers National); **(ff)** improperly paying numerous law firms other than the Hawley Troxell Defendants hundreds of thousands of dollars representing AIA and the Controlling AIA Defendants in litigation caused by their own intentional acts and torts; **(gg)** paying more of AIA's funds to litigate disputes (including with Donna in the Idaho state courts) than it would have taken to simply pay the money owed; **(hh)** failing to obtain security, failing to charge interest, and failing to collect on loans of at least $307,000 made to John; **(ii)** removing the $400,000 held in the court registry and the over $200,000 in a bank account in *Taylor v. AIA Services Corp., et al.*, and allowing the Controlling AIA Defendants to utilize those funds when the Hawley Troxell Defendants should have ensured that those funds were kept from them; **(jj)** expending significant sums on the illegal repurchase of common shares in AIA Services, which also resulted in the ownership interest of the Controlling AIA Defendants increasing; and **(kk)** allowing AIA to engage in the transactions identified in this Second Amended Complaint when no dividends had been declared or paid on the Series C Preferred Shares held in the AIA Services 401(k) Plan and those shares now have accrued dividends owed of over $1,000,000. The Controlling AIA Defendants and/or the Hawley Troxell Defendants have assisted one another and others in committing the intentional torts against AIA described herein and concealing, or covering up, the facts and the intentional torts committed against AIA, including those specifically referenced in this paragraph and elsewhere in this Second Amended Complaint.

SECOND AMENDED COMPLAINT - 34

135.    At all relevant times, John was CEO, President and director of AIA Services, AIA Insurance and CropUSA and a shareholder of AIA Services at the time of all of the improper transactions with CropUSA and other improper acts identified in this Second Amended Complaint (also a classic example of a conflict of interest), and he improperly benefited from those unlawful transactions with the assistance and/or covering up of the transactions through the Controlling AIA Defendants and the Hawley Troxell Defendants (as to certain of the transactions and malfeasance).

136.    At all relevant times, John was also owned interests in other entities who improperly benefitted directly or indirectly from AIA, which were additional conflicts of interest and proof of self-dealing.

137.    During certain relevant times, the Controlling AIA Defendants were all purported shareholders of CropUSA and either majority shareholders (as a group) or officers of AIA Services at the time of the improper transactions and malfeasance identified in this Second Amended Complaint (also a classic example of conflict of interest), and they improperly benefited, directly or indirectly, from those unlawful transactions with the assistance and/or covering up of the transactions through the Controlling AIA Defendants and the Hawley Troxell Defendants (as to certain of the transactions and malfeasance).

138.    As a result of the acts and omissions set forth and/or contemplated above and other acts and/or omissions which will be established at or before trial, the Controlling AIA Defendants and the Hawley Troxell Defendant have proximately caused AIA millions of dollars in damages.

## V.    CERTIFICATE OF COMPLIANCE WITH IDAHO CODE SECTION 30-1-742 AND FEDERAL RULE OF CIVIL PROCEDURE 23.1

139.    As a prerequisite to filing this lawsuit under Idaho Code § 30-1-742 and Federal Rule of Civil Procedure 23.1, Plaintiffs (and over ten other shareholders of AIA Services) have been shareholders of AIA Services during all relevant times to the claims asserted in this Second

SECOND AMENDED COMPLAINT - 35

Amended Complaint.

**140.**   On July 21, 2008, Donna served a written derivative demand letter on the Boards of Directors of AIA Services and AIA Insurance. (Dkt. #23-9 and #67-19.)

**141.**   On July 23, 2008, the Hawley Troxell Defendants filed a Motion for Stay of Proceedings in *Taylor v. AIA Services Corp.*, *et al.*, and asserted that the stay was necessary so that AIA Services and AIA Insurance could conduct an inquiry into the demands made by Donna in her letter dated July 21, 2008.

**142.**   On August 14, 2008, in *Taylor v. AIA Services Corp.*, *et al.*, the Hawley Troxell Defendants disingenuously filed a petition for a court appointed independent inquiry on behalf of AIA when they had no intention of following through with the inquiry. (*See* Dkt. #67-20.)

**143.**   On September 4, 2008, Reed Taylor supported the appointment of independent investigators. However, Reed Taylor objected to the investigators proposed by the Hawley Troxell Defendants, who were purportedly representing AIA, and the Controlling AIA Defendants. (*See* Dkt. #67-21.) Reed Taylor believed totally independent people should be appointed.

**144.**   Although the parties had filed briefing with respect to the appointment of independent investigators, the Hawley Troxell Defendants never noted the motion for a hearing and the court never ruled on the request, and they intentionally abandoned the appointment of an independent inquiry.

**145.**   The Hawley Troxell Defendants and Controlling AIA Defendants have never conducted a further investigation of the demands made in Donna's derivative demand letter of July 21, 2008. No action was ever taken by the Boards of Directors.

**146.**   On April 3, 2012, Plaintiffs made another written demand on the Boards of Directors of AIA Services and AIA Insurance, which included demands to keep the $400,000 cash

SECOND AMENDED COMPLAINT - 36

held in the Court registry in *Taylor v. AIA Services Corp.*, *et al*., to comply with AIA's amended articles of incorporation, to comply with AIA's bylaws, provide full disclosure, and to protect certain other assets. (Dkt. #67-33.) This particular demand was copied directly to Babbitt and Ashby, so they had full knowledge of it. This demand, like all of the others, was ignored. (*See* Dkt. #67, p. 11 ¶ 29.)

147.   On July 16, 2012, the Plaintiffs and over ten other shareholders of AIA Services served additional written derivative demands upon the Boards of Directors of AIA Services and AIA Insurance. (Dkt. #67-42.) The demands requested, among other things, that AIA pursue this lawsuit with all claims as of July 16, 2012 and future claims, including punitive damages. (*Id*.) In addition, Plaintiffs have made additional written derivative demands upon the Boards of Directors of AIA Services and AIA Insurance, but no action has ever been taken by the Boards of Directors.

148.   Over ninety days have elapsed since the Plaintiffs' written derivative demands were made and no action has been taken by AIA whatsoever, and all of the claims asserted in this lawsuit flowed from those derivative demands.

149.   As owner of Preferred A Shares in AIA Services, and as beneficial owner common shares in AIA Services, Donna fairly represents the interests of shareholders not named in this lawsuit. She also assisted in defeating the litigation involved the Controlling AIA Defendants' efforts to effectuate an improper reverse stock split to eliminate shareholder standing in this lawsuit, when she could have simply sought to solely protect her interests only. Donna is not pursuing this lawsuit in a collusive manner in order to obtain jurisdiction where it does not otherwise exist but to only pursue *bona fide* claims. Donna has pursued this lawsuit solely for the benefit of AIA and their innocent shareholders.

///

SECOND AMENDED COMPLAINT - 37

150.     As the second largest common shareholder AIA Services (who traded a book of insurance business worth approximately $500,000 to AIA Services in exchange for his common shares), Miesen also fairly represents the interest of AIA and their shareholders. Miesen has never received a penny in return for his investment in AIA. Miesen is not pursuing this lawsuit in a collusive manner in order to obtain jurisdiction where it does not otherwise exist but to only pursue *bona fide* claims. Miesen has pursued this lawsuit solely for the benefit of AIA and their innocent shareholders.

## VI.    COUNT I—BREACH OF FIDUCIARY DUTIES
### (Against the Controlling AIA Defendants and the Hawley Troxell Defendants)

151.     Plaintiffs re-allege and incorporate by reference herein each and every allegation asserted elsewhere in this Second Amended Complaint to the extent necessary to support this cause of action.

152.     The Controlling AIA Defendants owed fiduciary duties to AIA as the majority and controlling shareholders. As members, or purported members, of the Board of Directors for AIA Services and/or AIA Insurance, the Controlling AIA Defendants, who have each served as a director of AIA Services at one time, owed fiduciary duties to the corporations. As corporate officers of AIA, John, as President and CEO, and Duclos, as Secretary, owed fiduciary duties to AIA, which were further elevated during the times in which the both served as directors too (which is from 1995 to the present time for John).

153.     As attorneys for AIA, the Hawley Troxell Defendants owed fiduciary duties to AIA (including the undivided duty of loyalty). If not authorized to act as attorneys for AIA, the Hawley Troxell Defendants acted with apparent authority as agents and owed fiduciary duties as a result of that agency relationship. The Hawley Troxell Defendants had conflicts of interest when they undertook to represent AIA and CropUSA, and when they proceeded in the manner directed by

any one or more of the Controlling AIA Defendants, thereby improperly representing the interests of the Controlling AIA Defendants, instead of the best interests of AIA. *Reis v. Barley, Snyder, Senft & Cohen LLC,* 484 F.Supp.2d 337 (E.D. Pa. 2007).

154.    Based on any and/or all of the acts and/or omissions set forth in this Second Amended Complaint and/or those facts proven at or before the time of trial, the Controlling AIA Defendants and the Hawley Troxell Defendants have breached their fiduciary duties owed to AIA, including, without limitation, breaching their undivided duties of loyalty, trust and confidence owed to AIA, and by placing their interest in earning hundreds of thousands of dollars, and ultimately over $1,000,000, in attorneys' fees over looking after the interests of AIA.

155.    The Hawley Troxell Defendants have separately breached their fiduciary duties as matter of law when they simultaneously represented AIA and CropUSA. In addition, Riley was aware that CropUSA was derived from AIA and he was further aware of the restrictions in AIA Services' amended articles of incorporation as he helped draft them. The Hawley Troxell Defendants have further breached their fiduciary duties as a matter of law for the violations of the Rules of Professional Conduct dealing with loyalty to a client and conflicts of interest.

156.    As a direct and/or proximate cause of the Controlling AIA Defendants and the Hawley Troxell Defendants breaches of their fiduciary duties, AIA has been damaged in the amount to be proven at or before trial.

157.    In addition, each of the Controlling AIA Defendants and the Hawley Troxell Defendants is a "faithless fiduciary" as defined by law and is therefore required to disgorge all compensation and consideration received from AIA and/or CropUSA. The disgorgement is in addition to liability caused by the breaches of fiduciary duty. In the case of the Hawley Troxell Defendants, the disgorgement goes to all fees received for or paid on behalf of AIA and CropUSA.

SECOND AMENDED COMPLAINT - 39

In the case of the faithless Controlling AIA Defendants, the disgorgement goes to all salary, bonuses, warrants, stock options, or stock received from AIA.

## VII.   COUNT II—AIDING AND ABETTING BREACHES OF FIDUCIARY DUTIES
### (Against the Controlling AIA Defendants and the Hawley Troxell Defendants)

**158.**   Plaintiffs re-allege and incorporate by reference herein each and every allegation asserted elsewhere in this Second Amended Complaint to the extent necessary to support this cause of action.

**159.**   One who counsels, advises, abets or assists in the commission of an actionable wrong is responsible to the injured person for the entire loss or damage. 86 C.J.S. Torts § 105; RESTATEMENT (FIRST) OF TORTS § 876 (1939). Aiding and abetting in the commission of an actionable wrong may be inferred from the fact that one aided and abetted efforts to conceal the wrong. 86 C.J.S. Torts § 105. Liability for aiding and abetting the commission of a tort may be established by showing the person was present at the time of the actionable wrong and did not disapprove or oppose the action. Plaintiffs alleging aiding and abetting need not prove that the aiding and abetting was necessary for the commission of the tort, only that the aiding and abetting made it easier for the tort to occur. *See Wells Fargo Bank v. Arizona Laborers, Teamsters and Cement Masons Local No. 395 Pension Trust Fund*, 201 Ariz. 474, 38 P.3d 12 (2002).

**160.**   During certain relevant times, the Hawley Troxell Defendants and the Controlling AIA Defendants had knowledge of the other defendants' acts and/or omissions as described in this Second Amended Complaint and as proven at trial, knew that such acts and/or omissions constituted breaches of fiduciary duties, did not disapprove of such acts or omissions, took no steps to prevent the commission of the breaches of fiduciary duties flowing from the acts and/or omissions, and assisted in the concealment of such acts and/or omissions described herein, thereby damaging AIA.

SECOND AMENDED COMPLAINT - 40

**161.**     As a direct and/or proximate cause of the Hawley Troxell Defendants and the Controlling AIA Defendants aiding and abetting one another in the breaches of fiduciary duties, AIA has been damaged in the amount to be proven at or before trial.

### VIII.     COUNT III—LEGAL MALPRACTICE
### (Against the Hawley Troxell Defendants)

**162.**     Plaintiffs re-allege and incorporate by reference herein each and every allegation asserted elsewhere in this Second Amended Complaint to the extent necessary to support this cause of action.

**163.**     A legal malpractice claim may be brought in a derivative action. *Schulman v. Wolf & Samson, PC,* 951 A.2d 1051 (N.J. 2008).

**164.**     Since at least 1999, the Hawley Troxell Defendants had an attorney-client relationship with AIA, while Riley has had an attorney-client relationship with AIA since prior to 1995. The Hawley Troxell Defendants owed duties to AIA, including, without limitation, duties of care, good faith and loyalty. Despite the duties owed to AIA, the Hawley Troxell Defendants also improperly represented CropUSA.

**165.**     The Hawley Troxell Defendants have breached their duties owed to AIA, including, without limitation, the breached duties described in this Second Amended Complaint. The Hawley Troxell Defendants have further violated their duty of loyalty owed to AIA by improperly simultaneously representing AIA and CropUSA, together with directly and/or indirectly improperly representing the interests of the Controlling AIA Defendants.

**166.**     AIA suffered damages as a direct, foreseeable and/or proximate result of the breaches of duty and the acts of the Hawley Troxell Defendants, including those acts described in this Second Amended Complaint and/or proven at the time of trial. At a minimum, the Hawley Troxell Defendants were also a substantial factor in the harm and damages inflicted upon AIA,

SECOND AMENDED COMPLAINT - 41

including, without limitation, the ultimate decimation of AIA by the Controlling AIA Defendants. Had the Hawley Troxell Defendants properly discharged their duties, the Controlling AIA Defendants would never have decimated AIA.

167.     As a direct and/or proximate cause of such acts and/or omissions, the Hawley Troxell Defendants are liable to AIA for damages in the amount to be proven at or before the time of trial.

### IX.     COUNT IV—FRAUD/FRAUDULENT CONCEALMENT/ CONSTRUCTIVE FRAUD (Against the Controlling AIA Defendants)

168.     Plaintiffs re-allege and incorporate by reference herein each and every allegation asserted elsewhere in this Second Amended Complaint to the extent necessary to support this cause of action.

169.     The Controlling AIA Defendants are liable to AIA for fraud because: **(a)** they made representations of fact to AIA and AIA Services' innocent minority shareholders as asserted throughout this Second Amended Complaint, including but not limited to, (i) representations that CropUSA was being operated for the benefit of AIA, (ii) representations that AIA was being properly operated (including that the Boards of Directors had properly authorized certain transactions when Donna's designee was not on the Board of AIA Services and the provisions in the amended articles and bylaws had not been complied with), (iii) representations that the information on AIA's financial statements was true (John separately certified to auditors and others that the information contained on certain of AIA's financial statements was true and correct), (iv) representations that expenses and loans between AIA and other entities or parties were properly entered into and accounted for (i.e., there are hundreds of thousands of dollars, if not millions of dollars, in funds and other assets used by CropUSA which were derived from AIA and never

accounted for), and (v) other representations referenced in this Second Amended Complaint; **(b)** these representations were false; **(c)** these representations were material; **(d)** they knew these representations were false; **(e)** they intended that there be reliance; **(f)** AIA was ignorant of the falsity of these representations; **(g)** AIA relied on these representations; **(h)** AIA's reliance was justified; and **(i)** injury resulted. *See, e.g., Mannos v. Moss,* 143 Idaho 927, 155 P.3d 1166 (2007) (holding that misrepresentations in financial statements precluded summary judgment). Constructive fraud is identical to fraud, except that the plaintiff need not prove speaker's knowledge of the fraud and the speaker's intent that the other party rely on the representations.

170.    The Controlling AIA Defendants owed duties to AIA during certain relevant times as majority shareholders, board members and/or officers of AIA. In addition to making false representations, the Controlling AIA Defendants also concealed information from AIA and its innocent minority shareholders with knowledge that the concealed information was material and that the concealment would cause AIA to suffer otherwise avoidable damages, including without limitation, information contained in this Second Amended Complaint. The Controlling AIA Defendants' failure to disclose a fact to AIA and AIA Services' innocent minority shareholders where one has a duty to disclose is the legal equivalent of representing the non-existence of the fact. Where facts are fraudulently concealed, Plaintiffs need not show reliance as there is nothing other than silence upon which to rely.

171.    The Controlling AIA Defendants represented to AIA Services that CropUSA was a wholly owned subsidiary of AIA Services. Simultaneously, the Controlling AIA Defendants adopted the position, not disclosed to AIA or its innocent minority shareholders, that CropUSA was an independent entity with John as its alleged sole shareholder and subsequently failed to disclose that CropUSA was not a separate entity. These representations were false, the Controlling

SECOND AMENDED COMPLAINT - 43

AIA Defendants knew of their falsity, the Controlling AIA Defendants intended that there be reliance, there was justifiable reliance by AIA and AIA Services' innocent minority shareholders, and AIA was damaged as a result.

172.    By operating CropUSA as an independent entity, and by using CropUSA as a vehicle for misappropriating and converting corporate assets, the Controlling AIA Defendants committed ongoing fraud that has persisted through the date of this Second Amended Complaint.

173.    The Controlling AIA Defendants also made misrepresentations to AIA and AIA Services' innocent minority shareholders in the form of false, misleading and fraudulent financial statements (which such financial statements also failed to disclose numerous improper and unlawful transactions and their ownership interests in CropUSA and other entities), upon which AIA and AIA Services' innocent minority shareholders reasonably relied, with that reliance being the proximate cause of AIA's damages.

174.    When the Controlling AIA Defendants transferred more than $1.5 million to CropUSA in 2004, they concealed the fact of this transaction from AIA and AIA Services' innocent minority shareholders and AIA was damaged by this concealment.

175.    When the Controlling AIA Defendants transferred AIA corporate assets, including funds, employees, goodwill and trade secrets to CropUSA and other entities and were subsidizing CropUSA and other entities, they concealed these facts from AIA and AIA Services' innocent minority shareholders. AIA suffered damages by these concealments.

176.    When the Controlling AIA Defendants had AIA pay certain of CropUSA's corporate expenses, they concealed this fact from AIA.  AIA suffered damages as a result of this concealment.

///

SECOND AMENDED COMPLAINT - 44

177.     When the Controlling AIA Defendants pledged the mortgage obtained by AIA from the state of Idaho to CropUSA so that CropUSA could borrow money to pay the attorney's fees of the Hawley Troxell Defendants, they concealed this fact from AIA.  AIA suffered damages as a result of this concealment.

178.     When the Controlling AIA Defendants had AIA Insurance guarantee CropUSA's $15 million line of credit and later sold over $10,000,000 in assets derived from AIA to Hudson Insurance, they concealed the fact of this guarantee and asset sale from AIA.

179.     When the Controlling AIA Defendants finally disclosed their ownership interests in CropUSA, CropUSA Insurance Services, LLC and other entities in AIA Services' financial statements in July 2012[2] (*See* Dkt. #67-38), they continued to conceal how they obtained their ownership interest in those entities (and in the case of CropUSA that the ownership interest came from AIA) and many transactions and purported loans between the entities and AIA (loans and guarantees made by AIA which were prohibited by AIA Services' amended articles of incorporation and restated bylaws).

180.     As a direct and/or proximate cause of the Controlling AIA Defendants' fraudulent acts, AIA has been damaged in an amount to be proven at or before trial, and the ongoing fraud bars the Controlling AIA Defendants from asserting statute of limitations defenses. To the extent that the Hawley Troxell Defendants seek to assert the statute of limitations as a defense, they too are barred from doing so through their fraudulent concealment of facts from AIA.

///

///

///

---

[2] While the financial statements were dated as of year-end 2011, they were not provided to AIA or its shareholders until July 2012 in connection with the failed ill-conceived reverse stock split.

SECOND AMENDED COMPLAINT - 45

## X.   COUNT V—AIDING AND ABETTING FRAUD
### (Against the Controlling AIA Defendants and the Hawley Troxell Defendants)

**181.**    Plaintiffs re-allege and incorporate by reference herein each and every allegation asserted elsewhere in this Second Amended Complaint to the extent necessary to support this cause of action.

**182.**    One who aids and abets in the commission of a tort is liable with the primary tortfeasor(s) for all damages resulting from the tort. Aiding and abetting is established where one has knowledge of the torts, does not disapprove, and takes no action to prevent the commission of the torts or assists in covering up such torts. The foregoing applies to the Controlling AIA Defendants and the Hawley Troxell Defendants.

**183.**    The Controlling AIA Defendants have aided and abetted in one another's fraud committed against AIA. The Controlling AIA Defendants' silence, failure to act and intentional acts to cover up fraud upon AIA constitutes the aiding and abetting of fraud upon AIA.

**184.**    The Hawley Troxell Defendants have aided and abetted in the fraud committed against AIA by the Controlling AIA Defendants by assisting in the commission of fraud. The Hawley Troxell Defendants' silence, failure to act and intentional acts to cover up fraud upon AIA constitutes the aiding and abetting the fraud upon AIA.

**185.**    The Hawley Troxell Defendants knew or should have known that the transfer of AIA's assets, loans and other unauthorized transactions to CropUSA constituted a fraud against AIA.

**186.**    The Hawley Troxell Defendants knew or should have known that the transfer of approximately $1,500,000 to CropUSA in 2004 constituted a fraud on AIA.

**187.**    The Hawley Troxell Defendants knew or should have known that the practice of allocating CropUSA expenses to AIA, and otherwise failing to maintain arms' length transactions

between CropUSA and AIA, constituted a fraud on AIA.

188.    By knowingly providing legal cover for the fraudulent acts described herein, the
Hawley Troxell Defendatns have aided and abetted the fraud committed by the Controlling AIA
Defendants and CropUSA.

189.    As aiders and abettors, the Hawley Troxell Defendants are liable to AIA to the same
extent as the primary tortfeasors. RESTATEMENT (FIRST) OF TORTS § 876 (1939). Likewise, the
Controlling AIA Defendants are all liable for aiding and abetting each other in the commission of
fraud against AIA.

190.    As a direct and/or proximate cause of the Hawley Troxell Defendants and the
Controlling AIA Defendant aiding and abetting in fraud, AIA has been damaged in the amount to
be proven at or before the time of trial.

## XI.    COUNT VI—BREACH OF CONTRACT
### (Against John)

191.    Plaintiffs re-allege and incorporate by reference herein each and every allegation
asserted elsewhere in this Second Amended Complaint to the extent necessary to support this cause
of action.

192.    On August 1, 1995, John and AIA Services entered into an Executive Officer's
Agreement. (*See* Dkt. #67-8.)

193.    The Executive Officer's Agreement contains contractual provisions preventing
John from doing certain acts. For example, Section 9 of the Executive Officer's Agreement sets
for express covenants not to compete. Subsection A of the covenants prohibits John from soliciting
AIA customers or otherwise diverting the business of AIA customers. Subsection B prohibits John
from participating in any insurance business that underwrites, markets or administers insurance
products for commodity associations. Subsection C prohibits John from soliciting AIA Services

SECOND AMENDED COMPLAINT - 47

employees for other employment.  Subsection D of the covenants bars John from divulging or exploiting trade secrets belonging to AIA.

194.    John has breached his contractual obligations owed to AIA, including, without limitation, by forming CropUSA as anything other than a wholly-owned subsidiary of AIA, competing against AIA with CropUSA and other entities (including Pacific Empire Holdings and CropUSA Insurance Services, LLC). John has breached all four subsections of Section 9 of the Executive Officer's Agreement.

195.    As a direct and/or proximate cause of John's breaches of the Executive Officer's Agreement, AIA has been damaged in an amount to be proven at or before trial. Such breaches also constitute the breaches of his fiduciary duties owed to AIA.

## XII.    COUNT VII—DECLARATORY JUDGMENT
### (Against the Controlling AIA Defendants and the Hawley Troxell Defendants)

196.    Plaintiffs re-allege and incorporate by reference herein each and every allegation asserted elsewhere in this Second Amended Complaint to the extent necessary to support this cause of action.

197.    Plaintiffs seek a declaratory judgment against Controlling AIA Defendants, including, without limitation, for the following relief: (a) for a full accounting with supporting documentation of all of AIA's funds, assets, loans and other transactions from 1999 through the present time; (b) requiring the Controlling AIA Defendants to comply with AIA's amended articles of incorporation, bylaws and the Idaho Business Corporation Act; (c) rescinding the purchases of the shares held by the ESOP and/or ensuring that those shareholders receive fair value for their shares; (d) rescinding and/or declaring void the common shares issued to John through is Executive Officer's Agreement; and (d) such other relief as may be requested at or before trial (including any declaratory relief contemplated by any of the acts and/or omissions set forth in this Second

SECOND AMENDED COMPLAINT - 48

Amended Complaint).

**198.** Plaintiffs seek a declaratory judgment against the Hawley Troxell Defendants, including, without limitation, for the following relief: (a) that the representation agreement, fee agreements and any related agreements entered into with them and AIA be declared void (including, without limitation, because such agreements violated the applicable Rules of Professional Conduct); (b) any agreements or accounts regarding any sums owed by AIA, if any, be declared void; and (c) such other relief as may be requested at or before trial (including any declaratory relief contemplated by any of the acts and/or omissions set forth in this Second Amended Complaint).

### XIII.   COUNT VIII—EXCESSIVE COMPENSATION/CORPORATE WASTE
#### (Against the Controlling AIA Defendants)

**199.** Plaintiffs re-allege and incorporate by reference herein each and every allegation asserted elsewhere in this Second Amended Complaint to the extent necessary to support this cause of action.

**200.** To support a claim for excessive compensation, Plaintiffs need only show that the board lacked independence and/or lacked good faith. *In Re: Tyson Foods, Inc.,* 919 A.2d 563 (Del. 2000). The Controlling AIA Defendants have been officers and/or controlled AIA's Boards of Directors from 1995 through certain relevant times.  The Controlling AIA Defendants have lacked independence and have not acted in good faith, including, without limitation, by committing the intentional acts and/or omissions described in this Second Amended Complaint.

**201.** The Controlling AIA Defendants paid excessive compensation and have wasted corporate assets during the course of managing and/or operating AIA, including, without limitation, by paying themselves excessive compensation (and practically speaking, any compensation at all based on their acts and omissions) and operating AIA for the benefit of

SECOND AMENDED COMPLAINT - 49

CropUSA, the Controlling AIA Defendants and other entities they partially or wholly own, including Pacific Empire Radio Corp., CropUSA Insurance Services, LLC, and Pacific Empire Holdings Corp. The Controlling AIA Defendants also decimated AIA's agency force and caused them to transfer to CropUSA and ultimately Hudson and other entities. In addition, notwithstanding the fact that John is not entitled to retain any of his compensation or benefits as a faithless fiduciary, it was separately corporate waste to pay him in the first place as he did nothing for AIA (AIA's business was simply running off the commissions received for policies sold years before). The other transactions and malfeasance described in this Second Amended Complaint also constitute corporate waste, and none of those transactions and malfeasance were properly disclosed to all of AIA Services' shareholders nor was any authorization from them ever sought or obtained.

202.    The Controlling AIA Defendants are liable to AIA for damages caused by paying excessive compensation and otherwise wasting and needlessly depleting AIA's funds and assets for their own benefit and with disregard for AIA.

203.    As a direct and/or proximate cause of the Controlling AIA Defendants' waste, AIA has been damaged in the amount to be proven at or before trial.

## XIV.    COUNT IX—ACCOUNT STATED
### (Against John)

204.    Plaintiffs re-allege and incorporate by reference herein each and every allegation asserted elsewhere in this Second Amended Complaint to the extent necessary to support this cause of action.

205.    John established an account by borrowing $307,000 from AIA for his personal use. John subsequently confirmed the amount of the debt by "correcting" an alleged so-called accounting "error" when he had previously extinguished the $307,000 debt by improperly crediting the payment of Reed Taylor's $6 million promissory after the issue arose in *Taylor v.*

SECOND AMENDED COMPLAINT - 50

*AIA Services Corp., et al.*, so that AIA's book show that AIA is creditor and John is debtor for $307,000, i.e., the correction was only made because Reed Taylor demanded it and he was suing AIA Services for repaying of the $6 million note.

206.   John has not paid any portion of this debt and the entire balance remains due and payable to AIA. John is liable to AIA for $307,000 on the account stated and/or such other amount as may be presently owed, plus prejudgment interest from the date the obligation was incurred. If John has since paid back the $307,000 or any part of the sums he owes, then Plaintiffs still seek the balance owed and prejudgment interest for the benefit of AIA, including, because John has been a faithless fiduciary who is not entitled to any interest-free loans from AIA.

## XV.   <u>JURY DEMAND</u>

207.   Plaintiffs hereby demand a trial by jury of no less than the maximum number of jurors permitted on all causes of action for which a jury trial is allowed by law.

## XVI.   <u>PRAYER FOR RELIEF</u>

Wherefore Plaintiffs pray for the following relief:

1.   For a judgment jointly and severally against the Controlling AIA Defendants and the Hawley Troxell Defendants for damages in an amount to be proven at trial, plus prejudgment interest;

2.   For judgments against the Controlling AIA Defendants and the Hawley Troxell Defendants in an amount to be proven at trial for damages for which joint and several liability does not apply to all defendants, plus prejudgment interest;

3.   For a judgment or order requiring the Hawley Troxell Defendants to disgorge all attorneys' fees and costs paid to them by AIA Services, AIA Insurance, CropUSA and by any other party on behalf of those entities in the amount to be proven at the time of trial, plus prejudgment interest;

SECOND AMENDED COMPLAINT - 51

4.      For a judgment or order requiring the Controlling AIA Defendants to disgorge all compensation received from AIA or CropUSA since 1999, including stock, cash, benefits, and other assets, including based on intentionally breaching their fiduciary duties and being faithless fiduciaries;

5.      For judgment against John in the amount to be proven at the time of trial, plus prejudgment interest;

6.      For an order requiring that all funds recovered as a result of this litigation, minus fees, costs and bona fide debts, be deposited with the Court registry and distributed only after court order, and that no funds from this litigation be paid to faithless fiduciary Controlling AIA Defendants;

7.      For judgments against the Controlling AIA Defendants, jointly and severally, as the alter-ego of CropUSA or to pierce its corporate veil, for all damages incurred by AIA and attributable in whole or in part to CropUSA;

8.      For a declaratory judgment for the relief specified in this Second Amended Complaint and any other declaratory relief requested at or before trial;

9.      For an award of the attorneys' fees and cost incurred in this action as allowed by statute, contract, or recognized grounds of equity; and

10.     For any such further relief or remedy, including preliminary and/or permanent injunctive relief, as Plaintiffs may request or as this Court may find just and equitable.

DATED:  This 20th day of June, 2016.

RODERICK BOND LAW OFFICE, PLLC


By:   */s/ Roderick C. Bond*
              Roderick C. Bond
              Attorney for Plaintiffs

SECOND AMENDED COMPLAINT - 52

## VERIFICATION OF DALE L. MIESEN

STATE OF TEXAS          )
                        ) ss.
COUNTY OF TARRANT       )

I, Dale L. Miesen, being first duly sworn on oath, deposes and says:

I am one of the Plaintiffs in the above-entitled action. I have read the contents of this Second Amended Complaint, know the contents of this Second Amended Complaint, and believe that the facts in set forth in this Second Amended Complaint and exhibits attached thereto are true and accurate to the best of my knowledge and belief.

Dale L. Miesen

SUBSCRIBED AND SWORN to before me this 20 day of June, 2016.

Karen R. Burton
Commission Expires
07-03-2017

Notary Public for Texas
Residing at: 1066 Norwood, Hurst TX 76054 / Tarrant County
My commission expires: 7/3/2017

## VERIFICATION OF DONNA J. TAYLOR

STATE OF IDAHO          )
                                      ) ss.
COUNTY OF NEZ PERCE     )

I, Donna J. Taylor, being first duly sworn on oath, deposes and says:

I am one of the Plaintiffs in the above-entitled action. I have read the contents of this Second Amended Complaint, know the contents of this Second Amended Complaint, and believe that the facts in set forth in this Second Amended Complaint and exhibits attached thereto are true and accurate to the best of my knowledge and belief.

Donna J. Taylor

SUBSCRIBED AND SWORN to before me this 30th day of June, 2016.

Notary Public for Idaho
Residing at: Lewiston
My commission expires: 8/21/20

SECOND AMENDED COMPLAINT - 54

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on the 20th day of June, 2016, I filed the foregoing electronically through the CM/ECF system, which caused the following parties or counsel to be served by electronic means, as more fully reflected on the Notice of Electronic Filing:

James D LaRue:    jdl@elamburke.com, sd@elamburke.com

Jeffrey A Thomson:    jat@elamburke.com, nlp@elamburke.com

Loren C Ipsen:    lci@elamburke.com, nlp@elamburke.com

Shawnee S Perdue:    sperdue@wielandperdue.com, admin@wielandperdue.com, tmooney@wielandperdue.com

Steven P Wieland:    swieland@wielandperdue.com, admin@wielandperdue.com, tmooney@wielandperdue.com

AND I FURTHER CERTIFY that on such date I served the foregoing on the following non-CM/ECF Registered Participants in the manner indicated:  Via first class mail, postage prepaid addressed as follows:

AIA Services Corporation
P.O. Box 538
Lewiston, ID  83501

AIA Insurance, Inc.
P.O. Box 538
Lewiston, ID  830501

_____*/s/ Roderick C. Bond*_____
Roderick C. Bond

SECOND AMENDED COMPLAINT - 55