RODERICK C. BOND, ISB NO. 8082
RODERICK BOND LAW OFFICE, PLLC
601 108th Ave. NE, Suite 1900
Bellevue, WA  98004
Telephone: (425) 591-6903
Fax: (425) 321-0343
Email: rod@roderickbond.com
Attorney for Plaintiff

UNITIED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| DALE L. MIESEN, an individual who is a shareholder and who is also bringing this action on behalf of and/or in the right of AIA Services Corporation and its wholly owned subsidiary AIA Insurance, Inc.; <br><br> Plaintiff, <br><br> v. <br><br> CONNIE TAYLOR HENDERSON, an individual; JOLEE K. DUCLOS, an individual; HAWLEY TROXELL ENNIS & HAWLEY LLP, an Idaho limited liability partnership; GARY D. BABBITT, an individual; D. JOHN ASHBY, an individual; RICHARD A. RILEY, an individual; MICHAEL W. CASHMAN SR., an individual; JAMES BECK, an individual; R. JOHN TAYLOR, an individual; CROP USA INSURANCE AGENCY, INC., an Idaho corporation; AIA SERVICES CORPORATION, an Idaho corporation; AIA INSURANCE, INC.; an Idaho corporation; CROP USA INSURANCE SERVICES, LLC; an Idaho limited liability company; and GEMCAP LENDING I, LLC, a Delaware limited liability company, <br><br> Defendants. | Civil No. 1:10-cv-00404-CWD <br><br> THIRD AMENDED COMPLAINT <br><br> DEMAND FOR JURY TRIAL |

THIRD AMENDED COMPLAINT - i

# Exhibit - A

## TABLE OF CONTENTS

I.    STATEMENT OF JURISDICTION.................................................................................... 1

II.   STATEMENT OF VENUE ............................................................................................... 1

III.  PARTIES AND DEFINITIONS OF THE PARTIES.......................................................... 1

IV.   FACTS ............................................................................................................................. 6

A.    The Background Facts Regarding AIA Services and AIA Insurance................................. 6

B.    John, Connie, Beck and Cashman Take Operational Control of AIA and AIA
      Authorizes the Issuance of Series C Preferred Shares and Additional Restrictions in
      Its Amended Articles of Incorporation .................................................................................. 8

C.    AIA Forms CropUSA and the Controlling AIA Defendants Unlawfully Transfer
      CropUSA to Themselves ..................................................................................................... 11

D.    The Hawley Troxell Defendants Aid and Abet the Controlling AIA Defendants
      in Taking CropUSA from AIA and Having AIA Fund CropUSA .................................... 15

E.    The Controlling AIA Defendants Unlawfully Transfer $1,510,693 From AIA to
      Fund CropUSA and Then They Use $634,269 of Those Funds to Repay a Debt that
      CropUSA Owed to AIA—thereby Resulting in a $2,144,962 Fraud Against AIA........... 17

F.    The Controlling AIA Defendants Continue to Unlawfully Fund, Subsidize and
      Operate CropUSA Using AIA's Funds, Assets, Labor and Financial Wherewithal ......... 21

G.    The Controlling AIA Defendants Continue to Unlawfully Use AIA's Funds and
      Financial Wherewithal with the Improper Assistance from the Hawley Troxell
      Defendants ............................................................................................................................ 23

H.    The Controlling AIA Defendants Enter Into Tolling Agreements, but Those
      Tolling Agreements Do Not Save the Hawley Troxell Defendants from the
      Unwaivable Conflicts of Interest ......................................................................................... 24

I.    The Controlling AIA Defendants Continue Unlawfully Using Funds from AIA
      and Intentionally Committing Torts against AIA with the Assistance of the
      Hawley Troxell Defendants—Even While This Lawsuit Was Pending............................. 30

THIRD AMENDED COMPLAINT - ii

# Exhibit - A

J.      The Controlling AIA Defendants, with GemCap Aiding and Abetting Them, Illegally Had AIA Guarantee Loans Made to CropUSA by GemCap, Concealed the Guarantees from AIA, Illegally Entered into Settlement Agreements with GemCap, Concealed the Settlement Agreements from AIA, and Unlawfully Transferred Property to GemCap Thereby Damaging AIA. .................................................................. 35

K.      John Unlawfully Transfers Certain Real Property to AIA and Requires AIA to Pay the Liabilities on the Property and He Alleges that AIA Owes Him $545,563 in Accrued Salary. ......................................................................................................... 43

L.      John Unlawfully Amends AIA Services and AIA Insurance's Bylaws and Issues Himself Series A Preferred Shares in AIA Services. ......................................................... 44

M.      There Is a Laundry List of the Unlawful Acts, Self-Dealing, Malfeasance and Intentional Torts Committed by the Controlling AIA Defendants ..................................... 45

V.      CERTIFICATE OF COMPLIANCE WITH IDAHO CODE SECTION 30-1-742 .......... 53

VI.     COUNT I—BREACH OF FIDUCIARY DUTIES .............................................................. 56

VII.    COUNT II—AIDING AND ABETTING BREACHES OF FIDUCIARY DUTIES ....... 60

VIII.   COUNT III—LEGAL MALPRACTICE ............................................................................ 60

IX.     COUNT IV—FRAUD/FRAUDULENT CONCEALMENT/ .......................................... 62

X.      COUNT V—AIDING AND ABETTING AND CONSIPIRACY OF FRAUD ............... 66

XI.     COUNT VI—BREACH OF CONTRACT .......................................................................... 67

XII.    COUNT VII—DECLARATORY JUDGMENT ................................................................. 68

XIII.   COUNT VIII—STATUTORY RELIEF (INCLUDING FOR ULTRA VIRES) .............. 70

XIV.    COUNT IX—CORPORATE WASTE/EXCESSIVE COMPENSATION ....................... 71

XV.     COUNT X—VIOLATIONS OF THE IDAHO CONSUMER PROTECTION ACT ....... 73

XVI.    COUNT XI—ACCOUNT STATED .................................................................................... 74

XVII.   JURY DEMAND .................................................................................................................. 75

THIRD AMENDED COMPLAINT - iii

# Exhibit - A

XVIII.    PRAYER FOR RELIEF............................................................................................. 75

VERIFICATION OF DALE L. MIESEN ................................................................................ 79

CERTIFICATE OF SERVICE .............................................................................................. 80

THIRD AMENDED COMPLAINT - iv

# Exhibit - A

Plaintiff Dale L. Miesen alleges cumulatively, or when necessary and where applicable in the alternative, as follows:

## I.    STATEMENT OF JURISDICTION

1.    This Court has jurisdiction over the subject matter of this lawsuit under 28 U.S.C. § 1332(a)(1) because the amount in controversy exceeds $75,000 and this action is between citizens of different states.

2.    This Court has personal jurisdiction pursuant to I.C. § 5-514 because the defendants: (a) committed torts within the state of Idaho (including conspiring to commit, covering up, and aiding in the commission of torts committed within the state of Idaho), which injured AIA in Idaho; and/or (b) transacted business within the state of Idaho and engaged in transactions within the state of Idaho in an effort to obtain a pecuniary benefit and/or enhance their investment in Idaho corporations named as defendants in this Third Amended Complaint. Examples of the specific facts supporting personal jurisdiction are set forth in certain of the paragraphs below.

## II.    STATEMENT OF VENUE

3.    Venue is proper in the District of Idaho under 28 U.S.C. § 1391(b)(2) and (c) because a substantial part of the acts, errors and omissions giving rise to the claims asserted in this Third Amended Complaint (and the torts committed against AIA Services Corporation and AIA Insurance, Inc.) occurred in the District of Idaho and certain of the defendants are citizens and residents of the District of Idaho.

## III.    PARTIES AND DEFINITIONS OF THE PARTIES

4.    Plaintiff Dale L. Miesen ("Plaintiff" or "Miesen") is a citizen and resident of Colleyville, Texas. Plaintiff is, and has been, a common shareholder of AIA Services Corporation ("AIA Services") during all relevant times and specifically at the time of the transactions, acts, omissions, malfeasance, and damages at issue in this lawsuit. Plaintiff is also presently a creditor

THIRD AMENDED COMPLAINT - 1

# Exhibit - A

of AIA Services.

5.        Plaintiff is bringing this derivative action as a shareholder and on behalf of AIA Services. In addition, Plaintiff is bringing this action as a double derivative action on behalf of AIA Insurance, Inc. ("AIA Insurance"), which is a wholly-owned subsidiary of AIA Services. AIA Services and AIA Insurance are collectively referred to as "AIA" in this Third Amended Complaint. The definition of "AIA" includes AIA Services and/or AIA Insurance for purposes of pleading in the alternative, and includes the Plaintiff to the extent he is required to support any cause of action and/or any of the relief requested in this Third Amended Complaint.

6.        Defendant AIA Services is a citizen of Idaho because it is an Idaho corporation, its principal place of business is in Lewiston, Idaho, and its primary purported officer, John Taylor, resides in Lewiston, Idaho. During all relevant times, AIA Services is or has been the parent corporation of AIA Insurance.

7.        Defendant AIA Insurance is a citizen of Idaho because it is an Idaho corporation, its principal place of business is in Lewiston, Idaho, and its primary purported officer, John Taylor, resides in Lewiston, Idaho.  During all relevant times, AIA Insurance has been a wholly-owned subsidiary of AIA Services.

8.        Plaintiff's assertions as to AIA Services' and/or AIA Insurance's board of directors and/or officers in this Third Amended Complaint is not intended to be an admission or an acknowledgement that the board of directors or officers were properly seated and elected or that the necessary quorum was present, and Plaintiff asserts that such was not the case for a number of years.

9.        Defendant CropUSA Insurance Agency, Inc. ("CropUSA") is a citizen of Idaho because it is an Idaho corporation, its principal place of business is in Lewiston, Idaho, and its

THIRD AMENDED COMPLAINT - 2

# Exhibit - A

primary purported officer, John Taylor, resides in Lewiston, Idaho. CropUSA was formerly known as AIA Crop Insurance, Inc.

10.     Defendant CropUSA Insurance Services, LLC ("CropUSA Insurance Services") is a citizen of Idaho because it is an Idaho limited liability company, its principal place of business is in Lewiston, Idaho, and its manager, John Taylor, is a resident of Lewiston, Idaho.

11.     CropUSA and CropUSA Insurance Services are referred to collectively and/or individually when pleading in the alternative as "CropUSA" in this Third Amended Complaint.

12.     Defendant R. John Taylor ("John" or "John Taylor") is a citizen and resident of Lewiston, Idaho. During all times relevant to this lawsuit, John served on the Board of Directors of AIA Services, AIA Insurance, and CropUSA and continues to serve on those boards. John also served as President of each of these corporations during all times relevant to this lawsuit. John is also licensed to practice law in the state of Idaho. John is a common shareholder of AIA Services and a common shareholder of CropUSA (although Plaintiff asserts those shares were unlawfully issued to him). John also owns shares or ownership interests in other entities that have engaged in inappropriate transactions with AIA and/or which have improperly benefitted from AIA during all relevant times.

13.     Defendant James Beck ("Beck") is a citizen and resident of the state of Minnesota. Beck served on the Board of Directors of AIA Services and AIA Insurance during certain relevant times. Beck was a common and/or preferred shareholder of AIA Services during certain relevant times and a common shareholder of CropUSA (although Plaintiff maintains that his common shares in AIA Services and CropUSA were unlawfully issued).

14.     Defendant Michael Cashman, Sr. ("Cashman") is a citizen and resident of the state of Minnesota. Cashman served on the Board of Directors of AIA Services during certain relevant

THIRD AMENDED COMPLAINT - 3

# Exhibit - A

times. Cashman was a common and/or preferred shareholder of AIA Services during certain relevant times and a common shareholder of CropUSA (although Plaintiff maintains that his common shares in AIA Services and CropUSA were unlawfully issued).

15.    Defendant Connie Taylor Henderson ("Connie") is a citizen and resident of the state of Washington. Connie served on the Board of Directors of AIA Services and AIA Insurance during certain relevant times until she resigned in 2014. Connie jointly owns with John the common shares of AIA Services held in John's name. Connie has actively asserted community ownership of those shares and specifically did so before the district court and on appeal in *Taylor v. AIA Services*.

16.    Defendant JoLee K. Duclos ("Duclos") is a citizen and a resident of Washington, or, alternatively, upon information and belief, she is now a citizen and a resident of the state of Idaho. Duclos has served as Secretary of AIA Services, AIA Insurance, CropUSA and other entities partially or wholly owned by John during certain relevant times. Duclos served on the Board of Directors of AIA Services and AIA Insurance during certain relevant times until she resigned in 2007. Duclos also served as a director of CropUSA curing certain relevant times. Duclos is a common shareholder of CropUSA (although Plaintiff maintains that those shares were unlawfully issued). Duclos has knowledge of the law by and through her training and performing the duties of a paralegal. Duclos has served as John's "lieutenant" during all relevant times.

17.    John, Beck, Cashman, Connie and Duclos are collectively referred to herein as the "Controlling AIA Defendants." The Controlling AIA Defendants have acted in concert and assisted one another in committing various torts described in this Third Amended Complaint and covering up and/or concealing those torts. The definition of "Controlling AIA Defendants" includes the acts and/or omissions of one or more of John, Beck, Connie, Cashman and/or Duclos

THIRD AMENDED COMPLAINT - 4

# Exhibit - A

for purposes of pleading in the alternative.

18.     Defendant Gary D. Babbitt ("Babbitt") is a citizen and resident of the state of Idaho and was an attorney practicing law in the state of Idaho with and on behalf of Hawley Troxell. Upon information and belief, Babbitt began representing AIA and CropUSA in 2007.

19.     Defendant Richard A. Riley ("Riley") is a citizen and resident of the state of Idaho and is an attorney in the state of Idaho with and on behalf of Hawley Troxell. Riley represented AIA and/or CropUSA from time to time from 1995 through the present time.

20.     Defendant D. John Ashby ("Ashby") is a citizen and resident of the state of Idaho and is an attorney in the state of Idaho with and on behalf of Hawley Troxell. Upon information and belief, Ashby began representing AIA and CropUSA in 2007.

21.     Defendant Hawley Troxell Ennis & Hawley LLP ("Hawley Troxell") is a citizen of the state of Idaho because it is an Idaho limited liability partnership in the business of practicing law, with its principal place of business in Boise, Idaho, and its principal officers or managers reside in the state of Idaho. Hawley Troxell has no office in the state of Washington. None of the individual partners of Hawley Troxell are residents of Washington. Hawley Troxell, though its attorneys, acted as counsel for AIA Services, AIA Insurance and CropUSA during certain relevant times and in certain lawsuits. Hawley Troxell is also named herein as it is vicariously liable for the acts and/or omissions of Babbitt, Riley, Ashby and its other attorneys.

22.     Babbitt, Ashby, Riley, other Hawley Troxell attorneys, and Hawley Troxell are collectively referred to as the "Hawley Troxell Defendants" in this Third Amended Complaint. The definition of "Hawley Troxell Defendants" includes the acts and/or omissions of one or more of Babbitt, Ashby, Riley, other attorneys at Hawley Troxell and/or Hawley Troxell for purposes of pleading in the alternative. The Hawley Troxell Defendants conducted business from their office

THIRD AMENDED COMPLAINT - 5

# Exhibit - A

in Boise, Idaho.

23.    Defendant GemCap Lending I, LLC ("GemCap") is a Delaware limited liability company and it conducts business throughout the United States, including in Nez Perce County, Idaho with CropUSA and CropUSA Insurance Services, respectively, both of which have principal places of business in Lewiston, Idaho. GemCap is a citizen of California because its principal place of business is in Malibu, California and its primary officers, Richard Ellis and David Ellis, are residents of the state of California. However, AIA conducts no business in California.

24.    Donna J. Taylor ("Donna Taylor"), a non-party to this lawsuit, is and has been the sole Series A Preferred Shareholder of AIA Services during all relevant times, and she never authorized any of the transactions at issue in this lawsuit from 1995 through the present time. While John alleges to have "purchased" 7,500 Series A Preferred Shares in 2016, Plaintiff maintains that the purchase was unauthorized and improper, and that Donna Taylor remains the sole Series A Preferred Shareholder of AIA Services.

## IV.    FACTS

### A.  The Background Facts Regarding AIA Services and AIA Insurance

25.    In 1983, AIA Services was formed as a closely-held Idaho corporation for the purpose of acting as a holding company for various other wholly-owned subsidiaries. AIA's business model was to work with farmers and growers to form trusts and/or related cooperatives through various growers and farmers' associations and sell insurance products to the members of those associations also becoming members of the trusts and/or cooperatives.

26.    AIA created the Grain Growers Membership & Insurance Trust, the National Contract Poultry Grower's Membership & Insurance Trust, and other, similar trusts. By way of its relationships with these various organizations, AIA held contracts for the exclusive right to market health insurance (*e.g.*, Group Universal Health Policies) and other insurance products to the

THIRD AMENDED COMPLAINT - 6

# Exhibit - A

members of the various trusts and associations.

27.    In 1987, Donna Taylor and Reed Taylor, non-parties to this lawsuit, were issued Series A Preferred Shares in AIA Services in connection with their divorce. Pursuant to the dissolution of their marriage, Donna Taylor was issued 200,000 shares of Series A Preferred shares on or about February 12, 1988, and has held those shares ever since, less those shares which have been redeemed in part over the years. (*See* Dkt. 67-1 and 67-2.)

28.    In connection with the issuance of the Series A Preferred Shares to Donna Taylor, AIA Services' shareholders adopted amendments to its articles of incorporation with restrictions on the manner in which AIA Services and its subsidiaries could conduct business. (*See* Dkt. 67-3.) AIA Services' amended articles of incorporation included, without limitation, the restrictions that: (a) barred AIA Services and AIA Insurance from guaranteeing any loans for any individual or entities which were not wholly-owned subsidiaries; (b) barred certain transactions with shareholders and affiliates; and (c) required AIA Services to comply with certain financial covenants. (*Id.*)  These amendments were expressly adopted to protect AIA from precisely the type of acts, omissions, guarantees, loans and transactions at issue in this lawsuit.

29.    In addition, AIA Services' amended articles of incorporation also provided Donna Taylor with the unqualified right, as the Series A Preferred Shareholder, to appoint a person, to be determined in her sole discretion, to the Board of Directors of AIA Services. (*See* Dkt. 67-3.)

30.    The Controlling AIA Defendants and the Hawley Troxell Defendants were fully aware of the restrictions under AIA Services' amended articles of incorporation and bylaws.

31.    Donna Taylor's Series A Preferred Shares have not been fully redeemed to this day, and the restrictions under AIA Services' amended articles of incorporation remain in full force and effect to this day and fully applicable. (*See* Dkt. 67-42, pp. 10-11 ¶ 19.)

THIRD AMENDED COMPLAINT - 7

# Exhibit - A

**B. John, Connie, Beck and Cashman Take Operational Control of AIA and AIA Authorizes the Issuance of Series C Preferred Shares and Additional Restrictions in Its Amended Articles of Incorporation**

32.     In 1995, the Controlling AIA Defendants, other than Duclos (although she did assist the Controlling AIA Defendants as an employee and officer (assistant secretary) of AIA), spearheaded a transaction to redeem Reed Taylor's majority common stock interest in AIA Services. (*See* Dkt. 67-5 and 67-6.)

33.     As part of the redemption, Beck and Cashman acquired Series C Preferred Shares in AIA Services, through an Investment Agreement, which was entered into with AIA Services and transmitted to AIA Services in Idaho and involved the transaction to redeem Reed Taylor's common shares in Idaho. When AIA Services amended its articles of incorporation to allow the issuance of the Series C Preferred Shares, AIA Services included additional restrictions in its articles of incorporation. Riley assisted in drafting and/or approving these restrictions and he was fully aware of them.

34.     Under the new and additional restrictions in AIA Services' amended articles of incorporation (these restrictions were in addition to others adopted in connection with the issuance of Donna Taylor's Series A Preferred Shares), AIA Services was barred from engaging in a number of corporate actions, including, but not limited to: (a) AIA Services could not acquire any common shares from any shareholders unless all dividends due on the Series C Preferred Shares had been paid (10% dividend per year) or those funds were set aside; (b) the Series C Preferred Shareholders had the right to elect one director to AIA Services' Board of Directors; and (c) if any Series C Preferred Shares were redeemed, such redemptions must be equally from all shareholders. (*See* Dkt. 67-3.)

THIRD AMENDED COMPLAINT - 8

# Exhibit - A

35.    Although the Series C Preferred Shares held by Beck, Cashman and their friends were eventually unlawfully and effectively redeemed by AIA, other Series C Preferred Shares were later issued to the AIA Services 401(k) Plan and those shares remain issued and outstanding to this day and no dividends have been paid as required since approximately 1997. As a result, these new restrictions under AIA Services amended articles of incorporation were in place for the benefit of AIA Services and the Series C Preferred Shares, which have remained in full force and effect to this day.  The Controlling AIA Defendants and the Hawley Troxell Defendants were fully aware of the additional restrictions under AIA Services' amended articles of incorporation.

36.    Upon the redemption of Reed Taylor's majority common shares, Beck, Cashman, John and Connie directly or indirectly became the majority common shareholders of AIA Services. (*See* Dkt. 67-5.) In addition, Beck, Cashman and John entered into a Voting Agreement to ensure that they would maintain control of AIA Services' Board of Directors, which was signed by Beck and Cashman and transmitted by them to Idaho. As a result, the Controlling AIA Defendants have maintained operational control of AIA from 1995 through the present time. Beck and Cashman attended certain board and shareholder meetings for AIA Services in person in Idaho and via telephone from Minnesota for meetings held in Idaho.

37.    In connection with the redemption of Reed Taylor's shares, John entered into an Executive Officer's Agreement with AIA Services, which guaranteed him certain salary payments and other compensation for three years; that agreement also contained non-compete and non-solicitation provisions. (*See* Dkt. 67-8.) John's salary after the first three years was required to be determined by AIA Services' Board of Directors, which was never done after the first three years.

38.    From 1999-2012, John improperly paid himself millions of dollars pursuant to his Executive Officer's Agreement for his and Connie's benefit (the amount of which in itself was

THIRD AMENDED COMPLAINT - 9

# Exhibit - A

improper based on AIA's business prospects and John's inability to do anything for the benefit of AIA), while he intentionally and repeatedly violated the non-compete and non-solicitation provisions of his Executive Officer's Agreement.

39. In connection with the redemption of Reed Taylor's shares in August 1995, AIA Services contributed funds to The Universe Life Insurance Company, which was a wholly-owned subsidiary of AIA Services, in order to make AIA Insurance, which was then a wholly-owned subsidiary of The Universe Life Insurance Company, a subsidiary of AIA Services. After that transaction, AIA Insurance became a wholly-owned subsidiary of AIA Services.

40. As a result, from August 1995 through all relevant times, AIA Insurance was a wholly-owned subsidiary through which AIA Services derived its commissions and administrative fees from insurance policies, which accounted for the bulk of AIA's revenues and profits.

41. From 1995 through 2005, AIA Insurance generated over $65 million in revenues from commissions (over $33 million) and administrative fees (over $27 million), and it continued to generate revenues thereafter.

42. From 1995 through all relevant times, each of the Controlling AIA Defendants has served at various times on the Board of Directors for AIA Services, AIA Insurance and/or CropUSA, while John has continuously served as the President of AIA and Duclos has continuously served as the Secretary of AIA.

43. From 1999 through certain relevant times, the Controlling AIA Defendants have also served from time to time on purported "advisory board" of CropUSA, which actually made the decisions on behalf of AIA and CropUSA. Specifically, Cashman, Beck and John served on the "advisory board" of CropUSA from 1999 through certain relevant times. Certain of the so-called "advisory board" meetings were conducted via telephone originating in Idaho and in person

THIRD AMENDED COMPLAINT - 10

# Exhibit - A

in Idaho.

44.     The Controlling AIA Defendants intentionally concealed from AIA and AIA Services' minority shareholders of the existence and authority of the "advisory board" of CropUSA.

C. **AIA Forms CropUSA and the Controlling AIA Defendants Unlawfully Transfer CropUSA to Themselves**

45.     By 1998, AIA's ability to sell health insurance had been impaired by undercapitalization in its underwriting subsidiary, The Universe Life Insurance Company. Accordingly, the company considered proposals to sell other forms of insurance, and in particular crop insurance, to be underwritten by other insurance companies. At a 1998 Board of Directors meeting, AIA Services' Board of Directors specifically discussed selling crop insurance and elected to have AIA pursue selling crop insurance.

46.     In 1999, AIA, then under the control of the Controlling AIA Defendants, began selling crop insurance through a wholly-owned subsidiary of AIA Services formed under the name "AIA Crop Insurance, Inc."

47.     The first purported meeting of shareholders of AIA Crop Insurance, Inc. ("AIA Crop Insurance") was held on January 11, 2000. The first purported meeting of the AIA Crop Insurance's Board of Directors was held on the same day. The purported minutes of the shareholder's meeting indicate that John, not the true owner AIA Services, claimed to be the sole shareholder of AIA Crop Insurance at the time of incorporation; these facts were concealed from AIA and AIA Services' innocent minority shareholders.

48.     Upon information and belief, at or shortly after the time of its formation, the Hawley Troxell Defendants began providing legal services to AIA Crop Insurance.

THIRD AMENDED COMPLAINT - 11

# Exhibit - A

**49.** At a special meeting of the shareholders of AIA Crop Insurance held on November 13, 2000, AIA Crop Insurance was renamed CropUSA in an apparent attempt to conceal its corporate lineage and origins.

**50.** The minutes of the November 13, 2000 special meeting of the shareholders also show that John continued to claim that he was the sole shareholder of CropUSA, while he was simultaneously representing in business plans provided to others that CropUSA was a subsidiary of AIA Insurance. (*See* Dkt. 67-66.)

**51.** At the time CropUSA was formed, John was employed by AIA Services under an Executive Officer's Agreement, dated August 1, 1995, Dkt. 67-8, which contained express covenants not to compete. Upon information and belief, John's Executive Officer's Agreement and AIA Service's amended articles of incorporation and restated bylaws were drafted and/or approved by Riley, and he had full knowledge of the restrictions under the terms of the foregoing documents.

**52.** CropUSA held its purported annual shareholder's meeting on January 10, 2001. By this time, the illegal "spin off" of CropUSA had been accomplished by having AIA Services' Series C Preferred Shareholders (primarily Beck and Cashman) exchange their Series C Preferred Shares for common shares in CropUSA (if CropUSA were in fact an independent entity, these maneuvers would have been completely unnecessary).

**53.** The minutes for the shareholder meeting held on January 10, 2001 for CropUSA revealed that CropUSA had retained Hawley Troxell as its advisor and SEC counsel and, upon information and belief, the Hawley Troxell Defendants have served continuously as CropUSA's attorneys in one form or the other ever since. According to the minutes, negotiations between AIA Services and CropUSA had resulted in an agreement whereby AIA Services would no longer

THIRD AMENDED COMPLAINT - 12

# Exhibit - A

operate CropUSA as a subsidiary.

54.    However, the negotiations referred to in the January 10, 2001 shareholder meeting minutes for CropUSA did not in fact occur. There was no decision, nor has there ever been a decision, on the part of AIA Services to discontinue the subsidiary status of CropUSA. The January 10, 2001 meeting minutes for CropUSA were concealed from AIA.

55.    None of the preferred or common shareholders of AIA Services (other than those present at the January 10, 2001 meeting) were given notice of or the opportunity to approve or oppose this corporate action; instead, it was concealed from them and AIA.

56.    In spite of the fact that John asserted on January 10, 2001 that CropUSA would no longer be a subsidiary of AIA Services, John wrote in a letter dated February 27, 2001, sent on behalf of AIA to Donna Taylor, that "AIA is developing a new crop insurance program through a new company called CropUSA." The letter went on to state that "[t]he costs of putting the CropUSA program together have been paid. AIA now needs to launch five new territories next Month." This February 27, 2001 letter constituted an unambiguous representation by John to AIA (and Donna Taylor) that CropUSA was a subsidiary of AIA and was being operated for the benefit of AIA and implicitly also for AIA Services' innocent minority shareholders (which included Donna Taylor). This representation to AIA was false, and John knew it was false. Upon information and belief, the other Controlling AIA Defendants were aware of this February 27, 2001 letter and the misrepresentations contained within the letter.

57.    Notwithstanding the fact that John was obligated under the terms of his Executive Officer's Agreement that required that he not compete with AIA Services, and notwithstanding the fact that he owed fiduciary duties to the AIA and AIA Services' shareholders, John set forth his plans to exploit the assets of AIA for the benefit of CropUSA (and himself as the majority

THIRD AMENDED COMPLAINT - 13

# Exhibit - A

purported shareholder) in the purported minutes of the purported January 10, 2001 meeting.

58.     The January 10, 2001 meeting minutes reveal that CropUSA authorized its officers to execute a Master Marketing Agreement with AIA Insurance that would allow CropUSA access to all of AIA's customers and customer lists, as well as all of AIA's trade secrets. AIA received no consideration for conveying this access or to enter into these agreements.

59.     CropUSA's officers (including John) were also purportedly authorized to enter into a Management Agreement with AIA Insurance wherein AIA Insurance purportedly agreed to provide management and administrative support to CropUSA without charge. However, John has since testified under oath that AIA's Board of Directors never authorized this agreement, although the Board has acquiesced in the action.

60.     AIA itself was never given notice of the Master Marketing Agreement and the Management Agreement, nor was AIA given the opportunity to approve or reject these agreements or any subsequent ones. Each of these agreements, when executed, constituted a violation of John's Executive Officer's Agreement, which contains a strict non-compete clause. Each of these agreements also constituted a direct breach of fiduciary duty or the aiding and abetting on behalf of each of the Controlling AIA Defendants in the commission of torts against AIA.

61.     Meanwhile, in 2001, John and Connie acquired a parking lot for $8,000 using AIA's line-of-credit. Upon information and belief, AIA was required to maintain control of the parking lot as part of its lease with Washington Bank Properties. John then increased the rent that AIA paid to use the parking lot to benefit him and Connie. For example, although John and Connie paid only $8,000 for the parking lot, they subsequently charged AIA $60,750 in rent to use the parking lot from 2004 through 2006. These unfair and self-serving rental payments to John and Connie were concealed from AIA and AIA Services' innocent minority shareholders and were

THIRD AMENDED COMPLAINT - 14

# Exhibit - A

never disclosed to either of them, as was John and Connie's purchase of the parking lot.

   D. **The Hawley Troxell Defendants Aid and Abet the Controlling AIA Defendants in Taking CropUSA from AIA and Having AIA Fund CropUSA**

   **62.**     Upon information and belief, certain of the Hawley Troxell Defendants were providing legal services to CropUSA and/or its board of directors as of January 10, 2001, and such providing of legal services has continued through certain relevant times.

   **63.**     Upon information and belief, from January 10, 2001, and continuing through the period relevant to this lawsuit, the Hawley Troxell Defendants had knowledge of John's Executive Officer's Agreement with AIA Services, had knowledge of the conflict of interest provisions in AIA's bylaws, and had knowledge of restrictions in AIA's amended articles of incorporation, but intentionally refused to comply with them and assisted John in violating them or covering up the violations.

   **64.**     The Hawley Troxell Defendants knew or should have known that the purported Master Marketing Agreement and Management Agreement constituted breaches of John's Executive Officer's Agreement, violations of AIA Service' amended articles of incorporation, violations of AIA Services' restated bylaws, and constituted breaches of John and the other Controlling AIA Defendants' fiduciary duties owed to AIA and AIA Services' minority shareholders.

   **65.**     Upon information and belief, the Hawley Troxell Defendants were also representing CropUSA from January 10, 2001, through certain relevant times, and by way of that representation they breached their fiduciary duties to AIA (including their undivided duty of loyalty owed to AIA) and took steps that materially assisted John and the Controlling AIA Defendants in the commission of the various torts described in this Third Amended Complaint and assisted in the concealment of those torts.

THIRD AMENDED COMPLAINT - 15

# Exhibit - A

66.     Beginning in 1999 and continuing through the time CropUSA ceased operating, CropUSA was funded and operated with assets improperly transferred from AIA, including, but not limited to, operating capital, office space, customer lists and other trade secrets, agents and staff, goodwill and other assistance. CropUSA paid nothing for these assets.

67.     The Controlling AIA Defendants, except Duclos, were all shareholders of AIA at the time CropUSA was formed and later purportedly became shareholders of CropUSA.

68.     The Controlling AIA Defendants, except Duclos (although she improperly took part in the meetings and acted as the Secretary) and Connie, all served on a purported "advisory board" of CropUSA and/or AIA, and this advisory board exercised actual control over CropUSA and AIA. By exercising control over these entities and committing acts that benefitted CropUSA at the expense of AIA, the Controlling AIA Defendants engaged in a conspiracy to defraud AIA, which should have had the right and title to the property of CropUSA.

69.     On January 10, 2002, CropUSA purportedly entered into a Memorandum of Understanding with the Controlling AIA Defendants. Under the terms of this memorandum, Beck and Cashman were obligated to guarantee loans on behalf of CropUSA. Beck and Cashman guaranteed loans for CropUSA, an Idaho corporation, in Idaho and sent their financial information to Idaho for the guarantees.

70.     Notably, Beck and Cashman had also been obligated to guarantee over $1,000,000 in loans on behalf of AIA since 1995, but they never did. Notwithstanding this obligation, the Controlling AIA Defendants subsequently arranged for AIA to guarantee CropUSA's lines of credit, even though the guarantees were barred by AIA's amended articles of incorporation and bylaws.

THIRD AMENDED COMPLAINT - 16

# Exhibit - A

71.     In 2004, the Controlling AIA Defendants attempted to raise capital for CropUSA by selling shares in CropUSA to private investors by way of a $10,000,000 private placement. The Hawley Troxell Defendants drafted the July 15, 2004 Private Placement Memorandum, despite their knowledge of the illegal "spin-off" of CropUSA and the fiduciary duties they owed to AIA.

72.     When CropUSA began distributing the Private Placement Memorandum in 2004, the company was experiencing financial difficulties that made it difficult, if not impossible, to attract investors to purchase shares pursuant to the private placement.

73.     In addition, in 2004, CropUSA's lack of adequate funding threatened its ability to sell crop insurance. To alleviate these problems, the Controlling AIA Defendants improperly turned to AIA to obtain the necessary funding.

E.    **The Controlling AIA Defendants Unlawfully Transfer $1,510,693 From AIA to Fund CropUSA and Then They Use $634,269 of Those Funds to Repay a Debt that CropUSA Owed to AIA—Thereby Resulting in a $2,144,962 Fraud Against AIA.**

74.     In order to boost CropUSA's balance sheet for the purpose of operating the company, the Controlling AIA Defendants devised a scheme to illegally transfer $1,510,693 from AIA Insurance to CropUSA. The Controlling AIA Defendants conspired with each other in the formation and execution of this scheme to unlawfully transfer $1,510,693 of AIA's funds to CropUSA, and aided and abetted one another in carrying out the scheme and ultimately covering it up.  Upon information and belief, the Hawley Troxell Defendants provided counsel to CropUSA with respect to the unlawful transfer of funds and/or has, at a minimum, assisted in covering up the facts of this illegal transfer.

75.     The scheme involved money derived from AIA Insurance. In August 2004, AIA Insurance received a payment of $1,510,693 from Trustmark. (*See* Dkt. 67-59.) Rather than deposit the payment of $1,510,693 into the account of AIA Insurance, where it would have benefited AIA

THIRD AMENDED COMPLAINT - 17

# Exhibit - A

and its innocent shareholders, John deposited the funds into a new account entitled "AIA Insurance Inc. CropUSA." (*See* Dkt. 67-60.) The address for this account coincided with the address for John's personal residence at 2020 Broadview Drive in Lewiston, Idaho, rather than any address used by AIA. (*Id.*)

76.    Shortly after diverting the $1,510,693 into the "AIA Insurance Inc. CropUSA" account, the Controlling AIA Defendants illegally transferred the funds to CropUSA. The Controlling AIA Defendants attempted to disguise this conversion of AIA Insurance's funds by characterizing the transaction as an alleged purchase by AIA Insurance of Series C Preferred Shares in its parent corporation, AIA Services. (*See* Dkt. 67-59.) Then, the Controlling AIA Defendants carried AIA Insurance's alleged investment in the Series C Preferred Shares as having a purported value of $1,510,693 when that was not the true value of the shares.

77.    However, as the Controlling AIA Defendants acknowledged at the time, there was no market for the Series C Preferred Shares which were purportedly being repurchased. At the time the $1,510,693 in funds were converted by CropUSA, there was no authorization of any kind for the transaction, and the transaction was concealed from AIA.

78.    In order to create a plausible explanation for the transfer of the $1,510,693, CropUSA eventually produced a document designated as a Consent in Lieu of Meeting dated August 26, 2004. (*See* Dkt. 67-61.) However, this document itself is completely fraudulent, as it was retroactively created the following year in order to deceive auditors who questioned the validity of this transaction.

79.    In addition, this $1,510,693 purported repurchase of shares separately violated the terms of AIA Services' amended articles of incorporation, which required that all Series C Preferred Shares be redeemed equally and simultaneously from all shareholders. (*See* Dkt. 67-3.)

THIRD AMENDED COMPLAINT - 18

# Exhibit - A

Instead of repurchasing an equal portion of the Series C Preferred Shares from AIA Services' 401(k) Plan, the Controlling AIA Defendants intentionally only repurchased the Series C Preferred Shares held by CropUSA (which had been previously held by Beck, Cashman and their friends).

80.     CropUSA was carrying these Series C Preferred Shares in AIA Services on its books with a value of $21,693, which means that CropUSA realized a gain of $1,489,000 on this purported sale of shares. (*See* Dkt. 67-59.) At that time, although the Controlling AIA Defendants had not properly accounted for all funds, assets, labor and other costs advanced from AIA for CropUSA, they had actually accounted for there being a debt of $634,269 owed by CropUSA to AIA.

81.     After unlawfully transferring the $1,510,693 received by AIA Insurance to CropUSA, the Controlling AIA Shareholders had CropUSA repay the $634,269 debt owed to AIA, thereby committing a double fraud upon AIA, i.e., AIA should have the $1,510,693 in its bank account now and it should have never lent the $634,269 to CropUSA in the first place. In other words, those fraudulent transactions alone resulted in the loss of $2,144,962 in funds to AIA and thus damaged AIA in the amount of $2,144,962. The Controlling AIA Defendants have actively concealed, or covered up, these transactions from AIA with the assistance of the Hawley Troxell Defendants.

82.     AIA and the innocent shareholders of AIA Services were never given notice of the 2004 stock transaction, nor were any proper board or shareholder meetings held to approve the transaction. However, as with the fraudulent document prepared on behalf of CropUSA, a fraudulent Consent in Lieu of Meeting, dated August 26, 2004, was prepared on behalf of AIA. This document was actually produced several months after the transaction and was created to deceive auditors.

THIRD AMENDED COMPLAINT - 19

# Exhibit - A

83.     Upon information and believe, the Hawley Troxell Defendants provided legal services to both AIA and CropUSA at the time of the 2004 transaction or had actual knowledge of the 2004 transaction.

84.     The Hawley Troxell Defendants at various times, as purported counsel for AIA, failed to disclose to AIA the 2004 transaction to transfer $1,510,693 to CropUSA and that the acts of the Controlling AIA Defendants constituted an intentional breach of their fiduciary duties (including the duty of loyalty) owed to AIA and a concealment of a prohibited transaction. For this reason alone, the Hawley Troxell Defendants could not reasonably rely on a tolling agreement to represent AIA, CropUSA and the interest of the Controlling AIA Defendants in later litigation.

85.     The Hawley Troxell Defendants failed to disclose to AIA, or to anyone else, that this $1,510,693 transaction was unlawful on many levels, including but not limited to the fact that it did not comply with the articles of incorporation and bylaws, caused a breach of AIA's other contracts, and could not be justified by the balance sheet of either AIA Insurance or CropUSA. Upon information and belief, the Hawley Troxell Defendants had knowledge of the back-dated Consent in Lieu of Meeting documents.

86.     On February 16, 2005, Beck sent an email to John and Cashman confirming the Controlling AIA Defendants' scheme to misappropriate CropUSA in an effort to profit at the expense of AIA: "[Cashman] and I are so convinced that CropUSA is a winner that anything standing in the way of a good result will be a crime." (Dkt. 67-54.) The crime was stealing CropUSA from AIA and then to drain AIA of its funds and assets to pursue the Controlling AIA Defendants' scheme. This was not the only email exchanged between the Controlling AIA Defendants, as they emailed one another on numerous occasions, including emails directed to recipients in Idaho.

THIRD AMENDED COMPLAINT - 20

# Exhibit - A

**F. The Controlling AIA Defendants Continue to Unlawfully Fund, Subsidize and Operate CropUSA Using AIA's Funds, Assets, Labor and Financial Wherewithal**

87.     After unlawfully taking $2,144,962 from AIA Insurance in 2004, the Controlling AIA Defendants continued to operate CropUSA with assets both tangible and intangible that rightfully belonged to AIA, continued to improperly subsidize CropUSA with AIA's assets and labor, and continued to conceal their actions from AIA and AIA Services' innocent minority shareholders.

88.     Under the management and direction of the Controlling AIA Defendants, AIA regularly failed to allocate costs to CropUSA and other entities and failed to charge markup, interest or profit on costs paid for other entities. For example, John's own salary of $250,000 was allocated entirely to AIA Services even though John's contractual right to a salary from AIA Services had expired in 1998 and had never been renewed by an authorized board. (And, further, John performed no actual work for AIA during the time in question.)

89.     John, with the knowledge and complicity of the other Controlling AIA Defendants, also performed work for other entities owned in full or in part by him while on AIA's payroll, i.e., CropUSA, Pacific Empire Radio Corp., Pacific Empire Communications Corp., Pacific Empire Holdings Corp., Radio Leasing I LLC and Radio Leasing II LLC. John also had other AIA employees work for these entities without compensation to AIA. These facts, like virtually all of the others referenced in this Third Amended Complaint, were concealed from AIA and AIA Services' innocent minority shareholders.

90.     Between its founding in 1999 and the filing of this lawsuit, CropUSA and other entities generated tens of millions of dollars of revenue (including premiums) and other benefits that would have flowed to AIA but for the unlawful and unauthorized acts of the Controlling AIA Defendants.

THIRD AMENDED COMPLAINT - 21

# Exhibit - A

91.     As of 2006, John owed AIA at least $307,000 for personal loans he had taken from AIA Services. For several years, John concealed these loans by engaging in false accounting whereby loans to him were treated as payments of principal on AIA Services' indebtedness due to Reed Taylor on his $6 million promissory note (which was later ruled to be illegal).  In 2006, John "corrected" the alleged accounting "error" by increasing the balance due on Reed Taylor's note to $6 million and reinstating John's $307,000 debt. John had still not repaid this personal loan.

92.     Over the years, John had AIA pay his personal maid, his personal credit card bills, donations, cash advances, family cell phone bills, and other personal expenses. John also had AIA purchase several vehicles from him, and he continued to drive these vehicles after the sales and purchase of other vehicles with AIA's funds to use for his benefit when there was no reason to do so. John also had AIA employees perform work on his personal residence and on other real property not owned by AIA. These acts were all committed with the knowledge and complicity of the Controlling AIA Defendants and without paying AIA the fair value of the services or expenses.

93.     At year-end 2006, AIA had improperly lent $95,000 to Pacific Empire Radio Corp., a corporation partially owned by John and Connie and in which they both served as directors at certain times. The Controlling AIA Defendants transferred that $95,000 receivable from AIA to CropUSA. By the end of 2012, AIA would lend over $1,400,000 in additional funds to Pacific Empire Radio Corp., when all such loans violated AIA Services' amended articles of incorporation and were not authorized under the circumstances by AIA Services' restated bylaws.

94.     In August 2007, AIA settled litigation with the state of Idaho whereby AIA received a mortgage worth approximately $1.5 million for the amount owed by Washington Bank Properties

THIRD AMENDED COMPLAINT - 22

# Exhibit - A

on the real property where AIA Services' headquarters was located.[1] Although AIA Insurance paid the costs of this litigation, the Controlling AIA Defendants, with the assistance of the Hawley Troxell Defendants, improperly titled the note in the name of AIA Services only, and then pledged the note to CropUSA so that the Controlling AIA Defendants could borrow money to pay their attorneys' fees and costs incurred defending in *Taylor v. AIA Services* to the Hawley Troxell Defendants.

95.     As with the 2004 transactions, the transaction pledging the mortgage owned by AIA Services to CropUSA for purportedly paying the Hawley Troxell Defendants' attorneys' fees and costs incurred representing AIA, CropUSA and the Controlling AIA Defendants was a blatant misappropriation and/or illegal pledging of AIA's assets. The loan documents and the pledge agreement were drafted by the Hawley Troxell Defendants, although they later asserted that they were only "scriveners" for the transaction. This transaction was improper and barred by AIA's amended articles of incorporation and bylaws.

G. **The Controlling AIA Defendants Continue to Unlawfully Use AIA's Funds and Financial Wherewithal with the Improper Assistance from the Hawley Troxell Defendants**

96.     On October 26, 2007, the Hawley Troxell Defendants drafted and delivered an opinion letter falsely representing that AIA Insurance was authorized to guarantee a $15,000,000 line-of-credit on behalf of CropUSA, which carried a hard-money loan with an exorbitant interest rate.

---

[1] AIA Services' headquarters was previously owned by its wholly-owned subsidiary the Universe Life Insurance Company, which had sold the building through a lease-back with an option to purchase in the 1990s. After the state of Idaho later took control of Universe Life through a receivership when the capital requirements were changed, the state of Idaho became the owner of the mortgage. Later, AIA was involved in litigation with the state of Idaho over its receivership over Universe Life. The litigation was settled and the state of Idaho transferred the mortgage back to AIA as the consideration for the settlement. AIA ultimately foreclosed on the mortgage thereby obtaining ownership of its headquarters, which was later unlawfully transferred to GemCap, as discussed below.

THIRD AMENDED COMPLAINT - 23

# Exhibit - A

97.    The Hawley Troxell Defendants' opinion letter was delivered for a loan guarantee which violated AIA Services' amended articles of incorporation, its restated bylaws and AIA Insurance's bylaws, and in violation of the duty of loyalty owed by the Hawley Troxell Defendants to AIA.

98.    Lancelot, the lender for this $15,000,000 line-of-credit was subsequently exposed as a Ponzi scheme, and its founder, Gregory Bell, pleaded guilty to criminal charges in federal court. Mr. Bell was the signee for Lancelot on the $15,000,000 line-of-credit. These facts pertaining to the $15,000,000 loan for CropUSA and AIA Insurance's guarantee of that loan, along with other transactions, were never disclosed to AIA by the Hawley Troxell Defendants or the Controlling AIA Defendants and the payment of interest on that loan was detrimental to AIA because most of CropUSA's assets could be traced directly to AIA (and the depletion of CropUSA's funds resulted in less funds available to recover).

H.    **The Controlling AIA Defendants Enter Into Tolling Agreements, but Those Tolling Agreements Do Not Save the Hawley Troxell Defendants from the Unwaivable Conflicts of Interest**

99.    In 2007, Reed Taylor filed suit against AIA and certain of the Controlling AIA Defendants, asserting claims for breaches of contract, breaches of fiduciary duties, conversion, fraud and other claims ("*Taylor v. AIA Services*"). In 2007, the Hawley Troxell Defendants appeared as counsel for AIA Services and AIA Insurance in that lawsuit. Later, Reed Taylor amended his complaint and named CropUSA as a defendant, after recognizing that millions of dollars had been transferred to it from AIA, among other improper transactions (including some of those transactions described in this Third Amended Complaint). (*See* Dkt. 82-2.) The Hawley Troxell Defendants also appeared and represented CropUSA in that lawsuit. (*Id.*) Although Riley did not formally appear as counsel in *Taylor v. AIA Services*, Riley took an active interest in *Taylor*

THIRD AMENDED COMPLAINT - 24

# Exhibit - A

*v. AIA Services* and consulted with Babbitt, Ashby and/or other attorneys at Hawley Troxell relative to that case. The scope of representation of the Hawley Troxell Defendants in *Taylor v. AIA Services* could not have included representing the interest of CropUSA or the Controlling AIA Defendants.

100.    As the purported attorneys for AIA, two entities, the Hawley Troxell Defendants owed duties of loyalty, care, and good faith to AIA and the Hawley Troxell Defendants breached their duties of care and fiduciary duties by engaging in the simultaneous representation of the Controlling AIA Defendants, AIA, CropUSA, and other parties (including Bryan Freeman) with interests adverse to the interests of AIA.

101.    The Controlling AIA Defendants, and any other former AIA directors or officers, had conflicts of interest that prevented any of them from waiving the conflicts of interest involved in the Hawley Troxell Defendants' joint representation of AIA Services, AIA Insurance and CropUSA. In addition, the Controlling AIA Defendants had conflicts of interest that prevented them from being disinterested or proper constituents or officers of AIA to direct the Hawley Troxell Defendants' representation of AIA Services, AIA Insurance and CropUSA.

102.    In 2007, Connie and Beck were purportedly appointed to the Boards of Directors of AIA Service and AIA Insurance by John. Connie and Beck were paid $5,000 per quarter to "serve" on the Boards of Directors of AIA and they also were to receive common shares for their purported "service." Beck and Connie attended certain AIA board meetings in person in Idaho or through telephone calls to Idaho, which further directed aspects of AIA's businesses and certain other transactions. Beck later testified that he serves on AIA's Boards to protect his own interests and those of his friends (the same friends who previously acquired Series C Preferred Shares in AIA Services and illegally exchanged them for common shares in CropUSA).

THIRD AMENDED COMPLAINT - 25

# Exhibit - A

103.    In 2007 and 2008, the Controlling AIA Defendants entered into written tolling agreements in connection with the various litigations directly or indirectly involving AIA. The Hawley Troxell Defendants were improperly involved with and/or facilitated the Controlling AIA Defendants entering into such tolling agreements for the purpose of allowing the Hawley Troxell Defendants to continue to represent AIA, CropUSA and directly or indirectly certain of the Controlling AIA Defendants.

104.    By tolling the statute of limitations for claims against the Controlling AIA Defendants, the Hawley Troxell Defendants sought to use the tolling agreements to authorize the waiver of their conflicts of interest representing AIA, CropUSA and the interests of the Controlling AIA Defendants in litigation that could have and should have exposed the fraud and intentional breaches of fiduciary duties committed by the Controlling AIA Defendants.

105.    The limited permissible circumstances when tolling agreements and conflict waivers may be appropriate were not present when the Hawley Troxell Defendants prepared and/or entered into agreements with AIA, CropUSA and/or the Controlling AIA Defendants. Upon information and belief, the Hawley Troxell Defendants prepared and/or entered into agreements and/or amended agreements without requiring AIA to have independent counsel and without involving disinterested and unconflicted constituents from AIA in violation of the Rules of Professional Conduct, including RPC 1.7, RPC 1.8 and RPC 1.13. Throughout the Hawley Troxell Defendants' representation of AIA and CropUSA, they failed to act in the best interests of AIA and to address the conflicts of interest and malfeasance committed against AIA with the highest unconflicted and disinterested constituents from AIA in violation of the Rules of Professional Conduct, including, RPC 1.13.

THIRD AMENDED COMPLAINT - 26

# Exhibit - A

106. The Hawley Troxell Defendants knew or should have known that the Controlling AIA Defendants had committed intentional acts of fraud and breaches of fiduciary duties (including the duty of loyalty) owed to AIA. The Hawley Troxell Defendants knew or should have known that by allowing the Controlling AIA Defendants to continue to operate and control AIA that they would continue to conceal their past torts and likely continue to commit new torts, which is precisely what occurred here as demonstrated by the facts alleged in this Third Amended Complaint.

107. Although these tolling agreements tolled the statute of limitations for claims AIA could assert against the Controlling AIA Defendants (which eliminates any defense they may have to assert any statute of limitations defenses), the facts set forth in this Third Amended Complaint demonstrate why such tolling agreements were improper under the circumstances as the agreements involved tolling intentional torts committed against AIA. While the claims were being tolled, the Controlling AIA Defendants continued to unlawfully use AIA's cash, resources and ability to borrow to fund other businesses and pay compensation to themselves.

108. During the course of the litigation in *Taylor v. AIA Services*, Reed Taylor attempted to negotiate a settlement, but he insisted that any settlement must include full disclosure to, and authorization by, AIA Services' minority shareholders and to allow them to participate in CropUSA common share ownership. (*See* Dkt. 67-18.) Not only did the Controlling AIA Defendants and Hawley Troxell Defendants reject Reed Taylor's offer, but they still refused and failed to provide full disclosure to AIA and AIA Services' innocent minority shareholders of the malfeasance and torts committed against AIA. The untenable position of the Hawley Troxell Defendants was confirmed when the only person seeking to require full and fair disclosure to the shareholders and for them to rightfully participate in AIA's business was a former creditor, Reed

THIRD AMENDED COMPLAINT - 27

# Exhibit - A

Taylor. (*Id.*)

109.    During the course of *Taylor v. AIA Services*, Connie and Beck represented to Judge Brudie, the Idaho Supreme Court, and AIA that the redemption of Reed Taylor's shares should be illegal to benefit AIA Services' minority shareholders. (*See* Dkt. 67-23 and 67-25.) After Judge Brudie ruled the redemption of Reed Taylor's shares was illegal, neither Connie, Beck, the Hawley Troxell Defendants nor any of the other Controlling AIA Defendants did anything to benefit AIA or its minority shareholders nor did they ever have any intention of helping them, contrary to what they had represented to Judge Brudie and the Idaho Supreme Court.

110.    Instead of sharing equally in AIA's assets with AIA Services' innocent minority shareholders, the Controlling AIA Defendants later sought to eliminate those minority shareholders for only ten cents per share, even though Connie and John both previously valued the shares much higher even after considering the over $6 million that AIA Services owed to Reed Taylor at the time of valuation (a debt that was later ruled to be illegal and void). (*See* Dkt. 67-24 and 67-50.)

111.    Riley was an attorney at the law firm of Eberle Berlin at the time of the redemption of Reed Taylor's shares in 1995 and he breached his duty of care by advising AIA Services to enter into the illegal stock redemption transaction. *See Taylor v. AIA Servs. Corp.*, 151 Idaho 552, 261 P.3d 829 (2011). Riley concealed facts from AIA regarding the redemption.

112.    The illegal redemption of Reed Taylor's common shares ultimately led to AIA incurring over $1 million in attorneys' fees and costs litigating and resulted in AIA Services being required to report to the IRS a gain from the $6 million it never had to pay Reed Taylor.

113.    Upon information and belief, the Controlling AIA Defendants never reported the gain from the extinguished $6 million debt to Reed Taylor on AIA Services' tax return. If the

THIRD AMENDED COMPLAINT - 28

# Exhibit - A

Controlling AIA Defendants did not report the $6 million income to the IRS and AIA Services is obligated to pay taxes, penalties and interest on that gain, the Controlling AIA Defendants and Hawley Troxell Defendants are liable for those sums as well for breaching their fiduciary duties owed to AIA.

114.    Based on the intentional acts of the Hawley Troxell Defendants, AIA has been decimated because the Controlling AIA Defendants remained in control of AIA through those tolling agreements and the Hawley Troxell Defendants' ongoing representation of AIA. The end result of these tolling agreements and ongoing representation was that the Hawley Troxell Defendants improperly ensured that the Controlling AIA Defendants would retain control over AIA to the detriment of AIA and for the improper benefit to the Hawley Troxell Defendants and the Controlling AIA Defendants.

115.    In or around 2007 or 2008, AIA Insurance received a settlement of approximately $800,000 for litigation that AIA Insurance had funded for certain policy holders. Instead of utilizing or retaining AIA's portion of such funds exclusively for AIA, the Controlling AIA Defendants improperly used those funds to, *inter alia*, continue their intentional acts of funding CropUSA and to pay litigation expenses caused by them or other unauthorized uses. Upon information and belief, the Hawley Troxell Defendants had knowledge of the receipt of those funds, yet they did nothing to protect the funds even though the funds were at issue in *Taylor v. AIA Services*.

116.    In 2008, the Controlling AIA Defendants and the Hawley Troxell Defendants permitted CropUSA to sell a book of crop insurance business to Hudson Insurance for the benefit of CropUSA when approximately 75% of the business had been derived directly from AIA's agency force (i.e., agents such as Larry Whitehead). The over $15 million sale price should have

THIRD AMENDED COMPLAINT - 29

# Exhibit - A

been paid to AIA, rather than to CropUSA or to pay the debts incurred by the Controlling AIA Defendants through CropUSA. Even if the sale of this book of business rightfully occurred, AIA should have been the recipient of the sale proceeds and there should not have been any money owed to Lancelot or others because the Controlling AIA Defendants had engaged in corporate waste and other breached fiduciary duties that resulted in the sums being allegedly owed.

117.    Sometime after CropUSA sold the bulk of its assets to Hudson Insurance in 2008, which were derived primarily from AIA, the Controlling AIA Defendants obtained further funds from Hudson Insurance for Growers National Cooperative Insurance Agency, Inc. ("Growers National"), an entity formed and funded by AIA for the purpose of selling crop insurance that allowed the members to participate in the agency by receiving patronage dividends.

118.    Upon information and belief, CropUSA received over $500,000 from Hudson Insurance for Growers National. These funds should have been paid to AIA and the receipt of the funds was concealed from AIA. Plaintiff will establish the exact amount of funds that the Controlling AIA Defendants and/or CropUSA received from Hudson Insurance for Growers National at the time of trial.

I.    **The Controlling AIA Defendants Continue Unlawfully Using Funds from AIA and Intentionally Committing Torts against AIA with the Assistance of the Hawley Troxell Defendants—Even While This Lawsuit Was Pending**

119.    Upon information and belief, the Hawley Troxell Defendants have been paid the bulk of the over $2,000,000 in attorneys' fees and costs incurred and/or paid for the various lawsuits. Plaintiff will establish the exact amount of funds paid to the Hawley Troxell Defendants by AIA and/or on behalf of AIA, which Plaintiff is seeking to be disgorged and returned to AIA.

120.    From 2009 through the present time, Donna Taylor exercised her right under the amended articles of incorporation to appoint two different directors to AIA Services' Board of

THIRD AMENDED COMPLAINT - 30

# Exhibit - A

Directors, but the Controlling AIA Defendants and/or the Hawley Troxell Defendants refused to honor her unqualified right thereby resulting in all actions taken by AIA Services' Board of Directors during that period of time being unauthorized and thus a breach of the fiduciary duties of the Controlling AIA Defendants.

121. In December 2009, Donna Taylor filed suit against AIA Services to exercise her unequivocal right to appoint her designee, Patrick Moran, to the Board of Directors of AIA Services and to appoint a receiver for AIA Services. The Hawley Troxell Defendants once again appeared in that lawsuit and successfully opposed Donna Taylor's designee being appointed to the Board of Directors or a receiver being appointed by improperly seeking a stay in the lawsuit.

122. Had the Hawley Troxell Defendants joined Donna Taylor in having a receiver appointed for AIA Services, which the Hawley Troxell Defendants should have done in light of the countless intentional torts committed against AIA by the Controlling AIA Defendants, there is no doubt that they could have stopped the Controlling AIA Defendants from carrying out their ongoing fraud, intentional breaches of fiduciary duties and their destruction of AIA. At a minimum, the Hawley Troxell Defendants' acts and/or omissions in this regard was a substantial factor of the improper transactions, unlawful acts, and the cause of millions of dollars of damages to AIA.

123. This lawsuit was filed by Plaintiff on August 11, 2010, and subsequently stayed at the request of the Controlling AIA Defendants and the Hawley Troxell Defendants. During that stay, inappropriate and unlawful transactions continued to occur.

124. The Controlling AIA Defendants continued to utilize AIA's funds, assets, labor, trade secrets and borrowing ability to unlawfully assist CropUSA and other entities owned by the Controlling AIA Defendants.

THIRD AMENDED COMPLAINT - 31

# Exhibit - A

125.    In March 2012, the Controlling AIA Defendants, improperly terminated AIA Services' ESOP and paid those shareholders three cents per share for their hard-earned common shares. At no time prior to or after the termination of the ESOP did the Controlling AIA Defendants disclose the facts pertaining to the malfeasance and torts existing at that time (as described in this Third Amended Complaint or otherwise) to those shareholders. (*See* Dkt. 67-30-33, 34.)  AIA Services was separately barred from purchasing or redeeming the common shares held in the ESOP.

126.    However, the Controlling AIA Defendants knew that AIA Services' amended articles of incorporation barred all stock redemptions, including any purchases of shares held by the ESOP, until the Series A Preferred Shares were all fully redeemed and the Series C Preferred Shares had been paid the over $1,000,000 in dividends owed. The repurchase of the ESOP shares for three cents per share was illegal, ultra vires and improper.

127.    Effective March 23, 2012, Beck and Cashman purportedly entered into an agreement with John to sell their purported common shares in AIA Services, which such shares had never been properly or lawfully issued in the first place. The agreement provided that Idaho law applied and, upon information and belief, Beck and Cashman entered into that agreement in connection with the failed effort to effectuate a reverse stock split to eliminate the minority shareholders.

128.    In 2012, the Controlling AIA Defendants improperly sought to effectuate a reverse stock split and to only pay AIA Services' minority common shareholders ten cents per share to repurchase those common shares (including Plaintiff's shares) without disclosing any facts and without offering full and fair compensation for the value of the shares. (*See* Dkt. 66-3, 67-48, 67-

THIRD AMENDED COMPLAINT - 32

# Exhibit - A

48.) The notice to the shareholders was signed by Duclos and the improper and unlawful reverse stock split was approved by Beck, John and Connie. (*Id.*)

129.    Fourteen shareholders objected to the alleged reverse stock split. (*See* Dkt. 67-41.) The ill-conceived reverse stock split violated AIA Services' amended articles of incorporation and the Controlling AIA Defendants did not comply with Idaho Code, including, by failing to provide the form for the shareholders to state the value that they believed should be paid for their common shares thereby further establishing the true improper purpose of the failed reverse stock split. The reverse stock split was not pursued for any proper business purpose.

130.    In response to the fourteen shareholder objections and notices of demands for payment, the Controlling AIA Defendants, without regard to the fact that they would expend tens of thousands of dollars more in funds litigating the issue rather than simply paying the shareholders the true fair value of their shares, had AIA Services file suit against the fourteen shareholders. (*See* Dkt. 83-15.) Judge Carl Kerrick dismissed the lawsuit, and further noted that it was disingenuous to seek a reverse stock split until this lawsuit was resolved. (*See* Dkt. 86-1.) Judge Kerrick later awarded attorneys' fees and costs to the shareholder defendants. That judgment in favor of those fourteen shareholders has still never been paid by the Controlling AIA Defendants or AIA, and the Controlling AIA Defendants should be required to pay that judgment on behalf of AIA.

131.    The failed reverse stock split drained AIA of significant and unnecessary attorneys' fees and costs (fees and costs which could have been paid to those shareholders or for other AIA obligations) and constituted a waste of AIA's assets. This purported reverse stock split was approved and/or acquiesced in by the Controlling AIA Defendants, which was a breach of their fiduciary duties. Upon information and belief, the Hawley Troxell Defendants were aware of the scheme to effectuate the reverse stock split to eliminate AIA Services' innocent minority

THIRD AMENDED COMPLAINT - 33

# Exhibit - A

shareholders, which would in turn eliminate common shareholder standing for this lawsuit.

132.  From 2009 through 2016, the Controlling AIA Defendants continued loaning money to, or allowed money to be lent to, Pacific Empire Radio Corporation in an amount exceeding $1,600,000 by year-end 2015 when that corporation had no ability to repay the sums owed and it benefitted John and Connie (who owned shares in that corporation at certain relevant times) as those were funds they would not have to personally provide to Pacific Empire Radio Corporation.  In 2015 and 2016, the IRS filed liens against Pacific Empire Radio Corporation in excess of $500,000 for the non-payment of employee withholding taxes, yet the Controlling AIA Defendants permitted AIA Services to lend over $1,600,000 to Pacific Empire Radio Corporation.

133.  From 1999 through 2012, the Controlling AIA Defendants concealed their ownership interests in other entities from AIA, which were derived from and/or funded by AIA, including, without limitation, CropUSA, CropUSA Insurance Services, LLC, and Pacific Empire Holdings Corp.

134.  From 1995 through 2016, John received over $2,700,000 in cash salary, compensation, benefits and property from AIA. This amount does not include any compensation, payments or other improper distributions he may have received from CropUSA and other entities funded or launched using AIA. At a minimum, John should be required to disgorge the over $2,000,000 that he received from AIA from 1999 through 2016 and other compensation, funds and benefits received from AIA since 1999, which John received while acting as a faithless fiduciary and while improperly competing against AIA through CropUSA and other entities (including Pacific Empire Holdings Corp.).

///

///

THIRD AMENDED COMPLAINT - 34

# Exhibit - A

**J.   The Controlling AIA Defendants, with GemCap Aiding and Abetting Them, Illegally Had AIA Guarantee Loans Made to CropUSA by GemCap, Concealed the Guarantees from AIA, Illegally Entered into Settlement Agreements with GemCap, Concealed the Settlement Agreements from AIA, and Unlawfully Transferred Property to GemCap Thereby Damaging AIA.**

135.   While the instant lawsuit was pending, the Controlling AIA Defendants sought additional funding for CropUSA. GemCap agreed to make the loan to CropUSA in Idaho for the purpose of operating its business in Idaho. On or about November 23, 2011, the Controlling AIA Defendants obtained a $5,000,000 line-of-credit from GemCap for CropUSA, which was subsequently amended on April 1, 2012, July 18, 2012, and February 4, 2013 to be a $10,000,000 line-of-credit (the original loan and all subsequent modifications and amendments are collectively the "GemCap Loan").

136.   On November 23, 2011, the Controlling AIA Defendants, with the substantial assistance from GemCap, had AIA Services and AIA Insurance guarantee $1,113,930 of the GemCap Loan. In connection with that guarantee, John, Beck and Connie executed a board resolution for AIA Services purportedly authorizing that guarantee, even though they all had conflicts of interest that prevented them from authorizing the guarantee, AIA was separately barred from guaranteeing the loans, they did not obtain consent from Donna Taylor for the guarantee, and Donna Taylor's designee on AIA Services' Board of Directors was not provided notice of the GemCap Loan. On October 1, 2012, the Controlling AIA Defendants had AIA purportedly guaranteed the entire $10,000,000 GemCap Loan (the 2011 $1,113,930 limited guarantee executed in 2011 and the $10,000,000 unlimited guarantee executed in 2012 are collectively referred to as the "Guarantees"). Even though AIA purportedly executed the Guarantees, AIA could not borrow funds from the GemCap Loan and AIA obtained no benefit whatsoever.

THIRD AMENDED COMPLAINT - 35

# Exhibit - A

137.    Upon information and belief, GemCap was aware of the existence of this lawsuit, or should have been aware of its existence, at the time of the GemCap Loan and AIA's Guarantees (which asserted claims based on other unlawful guarantees and alleged substantial other misconduct, including claims against the assets GemCap was purportedly accepting from AIA and CropUSA). Upon information and belief, GemCap was aware or should have been aware, that AIA Services' board of directors was not fully and properly seated (including that the Controlling AIA Defendants were not honoring Donna Taylor's unequivocal right to appoint a director) and that AIA's officers were not properly elected. Upon information and belief, GemCap knew, or should have known, that AIA Services was not conducting the required annual shareholder meetings and was not lawfully complying with fundamental corporate governance procedures.

138.    When GemCap accepted the first of the Guarantees from AIA, GemCap requested and was provided with an Officer's Certificate, signed by John and Duclos, that attached copies of AIA Services' amended articles of incorporation and bylaws (both of which contained provisions barring the Guarantees). As a result, GemCap was aware, or should have been aware, that AIA, and its purported officers, were not authorized to execute the Guarantees or pledge any of its assets to GemCap. AIA received no consideration for entry into the Guarantees and most of the GemCap Loan's indebtedness was already owed as of the date of the unlimited Guarantee executed on October 1, 2012.

139.    In connection with the GemCap Loan and AIA's Guarantees of that loan, GemCap requested, and was provided with, copies of AIA Services' amended articles of incorporation and restated bylaws, which expressly barred the Guarantees because, *inter alia*, the GemCap Loan was not for a wholly-owned subsidiary of AIA Services and the Loan implicated conflicts of interest

THIRD AMENDED COMPLAINT - 36

# Exhibit - A

provisions that pertained to the Controlling AIA Defendants. As a result, GemCap was fully aware, or should have been fully aware, that AIA was not authorized to execute the Guarantees or to perform under the Guarantees.

140.    The Guarantees were signed by John Taylor, as the purported President of AIA Services and the purported President of AIA Insurance. GemCap was aware, or should have been aware with the exercise of reasonable diligence, that John Taylor had no authority to execute the Guarantees on behalf of AIA Services or AIA Insurance, and that, under the circumstances, the Guarantees were barred by AIA Services' amended articles of incorporation and AIA's bylaws. The Controlling AIA Defendants all had knowledge of the Guarantees and the fact that they were barred, and they never provided notice of the Guarantees or obtained shareholder approval from them (including, without limitation, approval from Donna Taylor, who was the sole Series A Preferred Shareholder of AIA Services). The Guarantees are illegal and/or ultra vires because they violated AIA Services' amended articles of incorporation, AIA's bylaws and numerous Idaho Code sections.

141.    On December 20, 2012, GemCap filed a UCC financing statement with the Idaho Secretary of State stating that AIA Services and AIA Insurance had pledged "All of each of Debtor's right, title and interest, whether now existing or hereafter acquired, in and to all assets of such Debtor, wherever located, whether tangible or intangible, and the proceeds and products thereof" ("Financing Statement"). The Financing Statement was not properly authorized or disclosed to AIA's shareholders, and it violated AIA Services' amended articles of incorporation and AIA's bylaws.

142.    Under the terms of the GemCap Loan, CropUSA could borrow up to $10,000,000. Upon information and belief, CropUSA owed GemCap $8,676,288.39, plus interest, attorneys'

THIRD AMENDED COMPLAINT - 37

# Exhibit - A

fees and costs, as of July 26, 2013. Under the terms of the hard-money GemCap Loan, interest accrued at 18.5% per annum and 24% upon a default.

143.    According to a document later filed in 2014 in federal court in California, from April 15, 2013 through April 19, 2013, GemCap's agent traveled to Idaho to conduct a purported audit of CropUSA, AIA, and other entities at AIA's headquarters in Lewiston, Idaho.  John was present at the purported audit. Upon information and belief, GemCap's agent discovered facts that demonstrated that AIA and other entities owned by the Controlling AIA Defendants were engaging in improper transactions. This audit further reveals that the Hawley Troxell Defendants provided further legal work for CropUSA (despite the allegations and claims in this lawsuit). Upon information and belief, GemCap's agent traveled to Idaho to conduct other audits of CropUSA and AIA in Lewiston, Idaho. GemCap and the Controlling AIA Defendants never disclosed or provided the results of any of the audits to disinterested constituents at AIA or to AIA Services' minority shareholders.

144.    Upon information and belief, Gemcap provided CropUSA and other parties a notice of default through a notice dated July 16, 2013. Upon information and belief, GemCap provided a purported notice of default and demand for payment to AIA Services and AIA Insurance of the $8,676,288.39 owed by CropUSA through a notice dated July 29, 2013.

145.    GemCap, CropUSA and the Controlling AIA Defendants failed to disclose to properly elected and unconflicted directors of AIA, the Plaintiff, or AIA Services' other innocent minority common shareholders the GemCap Loan (including its terms), AIA's Guarantees (including their terms), and the subsequent notices of default of the GemCap Loan.

146.    On July 30, 2013, GemCap filed suit against CropUSA, John and others for the default of the GemCap Loan. GemCap asserted claims for breach of contract, fraud, conversion

THIRD AMENDED COMPLAINT - 38

# Exhibit - A

and other claims. The Controlling AIA Defendants and GemCap did not provide any notice of this lawsuit to AIA Services' shareholders nor did they take any action to proceed in the best interests of AIA.

147. After certain of AIA Services' shareholders learned of the GemCap lawsuit in California, GemCap was advised that AIA's Guarantees and the Settlement Agreements were unauthorized and illegal and that AIA was not being properly operated. Nevertheless, GemCap sought to collect from AIA based on the unauthorize and illegal Guarantees. At this point in time, GemCap had further actual knowledge of the unauthorized and illegal Guarantees and that AIA was not being operated properly (including that the Controlling AIA Defendants were breaching fiduciary duties owed to AIA), assuming that it was not aware of these facts prior to accepting AIA's Guarantees. As a result, GemCap was aware that AIA's Guarantees had been improperly and unlawfully executed.

148. Despite complaints from AIA Services' minority shareholders and even though GemCap, AIA, CropUSA and the Controlling AIA Defendants knew that AIA was barred from executing the Guarantees and entering into any settlement agreement that required the payment of any funds or transfer of any assets from AIA. GemCap and AIA, purportedly on behalf of John, purportedly entered into a purported settlement and a written settlement agreement sometime after January 9, 2015 (collectively the "Settlement Agreement" or "Settlement Agreements"). The Settlement Agreements were concealed from AIA and its shareholders by the Controlling AIA Defendants and GemCap, and further constitute a conspiracy to defraud AIA. AIA received no consideration for the Settlement Agreements.

149. Under the terms of the Settlement Agreements, AIA Services and AIA Insurance were require to transfer certain real property to GemCap and judgments would be entered against

THIRD AMENDED COMPLAINT - 39

# Exhibit - A

them in the amount of $12,126,584.61, which included $3,986,368.78 in interest, penalties and costs. The Settlement Agreements were barred by AIA Services' amended articles of incorporation and AIA's bylaws for the same reasons that the Guarantees were barred, and it was a breach of John's fiduciary duties owed to AIA when he executed the Settlement Agreement (which GemCap was fully aware). In addition, the Settlement Agreements illegally provided that AIA would not file for bankruptcy protection and that malpractice claims would be assigned to GemCap. The Settlement Agreements are illegal and/or ultra vires because they violated AIA Services' amended articles of incorporation, AIA's bylaws, numerous Idaho Code sections, and were the product of intentional breaches of John's fiduciary duties owed to AIA.

150. Under the terms of the Settlement Agreements, GemCap required John and/or certain other Controlling AIA Defendants to continue to improperly and unlawfully operate AIA in the manner that AIA had been operated in the past. The Controlling AIA Defendants have continued to improperly and unlawfully operate AIA since that time by and through their direct or indirect participation, lack of action, acquiescence and covering up of the improper and unlawful operation of AIA, which further resulted in GemCap substantially assisting and acquiescing in the Controlling AIA Defendants' breaches of fiduciary duties, fraud and other malfeasance by and through the continued improper operation of AIA, including, without limitation, allowing the Controlling AIA Defendants to operate AIA without having shareholder meetings, without having proper boards of directors, and in violation of AIA's amended articles of incorporation and bylaws.

151. Upon information and belief, the Controlling AIA Defendants were aware of the GemCap litigation and Settlement Agreements, but they and GemCap continued to aid and abet John by allowing him to unlawfully enter into the Settlement Agreements and to improperly operate AIA. The Controlling AIA Defendants and GemCap, assisted, acquiesced and assisted in

THIRD AMENDED COMPLAINT - 40

# Exhibit - A

covering up the transactions.

**152.** According to the financial statements for AIA for 2015 (which were belatedly provided to AIA Services' shareholders in August 2016 after many demands),[2] AIA disclosed the Guarantees and Settlement Agreements for the first time to AIA Services' shareholders. However, John inaccurately stated that the "Company admitted no liability, but entered into settlement discussions and reached a confidential settlement agreement in late 2014…".  However, John failed to disclose to AIA Services' shareholders that he had agreed to allow judgments in the amount of $12,126,584.61 to be unlawfully and inappropriately entered against AIA and that any judgment against him would be delayed (i.e., he once again placed his interests above the interests of AIA, even assuming that the Settlement Agreement was legal and authorized).

**153.** The real property located at 111 Main Street, Lewiston, Idaho (AIA Services' former headquarters) was ultimately transferred to GemCap and sold. As with the Guarantees and Settlement Agreements, the transfer of AIA Services' former headquarters to GemCap was not disclosed or authorized by AIA Services' shareholders.  According to recently provided 2015 financial statements for AIA (which were provided in August 2016), John disclosed for the first time that the real property located at 111 Main Street, Lewiston, Idaho (AIA Services' headquarters) was purportedly transferred to GemCap as a reduction of amounts allegedly owed to CropUSA, when AIA owed nothing to CropUSA and CropUSA actually owed AIA.  Upon information and belief, AIA Services' headquarters had a replacement value exceeding $7,000,000.

---

[2] Plaintiff is not alleging in this Third Amended Complaint that the applicable financial statements prepared for AIA or CropUSA are accurate. To the contrary, Plaintiff is alleging that certain financial statements were fraudulently prepared and/or approved by the Controlling AIA Defendants.

THIRD AMENDED COMPLAINT - 41

# Exhibit - A

154.    As a result of the Guarantees and Settlement Agreements, AIA paid sums for CropUSA and other entities, incurred and/or paid substantial attorneys' fees and costs, and/or were damaged. Once again, John placed his interests and the interests of the other Controlling AIA Defendants above the interests of AIA by improperly stipulating to judgments against AIA in excess of $12,000,000, but no judgment was entered against him even though he personally guaranteed the GemCap Loan, too. To the extent that the Guarantees and/or Settlement Agreements are not declared illegal or ultra vires and Plaintiff recovers all damages, the Controlling AIA Defendants are liable for all such damages not recovered and they are separately liable for any other damages caused by the ultra vires acts.

155.    GemCap knew that John had no apparent or actual authority to execute the Guarantees and Settlement Agreements on behalf of AIA, which is further supported by the fact that GemCap's attorneys were specifically advised that the Guarantees and Settlement Agreements were not authorized. GemCap knew that, by making the GemCap Loan, accepting the Guarantees and entering in the Settlement Agreements, it would be aiding and abetting and conspiring with the Controlling AIA Defendants and CropUSA by providing improper funding to the Controlling AIA Defendants and CropUSA and by assisting them in engaging in unauthorized, intra vires, ultra vires and/or illegal conduct.

156.    GemCap knew that the Controlling AIA Defendants breached their fiduciary duties owed to AIA, and/or aiding and abetting others in those breaches, by entering into the Guarantees and Settlement Agreements (and requiring AIA's assets and/or funds to be paid to GemCap or others because of GemCap (including attorneys)) and participating in, and covering up, the Controlling AIA Defendants' breaches of fiduciary duties against AIA. GemCap has aided and abetted one or more of the Controlling AIA Defendants in breaching their fiduciary duties and in

THIRD AMENDED COMPLAINT - 42

# Exhibit - A

the commission of fraud against AIA. GemCap has also aided and abetted the Controlling AIA Defendants by allowing them to maintain control over AIA when GemCap knew that they were not operating AIA in the best interests of AIA, and by concealing and covering up the Controlling AIA Defendants' breaches of fiduciary duties and fraud.

**K. John Unlawfully Transfers Certain Real Property to AIA and Requires AIA to Pay the Liabilities on the Property and He Alleges that AIA Owes Him $545,563 in Accrued Salary.**

157.    Subsequent to the GemCap Loan and according to AIA Services' purported 2015 financial statements (which were belatedly provided in August 2016 after many demands), John allegedly executed quitclaim deeds purportedly transferring certain real property, held in the name of other entities John controls, to AIA with a purported book value of $820,668, and AIA was improperly required to assume a purported $393,863 in debts on the real property. These real property transfers and assumptions of debts were unauthorized and ultra vires. Upon information and belief, GemCap was involved in these real property transfers and assumption of debts, and GemCap knew that such transfers were aiding and abetting John and other Controlling AIA Defendants in the breach of their fiduciary duties owed to AIA.

158.    Even if authorized, the determination of the $820,668 purported book value of such real property was not authorized and John and the Controlling AIA Defendants had conflicts of interest that prevented any of them from making any determination of value or authorizing the alleged transfers or assumption of debts. AIA's proper Board of Directors did not authorize the transactions nor did AIA Services' shareholders.

159.    According to the same recently provided financial statements for AIA for 2015, John alleges that AIA owes him $545,563 in alleged accrued salary as of December 31, 2015, but AIA owes John nothing and he is not entitled to any compensation because he has been a faithless

THIRD AMENDED COMPLAINT - 43

# Exhibit - A

fiduciary of AIA. Upon information and belief, at least one of the parcels of real property has already been transferred or lost as a result of foreclosure proceedings for less than the purported book value. AIA seeks to rescind the real property transfers and assumption of debts.

**L. John Unlawfully Amends AIA Services and AIA Insurance's Bylaws and Issues Himself Series A Preferred Shares in AIA Services.**

160. According to the recently provided financial statements for AIA for 2015 (which were belatedly provided in 2016 after many demands), sometime in 2016, John purportedly purchased 7,500 Series A Preferred Shares in AIA Services, but those shares were improperly issued and were never authorized by a properly seated and unconflicted Board of Directors of AIA Services, as required. In addition, AIA Services' amended articles of incorporation authorized the Series A Preferred Shares to only be issued to Donna Taylor in connection with the prior restructuring of AIA Services, and not to issue more Series A Preferred Shares to John.

161. It is unclear why John improperly issued the 7,500 Series A Preferred Shares in AIA Services when those shares were not purchased or issued for any legitimate business purposes, they were never properly authorized by AIA Services' Board of Directors or shareholders, and John had conflicts of interest that prevented him from purchasing or issuing those shares on behalf of the Board of Directors of AIA Services even if the shares were authorized to be issued under AIA Services' amended articles of incorporation (which they were not).

162. According to the same recently provided financial statements for AIA for 2015 and the letter accompanying those financial statements, John allegedly amended the bylaws of AIA Services and AIA Insurance to provide for an award of attorneys' fees and costs for "intracompany suits" if a "claiming party does not obtain a favorable judgment on the merits of the claim." These purported amendments were never adopted for a legitimate purpose, John had conflicts of interest that prevented him from adopting the provision, and the provisions are unenforceable.

THIRD AMENDED COMPLAINT - 44

# Exhibit - A

163.    According to the same recently provided financial statements for AIA for 2015, the Controlling AIA Defendants have spent over $400,000 litigating against Donna Taylor in an effort to not pay her the just over $400,000 in principal owed on her Series A Preferred Shares. This further demonstrates the breached fiduciary duties and corporate waste occurring at AIA by and through the Controlling AIA Defendants because AIA Services should have simply paid Donna Taylor the $400,000 instead of spending that money to fight her.

**M.** **There Is a Laundry List of the Unlawful Acts, Self-Dealing, Malfeasance and Intentional Torts Committed by the Controlling AIA Defendants**

164.    Since acquiring operational control of AIA Services in 1995, the Controlling AIA Defendants have engaged in repeated acts of faithless self-dealing, transactions detrimental to AIA, committed intentional torts (including fraud and breaches of fiduciary duties), breached their fiduciary duties (including their duties of loyalty), concealed, conspired to commit intentional torts, aided and abetted in the commission of intentional torts and to cover up those torts, to the detriment of AIA in Idaho, including, but not limited to, the following intentional acts:

(a) Controlling AIA's Board of Directors and/or the decisions made by AIA's Board of Directors and intentionally refusing to act in the best interests of AIA;

(b) Violating AIA Services' restated bylaws, including but not limited to, failing to hold annual shareholder meetings, failing to provide notice or obtain proper shareholder approval for certain transactions, failing to comply with conflicts of interest provision in the bylaws and articles of incorporation which restricted many of the unlawful or improper transactions described in this Third Amended Complaint, and failing to properly comply with applicable corporate governance;

(c) Violating AIA's amended articles of incorporation thereby allowing substantial funds and assets to be depleted from AIA and obligating AIA to be liable for loans or guarantees which were barred by those amended articles of incorporation;

THIRD AMENDED COMPLAINT - 45

# Exhibit - A

(d) Diverting corporate opportunities belonging to AIA, including CropUSA and Pacific Empire Holdings Corp. (a/k/a Sound Insurance);

(e) Unlawfully conveying, encumbering, utilizing, and/or pledging AIA's assets to themselves or other entities;

(f) Inappropriately redeeming, acquiring and/or issuing shares of stock and/or making payments on put options in AIA Services, including but not limited to, issuing shares to the Controlling AIA Defendants;

(g) Inappropriately paying dividends and failing to pay dividends;

(h) Engaging in transactions and actions in direct conflict of interest with their duties owed to AIA and failing to comply with conflict of interest provisions in AIA's bylaws and the law;

(i) Guaranteeing loans for CropUSA and failing to guarantee loans for AIA;

(j) Paying excessive compensation to officers and directors, including but not limited to, paying John $250,000 per year to purportedly act as CEO and President of AIA Services after his contractual entitlement to such salary had expired, when John had conflicts of interest that barred him from determining his pay, and he had represented that he would not take salary in certain year(s);

(k) Wasting AIA's assets and making improper payments, including by paying Connie and Beck $20,000 per year to purportedly serve on the Boards of Directors of AIA and paying John compensation when he was doing nothing for the benefit of AIA;

(l) Divulging and/or utilizing AIA's trade secrets for the benefit of themselves and other entities, including CropUSA (including, without limitation, AIA's agency force and customer lists);

(m) Soliciting and transferring AIA employees to work for CropUSA;

THIRD AMENDED COMPLAINT - 46

# Exhibit - A

(n) Engaging in acts and/or decisions without making full disclosure and without obtaining the required approval of AIA Services' shareholders resulting in none of the transactions and acts referenced in this Third Amended Complaint (and any that may be at issue at or before trial) being properly ratified by AIA Services, AIA Insurance or their shareholders;

(o) Engaging in millions of dollars of transactions that resulted in AIA conveying benefits without the receipt of any consideration, without being repaid and/or without being paid any mark-up or profit;

(p) Forming and operating entities in direct competition with AIA in the insurance marketplace, including without limitation, CropUSA and Pacific Empire Holdings Corp.;

(q) Making false representations, concealing facts, and omitting material facts from AIA, including, without limitation, regarding share values, items in AIA's financial statements (including notes), assets and debts in AIA's financial statements, the true value of funds and assets (including employees and trade secrets) utilized for other entities (including CropUSA), and that AIA was being operated for the benefit of the corporation;

(r) Concealing and failing to disclose material facts to AIA pertaining to loans, transfers, and utilization of assets, including without limitation, concealing or omitting material facts, including all of the necessary facts related to virtually each and every transaction described in this Third Amended Complaint;

(s) Making false representations to AIA, including without limitation, making and certifying false and misleading financial statements to AIA and representing that AIA was being properly operated when it was instead being used to fund the lifestyle, payments and other businesses owned or partially owned by the Controlling AIA Defendants;

THIRD AMENDED COMPLAINT - 47

# Exhibit - A

(t) Inappropriately loaning AIA's funds, or guaranteeing loans, to themselves and to other entities under their control in violation of AIA's amended articles of incorporation, bylaws and fiduciary duties;

(u) Paying tens of thousands of dollars in yearly fees to purportedly serve on the Board of Directors of AIA and other compensation and benefits, when such amounts were excessive and they were violating their fiduciary duties owed to AIA and they were all acting as faithless fiduciaries;

(v) Paying attorneys' fees and costs in various legal proceedings on behalf of the Controlling AIA Defendants and others when it was clear that they had intentionally failed to act in good faith, were not entitled to indemnification or to have attorneys' fees and costs advanced on their behalf, and by failing to obtain security for repayment of said funds;

(x) Acquiring a parking lot with AIA funds and charging AIA, and making AIA pay excessive rent for use of the parking lot (John increased the rent to $15,000 per year) even though AIA did not actually use the parking lot. Later, upon information and belief, the parking lot was transferred to Jordan Taylor, John and Connie's son (who is also a lawyer), for no consideration so he could sell it for $50,000;

(y) Failing to seat the full and required Board of Directors for AIA Services and thus there was never a required quorum for AIA Services' Board to take any action and further resulting in all purported actions being unauthorized, including, without limitation, by failing to honor Donna Taylor's appointment of Patrick Moran and Paul Durant to AIA Services' Board of Directors;

(z) Improperly purchasing and transferring shares held by AIA or which should have been held by AIA to themselves, including without limitation shares in Pacific Empire Radio Corp., Pacific Empire Communications Corp., and Pacific Empire Holdings Corp. (this entity was formed

THIRD AMENDED COMPLAINT - 48

# Exhibit - A

with AIA's assets by John, improperly competed against AIA, and was later sold for $240,000);

(aa) Allowing John to profit from CropUSA's sale of assets to Hudson Insurance by improperly allowing him to retain a monthly fee of $10,000 per month when those funds should have gone to AIA;

(bb) Failing to take appropriate legal action in the interests of AIA, including by failing to bar John from being an officer and director of AIA and failing to claw back CropUSA as a subsidiary of AIA and properly operate CropUSA (which would have resulted in CropUSA being worth millions of dollars);

(cc) Removing tenants from an AIA owned building to another building owned personally by John and/or other Controlling AIA Defendants;

(dd) Improperly subsidizing CropUSA and other entities with AIA's funds, labor and assets, failing to properly allocate expenses to CropUSA and failing to have other expenses paid back at all (which have already been identified as being approximately $500,000 as of 2008 after Plaintiff's expert was able to identify certain transactions that were actually accounted for);

(ee) Selling and/or transferring assets and or/contracts belonging to AIA to others (including the contract with Growers National);

(ff) Improperly paying numerous law firms other than the Hawley Troxell Defendants hundreds of thousands of dollars representing AIA and the Controlling AIA Defendants in litigation caused by their own intentional acts and torts and when the Controlling AIA Defendants had not acted in good faith or complied with their duties of loyalty to AIA;

(gg) Paying more of AIA's funds to litigate disputes (including with Donna Taylor in the Idaho state courts) than it would have taken to simply pay the money owed;

THIRD AMENDED COMPLAINT - 49

# Exhibit - A

(hh) Failing to obtain security, failing to charge interest, and failing to collect on loans of at least $307,000 made to John;

(ii) Removing the $400,000 held in the court registry and the over $200,000 in a bank account in *Taylor v. AIA Services*, and allowing the Controlling AIA Defendants to utilize those funds when the Hawley Troxell Defendants should have ensured that those funds were kept from them;

(jj) Expending significant sums on the illegal repurchase of common shares in AIA Services, which also resulted in increasing the ownership interest of the Controlling AIA Defendants;

(kk) Allowing AIA to engage in the transactions identified in this Third Amended Complaint when no dividends had been declared or paid on the Series C Preferred Shares held in the AIA Services 401(k) Plan and those shares now have accrued dividends owed of over $1,000,000;

(ll) Wasting AIA's funds and assets (and CropUSA's) on needlessly rented office space, unneeded employees and other wasted expenditures;

(mm) Allowing Connie to represent CropUSA in litigation involving Growers National in conflict with her duties of loyalty as a director of AIA, which such litigation resulted in approximately $500,000 being transferred to CropUSA for Growers National, even though AIA created Growers National (she separately aided and abetted in CropUSA's receipt of these funds);

(nn) Allowing John to make decisions for the management and operation of AIA when he had conflicts of interest and a long-standing track record of diverting money, labor, credit, trade secrets and other assets to CropUSA and other entities that he partially or wholly owned;

THIRD AMENDED COMPLAINT - 50

# Exhibit - A

(oo) Engaging in numerous illegal, ultra vires, and intra vires acts and transactions for, or in the name of, AIA, including, without limitation, entering into the Guarantees for the $10,000,000 GemCap Loan, and later transferring property worth over $1,000,000 to GemCap;

(pp) Engaging in countless improper transactions in Idaho for the benefit of themselves, CropUSA and/or other entities partially or wholly owned by the Controlling AIA Defendants (including the other transactions and allegations set forth in this Third Amended Complaint);

(qq) Organized, operated, controlled, and conducted CropUSA as their instrumentality, agency and/or conduit to the detriment of AIA, and they have further operated CropUSA improperly without complying with proper corporate governance procedures and as a means to defraud AIA.

The Controlling AIA Defendants, CropUSA, GemCap and/or the Hawley Troxell Defendants have assisted one another and others in committing the intentional acts and torts against AIA described in this paragraph and concealing, or covering up, the facts and the intentional torts committed against AIA, including those specifically referenced in this paragraph and elsewhere in this Third Amended Complaint. The Hawley Troxell Defendants continued to conceal facts from AIA and to aid and abet the Controlling AIA Defendants and CropUSA even after any representation may have terminated when they owed the duty to AIA to not do so.

165.    At all relevant times, John was CEO, President and director of AIA Services, AIA Insurance and CropUSA and a shareholder of AIA Services at the time of all of the improper transactions with CropUSA and other improper acts identified in this Third Amended Complaint (which were also conflicts of interest), and he improperly benefited from those unlawful transactions with the assistance and/or covering up of the transactions through the Controlling AIA Defendants and the Hawley Troxell Defendants (as to certain of the transactions and malfeasance).

THIRD AMENDED COMPLAINT - 51

# Exhibit - A

In 2016, John became the sole purported director, secretary and president of AIA Services, AIA Insurance and CropUSA Insurance Agency, Inc.

166.    At all relevant times, John also owned interests in other entities who improperly benefitted directly or indirectly from AIA and CropUSA (including Green Leaf Alliance, Green Leaf Re, Reinsurance Partners and Pacific Empire Radio Corp.), which were additional conflicts of interest and proof of self-dealing. The Controlling AIA Defendants were aware of these facts.

167.    During certain relevant times, the Controlling AIA Defendants were all purported shareholders of CropUSA and either majority shareholders (as a group) or officers of AIA Services at the time of the improper transactions and malfeasance identified in this Third Amended Complaint (which were also conflicts of interest), and they improperly benefited, directly or indirectly, from those unlawful transactions with the assistance and/or covering up of the transactions through the Controlling AIA Defendants and the Hawley Troxell Defendants (as to certain of the transactions and malfeasance).

168.    As a result of the acts and omissions set forth and/or contemplated above and other acts and/or omissions which will be established at or before trial, the Controlling AIA Defendants, CropUSA, GemCap and the Hawley Troxell Defendants have committed numerous torts against AIA in Idaho thereby proximately causing AIA to incur millions of dollars in damages. Indeed, had the Hawley Troxell Defendants simply sought on behalf of AIA to immediately bar John from serving as a director and officer of AIA Services and ensured that AIA was properly operated and its assets and CropUSA properly marshalled, the GemCap Guarantees and Settlement Agreement would never had occurred and AIA would not have been damaged by millions of dollars.

169.    Because discovery has not yet commenced, Plaintiff expects to obtain additional evidence in discovery and to conduct further investigation, which will further support the causes

THIRD AMENDED COMPLAINT - 52

# Exhibit - A

of action and relief requested below.

170.    Due to the fact that the Controlling AIA Defendants have had complete control over AIA during all relevant times and have never asserted, nor would they ever assert, claims against themselves or others on behalf of AIA, the adverse dominion doctrine bars the assertion of statute of limitations defenses to all claims and relief requested in this Third Amended Complaint. *Freeland v. Enosis Corp.,* 540 F.3d 721 (7th Cir. 2008).

### V.    CERTIFICATE OF COMPLIANCE WITH IDAHO CODE SECTION 30-1-742 AND FEDERAL RULE OF CIVIL PROCEDURE 23.1

171.    As a prerequisite to filing this lawsuit under Idaho Code §§ 30-1-742, 30-29-742, and Federal Rule of Civil Procedure 23.1, Plaintiff has been a common shareholder of AIA Services during all relevant times to the transactions at issue and the claims asserted in this Third Amended Complaint.

172.    On July 21, 2008, Donna Taylor, another shareholder of AIA Services, served a written derivative demand letter on the Boards of Directors of AIA Services and AIA Insurance. (Dkt. 23-9 and 67-19.)  In accordance with the then-applicable I.C. § 30-1-742, the Plaintiff was not required to make another demand under I.C. § 30-1-742 because that statute does not require every shareholder filing suit to serve a separate demand, as confirmed by the comment: "It should be noted that the shareholder bringing suit does not necessarily have to be the person making the demand. Only one demand need be made in order for the corporation to consider whether to take corrective action."

173.    On July 23, 2008, the Hawley Troxell Defendants filed a Motion for Stay of Proceedings in *Taylor v. AIA Services* and asserted that the stay was necessary so that AIA Services and AIA Insurance could conduct an inquiry into the demands made by Donna Taylor in her letter dated July 21, 2008 (Donna Taylor was not a party to that lawsuit, however).

THIRD AMENDED COMPLAINT - 53

# Exhibit - A

174.    On August 14, 2008, in *Taylor v. AIA Services*, the Hawley Troxell Defendants filed a purported petition for a court appointed independent inquiry on behalf of AIA when they had no intention of following through with the inquiry. (*See* Dkt. 67-20.)

175.    On September 4, 2008, Reed Taylor supported the appointment of independent investigators.  However, Reed Taylor objected to the investigators proposed by the Hawley Troxell Defendants, who were purportedly representing AIA, and the Controlling AIA Defendants. (*See* Dkt. 67-21.) Reed Taylor believed totally independent people should be appointed.

176.    Although the parties had filed briefing with respect to the appointment of independent investigators in *Taylor v. AIA Services*, the Hawley Troxell Defendants never noted the motion for a hearing and the court never ruled on the request, and they intentionally abandoned the appointment of an independent inquiry.  The Hawley Troxell Defendants and Controlling AIA Defendants have never conducted a further investigation of the demands made in Donna Taylor's derivative demand letter of July 21, 2008. No action was ever taken by AIA or AIA's Boards of Directors.

177.    On April 3, 2012, Plaintiff, along with other shareholders, made another written demand on the Boards of Directors of AIA Services and AIA Insurance, which included demands to keep the $400,000 cash held in the Court registry in *Taylor v. AIA Services* to comply with AIA's amended articles of incorporation, to comply with AIA's bylaws, provide full disclosure, and to protect certain other assets. (Dkt. 67-33.) This particular demand was copied directly to Babbitt and Ashby, so they had full knowledge of it. This demand, like all the others, was ignored. (*See* Dkt. 67, p. 11 ¶ 29.)

178.    On July 16, 2012, while the instant case was stayed, the Plaintiff, along with over ten other shareholders of AIA Services, served additional written derivative demands upon the

THIRD AMENDED COMPLAINT - 54

# Exhibit - A

Boards of Directors of AIA Services and AIA Insurance. (Dkt. 67-42.) The demands requested, among other things, that AIA pursue this lawsuit with all claims as of July 16, 2012 and future claims, including punitive damages, which also provided AIA and the Board of Directors yet another opportunity to address the demands previously made by Donna Taylor in 2008 (although Plaintiff was under no obligation to do so).

179.    On June 13, 2016, in accordance with I.C. § 30-29-742, Plaintiff, along with other shareholders of AIA Services, served yet another detailed derivative demand upon the Boards of Directors of AIA Services and AIA Insurance. (*See* Dkt. 148-2.) Plaintiff demanded, *inter alia*, that additional claims be asserted against the previously named defendants (including for more recent torts and damages) and to assert claims against GemCap and CropUSA Insurance Services. AIA failed to respond to this demand within ninety days.

180.    On August 23, 2016, in accordance with I.C. § 30-29-742, Plaintiff, along with other shareholders of AIA Services, served a substantially similar demand previously provided (Dkt. 148-2) in which Plaintiff demanded further action be taken, including, without limitation, to seek, *inter alia*, further claims and damages since the last derivative demand, to seek damages against GemCap for selling AIA's property, to void the improperly and allegedly amended bylaws of AIA Services and AIA Insurance, and to rescind the Series A Preferred Shares that John improperly issued to himself. The August 23, 2016 demand was made by Plaintiff as a shareholder and as a creditor of AIA Services. AIA's purported Board of Directors, through John, responded to this demand in writing, rejected the demand, belatedly rejected the prior June 13, 2016 demand (after ninety days had already expired), and refused to have AIA pursue the claims.

181.    In addition, Plaintiff has made additional written derivative demands upon the Boards of Directors of AIA Services and AIA Insurance, but no action has ever been taken by the

THIRD AMENDED COMPLAINT - 55

# Exhibit - A

purported Boards of Directors.

182.   Over ninety days have elapsed since the written derivative demands set forth above were made to AIA and its Boards of Directors, and no action has been taken by AIA whatsoever, and all of Plaintiff's claims and requested relief asserted in this lawsuit flow from those derivative demands.  AIA and its purported Boards of Directors never asked for any additional information or specificity regarding the derivative demands.

183.   As the second largest common shareholder of AIA Services (who traded a book of insurance business worth approximately $500,000 to AIA Services in exchange for his common shares), the Plaintiff fairly represents the interest of AIA and their shareholders (including the preferred shareholders, 401(k) Plan shareholders, and former ESOP shareholders) and lawful creditors (to the extent that AIA Services is deemed to be insolvent). Plaintiff has never received a return on his investment in AIA Services. Plaintiff is not pursuing this lawsuit in a collusive manner in order to obtain jurisdiction where it does not otherwise exist, but instead to only pursue *bona fide* claims on behalf of, for the benefit of, AIA and their innocent shareholders.

184.   Plaintiff is pursuing this derivative action to make AIA whole and recover the millions of dollars in damages inflicted upon it by the defendants. Upon obtaining judgment, the funds will allow AIA to continue to operate as a going concern or, alternatively, to be dissolved with the funds used to pay lawful creditors and the remaining funds to be distributed to the Series A Preferred Shareholders, the Series C Preferred Shareholders and then to the common shareholders.

### VI.   COUNT I—BREACH OF FIDUCIARY DUTIES
**(Against the Controlling AIA Defendants and the Hawley Troxell Defendants)**

185.   Plaintiff re-alleges and incorporates by reference herein each and every allegation asserted elsewhere in this Third Amended Complaint to the extent necessary to support this cause

THIRD AMENDED COMPLAINT - 56

# Exhibit - A

of action.

186. As members, or purported members, of the Board of Directors for AIA Services and/or AIA Insurance, the Controlling AIA Defendants, who have each served as a director of AIA Services during certain relevant times, owed fiduciary duties to AIA, including, without limitation, duties of good faith and to act in the best interests of AIA. Beck, Cashman and John continued to also serve on the board of directors of AIA Services through a so-called "advisory board," which controlled AIA and CropUSA. As corporate officers of AIA, John, as President and CEO, and Duclos, as Secretary, owed fiduciary duties to AIA, which were further elevated during the times in which they both served as directors of AIA, too (which is from 1995 to the present time for John). During certain relevant times, Beck, Cashman, John and Connie owed fiduciary duties to AIA because they were the majority shareholders of AIA Services, including, without limitation, to use their majority control of AIA in a fair, just and equitable manner. The Controlling AIA Defendants had conflicts of interest by and through their positions as officers, directors and/or shareholders of AIA Services and CropUSA.

187. As attorneys for AIA, the Hawley Troxell Defendants owed fiduciary duties to AIA (including the undivided duty of loyalty). If not authorized to act as attorneys for AIA, the Hawley Troxell Defendants acted with apparent authority as agents and owed fiduciary duties as a result of that agency relationship. The Hawley Troxell Defendants had conflicts of interest when they undertook to represent AIA and CropUSA, and when they improperly proceeded in the manner directed by any one or more of the Controlling AIA Defendants, thereby improperly representing the interests of the Controlling AIA Defendants, instead of the best interests of AIA. The Hawley Troxell Defendants were never retained to represent AIA and CropUSA by disinterested and unconflicted officers and directors of AIA. The Hawley Troxell Defendants placed their self-

THIRD AMENDED COMPLAINT - 57

# Exhibit - A

interests in earning in excess of $1,000,000 in fees in various lawsuits ahead of, and in direct conflict with, AIA's interests in having undivided and unconflicted representation. The Hawley Troxell Defendants knew that they were improperly retained to purportedly represent CropUSA and AIA when AIA's litigation decisions were being made by, and AIA improperly operated by, disinterested and unconflicted officers and directors who were also placing their self-interests ahead of AIA's interests, as more full discussed throughout this Third Amended Complaint.

188.    Based on any and/or all of the acts and/or omissions set forth in this Third Amended Complaint and/or those facts proven at or before the time of trial (including conflicts of interest that prevent the Controlling AIA Defendants to use the business judgment rule as a defense), the Controlling AIA Defendants and the Hawley Troxell Defendants breached their fiduciary duties owed to AIA, including, without limitation, breaching their undivided duties of loyalty, care, good faith, trust and confidence owed to AIA and/or engaging in collusive acts and behavior against AIA. In addition, Beck, Cashman, John and Connie have further breached their fiduciary duties owed to AIA as to the controlling majority shareholders of AIA Services by and through, *inter alia*, using their control of AIA in an unjust, unfair and inequitable manner to benefit themselves and other entities that they partially own or control to the detriment of AIA and Plaintiff.

189.    The Hawley Troxell Defendants have separately breached their fiduciary duties as matter of law by violating the Rules of Professional Conduct, including, without limitation, when they: (a) simultaneously represented AIA and CropUSA; (b) failed to proceed in the best interests of AIA; (c) failed to obtain information consent from authorized, unconflicted and disinterred constituents of AIA; (d) placed their interests in earning over $1,000,000 in attorneys' fees over the interests of AIA; (e) prepared and/or entered into Agreements and/or Amended Agreements involving AIA, CropUSA and/or the Controlling AIA Defendants that were not in the best interest

THIRD AMENDED COMPLAINT - 58

# Exhibit - A

of AIA and without requiring AIA to obtain independent counsel; and (f) assisting the Controlling AIA Defendants in the commission and/or covering up of fraud (including by failing to require full disclosure to AIA and AIA Services' shareholders). In addition, Riley was previously aware that CropUSA was derived from AIA (the other Hawley Troxell Defendants became aware in *Taylor v. AIA Services*) and they were further aware of the restrictions in AIA Services' amended articles of incorporation and bylaws when Riley had been aware of them, and assisted in preparing them. The Hawley Troxell Defendants have further breached their fiduciary duties as a matter of law for the violations of the Rules of Professional Conduct dealing with loyalty to a client and conflicts of interest, which separately requires disgorgement of all compensation (the over $1,000,000 in attorneys' fees and costs paid to it by and/or on behalf of AIA).

190.    As a direct and/or proximate cause of the Controlling AIA Defendants' and the Hawley Troxell Defendants' breaches of their fiduciary duties, AIA has been damaged in the amount to be proven at or before trial.

191.    In addition, each of the Controlling AIA Defendants and the Hawley Troxell Defendants is a "faithless fiduciary" as defined by law and is therefore required to disgorge all compensation and consideration received from AIA and/or CropUSA, irrespective of if they prove that they acted in AIA's interests as to any other issues. The disgorgements sought are in addition to liability caused by the breaches of fiduciary duty. In the case of the Hawley Troxell Defendants, the disgorgement includes all fees and costs received for or paid on behalf of AIA and/or CropUSA. In the case of the faithless Controlling AIA Defendants, the disgorgement includes all salary, bonuses, benefits, warrants, stock options, or stock received from AIA.

///

///

THIRD AMENDED COMPLAINT - 59

# Exhibit - A

## VII.    COUNT II—AIDING AND ABETTING BREACHES OF FIDUCIARY DUTIES
### (Against the Controlling AIA Defendants, the Hawley Troxell Defendants, CropUSA, and GemCap)

192.    Plaintiff re-alleges and incorporates by reference herein each and every allegation asserted elsewhere in this Third Amended Complaint to the extent necessary to support this cause of action.

193.    During certain relevant times, the Hawley Troxell Defendants, the Controlling AIA Defendants, CropUSA and/or GemCap: (a) had knowledge of the other defendants' acts and/or omissions constituting the breaches of fiduciary duties owed to AIA (including duties of loyalty, good faith and proceeding in the best interests of AIA) as further described in this Third Amended Complaint and/or proven at the time of trial; (b) knew that such acts and/or omissions by other defendants constituted breaches of fiduciary duties owed to AIA; (c) substantially participated in such breaches of fiduciary duties owed to AIA; (d) did not disapprove or seek ratification or disclosure of such breaches of fiduciary duties owed to AIA; (e) took no steps to prevent such breaches of fiduciary duties owed to AIA; and/or (f) assisted in the concealment, and covering up, of such breaches of fiduciary duties owed to AIA.

194.    As a direct and/or proximate cause of the Hawley Troxell Defendants, the Controlling AIA Defendants, CropUSA and GemCap's aiding and abetting of one another and/or others in the breaches of fiduciary duties owed by other defendants to AIA, AIA has been damaged in the amount to be proven at or before trial. As aiders and abettors, the defendants are jointly and severally liable for the underlying tort committed by one or more defendants.

### VIII.    COUNT III—LEGAL MALPRACTICE
### (Against the Hawley Troxell Defendants)

195.    Plaintiff re-alleges and incorporates by reference herein each and every allegation asserted elsewhere in this Third Amended Complaint to the extent necessary to support this cause

THIRD AMENDED COMPLAINT - 60

# Exhibit - A

of action.

196.    The Hawley Troxell Defendants owed duties to AIA, including, without limitation, duties of care, good faith and loyalty.

197.    The Hawley Troxell Defendants have breached their duties of care, good faith and loyalty owed to AIA, including, without limitation, the breached duties attributable to the acts and omissions described in this Third Amended Complaint. The Hawley Troxell Defendants have further breached their duties of good faith, care and loyalty owed to AIA by improperly simultaneously representing AIA and CropUSA, together with directly and/or indirectly improperly representing the interests of the Controlling AIA Defendants.

198.    AIA suffered damages as a direct, foreseeable and/or proximate result of the breaches of duty and the acts of the Hawley Troxell Defendants, including, without limitation, those acts described in this Third Amended Complaint and/or proven at the time of trial (including damages and the lost profits associated with CropUSA). At a minimum, the Hawley Troxell Defendants were also a substantial factor in the harm and damages inflicted upon AIA, including, without limitation, inflicting millions of dollars of damages against AIA by the Controlling AIA Defendants and the failure of CropUSA to be a profitable and valuable subsidiary of AIA today. Had the Hawley Troxell Defendants properly discharged their duties, the Controlling AIA Defendants would never have significantly damaged AIA, and it and CropUSA would be profitable today (and CropUSA a valuable subsidiary of AIA). In addition and/or alternative, millions of dollars of AIA's funds, assets, trade secrets, labor and other valuable consideration would have been recovered and/or not unlawfully transferred and/or utilized by CropUSA, the Controlling AIA Defendants and/or other entities that they own.

THIRD AMENDED COMPLAINT - 61

# Exhibit - A

199.    As a direct and/or proximate cause of such acts and/or omissions, the Hawley Troxell Defendants are liable to AIA for damages in the amount to be proven at or before the time of trial.

## IX.    COUNT IV—FRAUD/FRAUDULENT CONCEALMENT/ CONSTRUCTIVE FRAUD
### (Against the Controlling AIA Defendants, CropUSA and GemCap)

200.    Plaintiff re-alleges and incorporates by reference herein each and every allegation asserted elsewhere in this Third Amended Complaint to the extent necessary to support this cause of action.

201.    The acts, omissions, decisions, contracts, transactions, allocations, investments, and/or other business dealings of the Controlling AIA Defendants that were purportedly entered into on behalf of AIA were not disclosed or approved by fully seated and disinterested Boards of Directors of AIA and, therefore, AIA had no knowledge of any such acts, omissions, decisions, contracts, transactions, allocations, investments, and/or malfeasance.

202.    The Controlling AIA Defendants are liable to AIA for fraud because: **(a)** they made representations of material fact to AIA and AIA Services' innocent minority shareholders as asserted throughout this Third Amended Complaint, including but not limited to: (i) representations that CropUSA was being operated for the benefit of AIA, (ii) representations that AIA was being properly operated (including that the Boards of Directors had properly authorized certain transactions when Donna Taylor's designee was not on the Board of AIA Services and the provisions in the amended articles of incorporation and bylaws had not been complied with), (iii) representations that the information on AIA's financial statements was true (John separately certified to auditors and others that the information contained on certain of AIA's financial

THIRD AMENDED COMPLAINT - 62

# Exhibit - A

statements was true and correct), (iv) representations that expenses, compensation, and/or loans between AIA and other entities or parties were properly entered into and accounted for (i.e., there are hundreds of thousands of dollars, if not millions of dollars, in funds and other assets used by CropUSA which were derived from AIA and never accounted for), (v) representations that they had the authority to act on behalf of AIA when they did not (including failing to disclose conflicts of interest that prevented them from acting on behalf of AIA); and (vi) other representations referenced in this Third Amended Complaint and/or proven at or before trial since discovery has not begun; **(b)** such representations were false; **(c)** such representations were material and AIA would never have entered into or approved any of the acts, conduct or transactions if AIA had been provided with full disclosure and the true representations); **(d)** they knew such representations were false; **(e)** they intended that there be reliance by AIA on such representations; **(f)** AIA was ignorant of the falsity of such representations; **(g)** AIA relied on such representations; **(h)** AIA's reliance was justified; and **(i)** injury resulted to AIA.

203.    Constructive fraud is identical to fraud, except that the Plaintiff need not prove the Controlling AIA Defendants' knowledge of the fraud and their intent that AIA rely on the representations.

204.    The Controlling AIA Defendants owed duties to AIA during certain relevant times as majority shareholders, board members and/or officers of AIA. In addition to making false representations, the Controlling AIA Defendants also concealed information from AIA and its innocent minority shareholders with knowledge that the concealed information was material and that the concealment would cause AIA to suffer otherwise avoidable damages, including without limitation, information contained in this Third Amended Complaint. The Controlling AIA Defendants' failure to disclose a fact to AIA and AIA Services' innocent minority shareholders

THIRD AMENDED COMPLAINT - 63

# Exhibit - A

where one has a duty to disclose is the legal equivalent of representing the non-existence of the fact. Where facts are fraudulently concealed, Plaintiff need not show reliance as there is nothing other than silence upon which to rely.

205.    The Controlling AIA Defendants represented to AIA Services that CropUSA was a wholly-owned subsidiary of AIA Services. Simultaneously, the Controlling AIA Defendants adopted the position, not disclosed to AIA or its innocent minority shareholders, that CropUSA was an independent entity with John as its alleged sole shareholder and subsequently failed to disclose that CropUSA was not a separate entity. These representations were false, the Controlling AIA Defendants knew of their falsity, the Controlling AIA Defendants intended that there be reliance, there was justifiable reliance by AIA and AIA Services' innocent minority shareholders, and AIA was damaged as a result.

206.    By operating CropUSA as an independent entity, and by using CropUSA as a vehicle for misappropriating and converting corporate assets, the Controlling AIA Defendants committed ongoing fraud that has persisted through the date of this Third Amended Complaint.

207.    The Controlling AIA Defendants also made misrepresentations to AIA and AIA Services' innocent minority shareholders in the form of false, misleading and fraudulent financial statements (which such financial statements also failed to disclose numerous improper and unlawful transactions and their ownership interests in CropUSA and other entities), upon which AIA and AIA Services' innocent minority shareholders reasonably relied, with that reliance being the proximate cause of AIA's damages.

208.    When the Controlling AIA Defendants transferred more than $1.5 million to CropUSA in 2004, they concealed the fact of this transaction from AIA and AIA Services' innocent minority shareholders and AIA was damaged by this concealment.

THIRD AMENDED COMPLAINT - 64

# Exhibit - A

209.     When the Controlling AIA Defendants transferred AIA corporate assets, including funds, employees, goodwill and trade secrets to CropUSA and other entities and were subsidizing CropUSA and other entities, they concealed these facts from AIA and AIA Services' innocent minority shareholders. AIA suffered damages by these concealments.

210.     When the Controlling AIA Defendants had AIA pay certain of CropUSA's corporate expenses and unfairly used AIA's employees, trade secrets and facilities for CropUSA, they concealed these facts from AIA.  AIA suffered damages as a result of these concealments.

211.     When the Controlling AIA Defendants pledged the mortgage obtained by AIA from the state of Idaho to CropUSA so that CropUSA could borrow money to pay the attorney's fees of the Hawley Troxell Defendants to facilitate covering up the AIA Defendants' fraud, they concealed these facts from AIA.  AIA suffered damages as a result of these concealments.

212.     When the Controlling AIA Defendants had AIA Insurance guarantee CropUSA's $15 million line of credit and later sold over $10,000,000 in assets derived from AIA to Hudson Insurance, they concealed the fact of this guarantee and asset sale from AIA.

213.     When the Controlling AIA Defendants finally disclosed their ownership interests in CropUSA, CropUSA Insurance Services, LLC and other entities in AIA Services' financial statements in July 2012[3] (*See* Dkt. 67-38), they continued to conceal how they obtained their ownership interest in those entities (and in the case of CropUSA that the ownership interest came from AIA) and many transactions and purported loans between the entities and AIA (loans and guarantees made by AIA which were prohibited by AIA Services' amended articles of incorporation and restated bylaws).

---

[3] While the financial statements were dated as of year-end 2011, they were not provided to AIA or its shareholders until July 2012 in connection with the failed ill-conceived reverse stock split.

THIRD AMENDED COMPLAINT - 65

# Exhibit - A

214.    The Controlling AIA Defendants, CropUSA and GemCap concealed from AIA that they had AIA unlawfully and improperly enter into the Guarantees, Settlement Agreements and related agreements and instruments, together with unlawfully transferring property and making payments under those unlawful agreements and instruments.

215.    As a direct and/or proximate cause of the Controlling AIA Defendants' fraudulent acts, AIA has been damaged in an amount to be proven at or before trial, and the ongoing fraud bars the Controlling AIA Defendants from asserting statute of limitations defenses. To the extent that the Hawley Troxell Defendants seek to assert the statute of limitations as a defense, they too are barred from doing so through their fraudulent concealment of facts from AIA.

## X.    COUNT V—AIDING AND ABETTING AND CONSIPIRACY OF FRAUD
**(Against the Controlling AIA Defendants, CropUSA, GemCap and the Hawley Troxell Defendants)**

216.    Plaintiff re-alleges and incorporates by reference herein each and every allegation asserted elsewhere in this Third Amended Complaint to the extent necessary to support this cause of action.

217.    During certain relevant times, the Hawley Troxell Defendants, the Controlling AIA Defendants, CropUSA and/or GemCap: (a) had knowledge of the other defendants' acts and/or omissions constituting fraud upon AIA (including fraudulent concealment) as further described in this Third Amended Complaint and/or proven at the time of trial; (b) knew that such acts and/or omissions by other defendants constituted fraud upon AIA; (c) substantially participated in such fraud upon AIA; (d) did not disapprove or seek ratification or disclosure of such fraud upon AIA; (e) took no steps to prevent such fraud upon AIA; and/or (f) assisted in the concealment, and covering up, of such fraud upon AIA.

218.    In addition, through various agreements and actions, the Controlling AIA Defendants, CropUSA and/or GemCap: (a) conspired to defraud AIA and were members of the

THIRD AMENDED COMPLAINT - 66

# Exhibit - A

conspiracy at relevant times; (b) provided a substantial act and/or a substantial effect in furtherance of the conspiracy against AIA in Idaho; (c) are attributable to the acts of one another; and (d) engaged in a pattern of behavior and/or agreements to accomplish unlawful objectives and/or to accomplish a lawful objectives in an unlawful manner.

219.   As a direct and/or proximate cause of the Hawley Troxell Defendants, the Controlling AIA Defendants, CropUSA and/or GemCap's aiding and abetting of one another and/or others in the commission of fraud upon AIA, AIA has been damaged in the amount to be proven at or before trial.

## XI.   COUNT VI—BREACH OF CONTRACT
### (Against the Controlling AIA Defendants)

220.   Plaintiff re-alleges and incorporates by reference herein each and every allegation asserted elsewhere in this Third Amended Complaint to the extent necessary to support this cause of action.

221.   On August 1, 1995, John and AIA Services entered into an Executive Officer's Agreement. (*See* Dkt. 67-8.) The Executive Officer's Agreement contains contractual provisions preventing John from doing certain acts. For example, Section 9 of the Executive Officer's Agreement sets forth express covenants not to compete. Subsection A of the covenants prohibits John from soliciting AIA customers or otherwise diverting the business of AIA customers. Subsection B prohibits John from participating in any insurance business that underwrites, markets or administers insurance products for commodity associations. Subsection C prohibits John from soliciting AIA Services employees for other employment.  Subsection D of the covenants bars John from divulging or exploiting trade secrets belonging to AIA.

222.   John has breached his contractual obligations owed to AIA, including, without limitation, by forming CropUSA as anything other than a wholly-owned subsidiary of AIA,

THIRD AMENDED COMPLAINT - 67

# Exhibit - A

competing against AIA with CropUSA and other entities (including Pacific Empire Holdings and CropUSA Insurance Services, LLC). John has breached all four subsections of Section 9 of the Executive Officer's Agreement.

223.    As a direct and/or proximate cause of John's breaches of the Executive Officer's Agreement, AIA has been damaged in an amount to be proven at or before trial. Such breaches also constitute the breaches of his fiduciary duties owed to AIA.

224.    Upon information and belief, certain and/or all of the Controlling AIA Defendants entered into agreements with AIA regarding the payment of certain of their attorneys' fees and costs in litigation, which such agreements were never properly presented to or approved by disinterested shareholders. Upon information and belief, such agreements required the Controlling AIA Defendants to pay back the funds advanced for their defense if it was determined that they did not act in good faith or in accordance with other required standards.  Certain and/or all of the Controlling AIA Defendants breached their contracts when they failed to discharge their duties in good faith and failed to comply with all applicable standards. As a direct and/or proximate cause of such breaches, AIA has been damaged and is entitled to be paid back for all attorneys' fees and costs advanced or paid, directly or indirectly, by AIA, plus prejudgment interest.

## XII.    COUNT VII—DECLARATORY JUDGMENT
### (Against the Controlling AIA Defendants, the Hawley Troxell Defendants, CropUSA and GemCap)

225.    Plaintiff re-alleges and incorporates by reference herein each and every allegation asserted elsewhere in this Third Amended Complaint to the extent necessary to support this cause of action.

226.    Plaintiff seeks a declaratory judgment against Controlling AIA Defendants, Hawley Troxell Defendants, CropUSA, and GemCap, including, without limitation, for the following relief: (a) for a full accounting with supporting documentation of all of AIA's funds, assets, loans

THIRD AMENDED COMPLAINT - 68

# Exhibit - A

and other transactions from 1999 through the present time; (b) requiring the Controlling AIA Defendants to comply with AIA's amended articles of incorporation, bylaws and the Idaho Business Corporation Act; (c) rescinding the purchases of the shares held by the ESOP and/or ensuring that those shareholders receive fair value for their shares; (d) rescinding and/or declaring void the common shares issued to John through his Executive Officer's Agreement; (e) voiding any purported common interest or joint defense agreements, jurisdiction consent agreements and any other improper agreement pertaining to AIA Services and/or AIA Insurance; (f) declaring illegal, at a minimum as to AIA Services and AIA Insurance, the Guarantees and Settlement Agreements entered into in favor of GemCap; (g) declaring as illegal and/or setting aside any agreements between AIA Services and/or AIA Insurance and CropUSA; (h) setting aside, rescinding and/or voiding any transfers of real property or other purported asset to AIA from John (John executed quitclaim deeds to AIA for certain properties held in the names of others, did not properly value the properties, and required AIA to assume the liabilities for those properties without proper board or shareholder approval); (i) settling aside, voiding or rescinding recent purported amendments to AIA Services and AIA Insurance's bylaws, which were adopted without shareholder approval and for improper purposes (including because John had conflicts of interest); (j) setting aside, voiding and/or rescinding the 7,500 Series A Preferred Shares purportedly issued to John, including, because a proper board never authorized the issuance of those shares, the shares were not issued for legitimate purposes, and the articles of incorporation were not amended to authorize the issuance of any Series A Preferred Shares to anyone other than Donna Taylor; (k) setting aside, rescinding and/or voiding any contracts, agreements, guarantees, financing statements and/or other instruments that were illegal, intra vires, ultra vires (including transfers of real or personal property); (l) setting aside, voiding and/or rescinding the 475,000 common shares

THIRD AMENDED COMPLAINT - 69

# Exhibit - A

purportedly issued to John and/or Connie under John's Executive Officer's Agreement (which he breached countless times) and because he is a faithless fiduciary and is not entitled to any compensation; (m) rescinding the common shares issued originally to Beck, Cashman and the other Series C Preferred Shareholders, which were later transferred to John; (n) for a determination that the Controlling AIA Defendants did not act in good faith and were not entitled to have any attorneys' fees or costs paid or advanced for them by AIA; and (o) such other declaratory relief as may be requested at or before trial (including any declaratory relief related to any other acts and/or omissions described in this Third Amended Complaint or as may be contemplated by any cause of action).

227. Plaintiff seeks a declaratory judgment against the Hawley Troxell Defendants, including, without limitation, for the following relief: (a) that the representation agreement, fee agreements and any related agreements entered into with them and AIA be declared void (including, without limitation, because such agreements violated the applicable Rules of Professional Conduct); (b) any agreements or accounts regarding any sums owed by AIA, if any, be declared void; and (c) such other relief as may be requested at or before trial (including any declaratory relief contemplated by any of the acts and/or omissions set forth in this Third Amended Complaint).

### XIII.    COUNT VIII—STATUTORY RELIEF (INCLUDING FOR ULTRA VIRES)
(Against All Defendants)

228. Plaintiff re-alleges and incorporates by reference herein each and every allegation asserted elsewhere in this Third Amended Complaint to the extent necessary to support this cause of action.

229. Plaintiff seeks all damages, equitable relief, injunctive relief and other relief available against the Defendants under applicable Idaho Code, including, but not limited to I.C. §§

THIRD AMENDED COMPLAINT - 70

# Exhibit - A

30-1-304 and 30-29-304: (a) if this Court does not find the Guarantees and/or Settlement Agreements illegal as to AIA Services and AIA Insurance, Plaintiff requests a judgment that the Guarantees and/or Settlement Agreements are ultra vires and this Court should set aside the Guarantees, Settlement Agreements and related instruments (including Financing Statements and deeds) and enjoin AIA Services and AIA Insurance from complying with the Guarantees, Settlement Agreements and related instruments; (b) award damages to AIA Services and AIA Insurance for damages and losses already sustained from the Guarantees and Settlement Agreements (including attorneys' fees and costs); (c) award AIA Services and AIA Insurance anticipated lost profits and other losses, including, the lost profits and damages attributable to the money received by GemCap for the sale of AIA Services' former headquarters in Lewiston, Idaho (approximately $1,000,000) and any other damages and lost profits relating to that property and any other damage claim, and enjoin the transfer of any funds to GemCap; (d) setting aside and/or enjoining any other transfers, payments, obligations, notes, contracts, agreements, guarantees, and instruments (including deeds) which were ultra vires (including the payment of attorneys' fees and costs for any of the defendants); and (e) award all damages and relief (including setting aside any agreements) pertaining to all ultra vires acts involving AIA Services and/or AIA Insurance.

230. To the extent that there is no cause of action under this Count VIII, then the allegations in this Count VIII are incorporated by reference to support other causes of action and relief in this Third Amended Complaint (including in Count VII and the prayer for relief below).

## XIV. COUNT IX—CORPORATE WASTE/EXCESSIVE COMPENSATION
### (Against the Controlling AIA Defendants)

231. Plaintiff re-alleges and incorporates by reference herein each and every allegation asserted elsewhere in this Third Amended Complaint to the extent necessary to support this cause of action.

THIRD AMENDED COMPLAINT - 71

# Exhibit - A

**232.** The Controlling AIA Defendants have been officers and/or controlled AIA's Boards of Directors from 1995 through certain relevant times. The Controlling AIA Defendants have lacked independence and have not acted in good faith, including, without limitation, by committing the intentional acts and/or omissions described in this Third Amended Complaint.

**233.** The Controlling AIA Defendants' waste and excessive compensation, includes, without limitation: (a) the payment of excessive and unnecessary compensation to officers and employees; (b) the waste of corporate assets during the course of managing and/or operating AIA, including, without limitation, by paying themselves excessive compensation (and practically speaking, any compensation at all based on their acts and omissions) and using millions of dollars of AIA's funds, assets, employees and property for improper and unnecessary purposes; (c) diverting millions of dollars of AIA's assets and funds to benefit CropUSA, themselves, and other entities they partially or wholly own, including Pacific Empire Radio Corp., CropUSA Insurance Services, LLC, and Pacific Empire Holdings Corp. (a/k/a Sound Insurance); (d) destroying AIA's agency force and causing them to transfer to CropUSA and ultimately Hudson Insurance and other entities; (e) diverting CropUSA's business from AIA and running that business improperly by renting needless office space, employing unnecessary persons (including high-paying executives who did nothing for the business), entering into unnecessary high-interest loans, and engaging in other improper and unnecessary transactions (some of which AIA received no consideration); and (f) impairing and destroying AIA's businesses, including CropUSA. In addition, notwithstanding the fact that the Controlling AIA Defendants are not entitled to retain any of their compensation or benefits as a faithless fiduciary, it was separately corporate waste to pay them in the first place as they have done nothing to benefit AIA.

THIRD AMENDED COMPLAINT - 72

# Exhibit - A

234.     The other transactions and malfeasance described in this Third Amended Complaint also constitute corporate waste, and none of those transactions and malfeasance were properly disclosed to all of AIA Services' shareholders nor was any authorization from them ever sought or obtained.

235.     The Controlling AIA Defendants are liable to AIA for damages caused by paying excessive compensation and otherwise diverting, wasting and needlessly depleting AIA's funds and assets for their own benefit and with disregard for AIA.

236.     As a direct and/or proximate cause of the Controlling AIA Defendants' waste and excessive compensation, AIA has been damaged in the amount to be proven at or before trial.

## XV.     COUNT X—VIOLATIONS OF THE IDAHO CONSUMER PROTECTION ACT
### (Against GemCap)

237.     Plaintiff re-alleges and incorporates by reference herein each and every allegation asserted elsewhere in this Third Amended Complaint to the extent necessary to support this cause of action.

238.     GemCap is defined as a "Person" under I.C. § 48-602(1).  GemCap knowingly had AIA enter into the written Settlement Agreements and related agreements and instruments when the transactions were one-sided in favor of GemCap and the transactions were a pattern of conduct that would outrage and offend the public conscience as provided under I.C. § 48-603C. Such unconscionable conduct includes knowingly and intentionally violating AIA Services' amended articles of incorporation, AIA's bylaws and Idaho Code sections, together with contractual provisions which violate the law and public policy without regard to AIA or their innocent minority shareholders.

239.     As described in this Third Amended Complaint and/or as proven at or before trial, GemCap engaged in misleading, false and deceptive practices when it entered into and negotiated

THIRD AMENDED COMPLAINT - 73

# Exhibit - A

the one-sided written Settlement Agreement when it knew that AIA Services' shareholders were challenging the Guarantees and they had never been presented with the facts nor were they even asked to authorize the Settlement Agreement and related agreements and instruments, including, without limitation, through illegal provisions in the Settlement Agreement barring AIA from seeking bankruptcy protection and unlawfully requiring legal malpractice claims to be assigned. The Settlement Agreements and the prior Guarantees were all entered into with GemCap.

240.    GemCap's acts and/or practices, as described above and in this Third Amended Complaint and/or as proven at or before trial, are misleading, deceptive, and unconscionable methods, acts and practices in the conduct of trade and commerce in violation of the Idaho Consumer Protection Act, I.C. § 48-602, *et seq*. Based on the ongoing flagrant violations that commenced with the original Guarantee and continued through the unlimited Guarantee and the subsequently written Settlement Agreement, the Guarantees and Settlement Agreements should be voided and GemCap should be ordered to pay punitive damages of three times the damages inflicted upon AIA, which now stand at over $1,000,000 by way of the property transferred via the written Settlement Agreement.

241.    As a direct and/or proximate cause of GemCap's violations of the Idaho Consumer Protection Act, AIA has been damaged in the amount to be proven at or before trial, including for the approximately $1,000,000 in cash proceeds unconscionably obtained by GemCap in 2016 for the sale of AIA Services' former headquarters, and all other damages incurred by AIA, and this Court should award punitive damages for all such damages.

### XVI.    COUNT XI—ACCOUNT STATED
#### (Against John)

242.    Plaintiff re-alleges and incorporates by reference herein each and every allegation asserted elsewhere in this Third Amended Complaint to the extent necessary to support this cause

THIRD AMENDED COMPLAINT - 74

# Exhibit - A

of action.

**243.** John established an account by borrowing $307,000 from AIA for his personal use. John subsequently confirmed the amount of the debt by "correcting" a purported accounting "error" when he had previously extinguished the $307,000 debt by improperly crediting the payment of Reed Taylor's $6 million promissory note after the issue arose in *Taylor v. AIA Services* so that AIA's books show that AIA is creditor and John is debtor for $307,000, i.e., the correction was only made because Reed Taylor demanded it and he was suing AIA Services for repayment of the $6 million promissory note.

**244.** Upon information and belief, John has not paid any portion of this debt and the entire balance remains due and payable to AIA. John is liable to AIA for $307,000 on the account stated and/or such other amount as may be presently owed, plus prejudgment interest from the date the obligation was incurred. If John has since paid back the $307,000 or any part of the sums he owes, then Plaintiff still seeks the balance owed and prejudgment interest for the benefit of AIA, including, because John has been a faithless fiduciary who is not entitled to any interest-free loans from AIA.

## XVII.   JURY DEMAND

**1.** Plaintiff, through the signature of his attorney below, hereby demands a trial by jury of no less than the maximum number of jurors permitted on all causes of action for which a jury trial is allowed by law.

## XVIII.   PRAYER FOR RELIEF

Wherefore, Plaintiff prays for the following relief:

**1.** For a judgment against the defendants, jointly and severally and/or individually, for all damages in an amount to be proven for each defendant at or before trial, including, without limitation, consequential damages, incidental damages, lost profits, lost business opportunities,

THIRD AMENDED COMPLAINT - 75

# Exhibit - A

unlawful distributions, corporate waste, and all other damages, plus prejudgment interest;

2.    For a judgment or order requiring the Hawley Troxell Defendants for all damages and ordering them to disgorge all attorneys' fees and costs paid to them by AIA Services, AIA Insurance, CropUSA and by any other party on behalf of those entities in the amount to be proven at the time of trial, plus prejudgment interest;

3.    For a judgment or order requiring the Controlling AIA Defendants to disgorge all compensation received from AIA or CropUSA since 1999 for being faithless fiduciaries and breaching their fiduciary duties, including, without limitation, all stock, cash, benefits, and other cash and non-cash compensation, attorneys' fees and costs (i.e., Connie received payments for attorneys' fees and costs from AIA or from CropUSA in violation of her duties to AIA) and that John is owed no compensation by AIA;

4.    For judgment against GemCap, AIA, John and CropUSA declaring that AIA's Guarantees, the Settlement Agreements and all related agreements and instruments illegal, ultra vires, intra vires, void and/or unenforceable and awarding AIA damages;

5.    For judgment against John in the amount to be proven at the time of trial, plus prejudgment interest;

6.    For judgments against the Controlling AIA Defendants, jointly and severally, as the alter-ego of CropUSA and/or to pierce its corporate veil, for all damages incurred by AIA and attributable in whole or in part to CropUSA;

7.    For judgments against any one or more of the defendants and for any and all damages and relief available under Idaho Code (including, without limitation, I.C. §§ 30-29-304, 30-29-833 (and their predecessors), 48-608, and the common law;

THIRD AMENDED COMPLAINT - 76

# Exhibit - A

8.      For a preliminary and/or permanent injunction and/or declaratory relief against AIA enjoining them from complying with the unauthorized, improper, intra vires, and ultra vires transactions and agreements relating in any way to AIA, including, without limitation, the Guarantees, Settlement Agreements, and all agreements and instruments related to the foregoing (including from transferring any money or property and from distributing the proceeds of any property or asset sales); to set aside and void such agreements and instruments; and award damages;

9.      For declaratory judgment requiring the reissuance of the common shares in AIA Services to the ESOP participants and voiding and/or rescinding John's alleged purchase of 7,500 Series A Preferred Shares in AIA Services and the 475,000 common shares in AIA Services improperly issued to him under his Executive Officer's Agreement that he violated on countless occasions;

10.     For a declaratory judgment requiring AIA Services to reissue the common shares formerly held by the innocent ESOP participants because the Controlling AIA Defendants' improperly terminated the ESOP;

11.     For an order requiring that all funds recovered as a result of this litigation, minus fees, costs and bona fide debts, be deposited with the Court registry and distributed only after court order, and that no funds recovered from this litigation be paid to, or for the benefit of, the Controlling AIA Defendants;

12.     To the extent that GemCap is deemed to be owed any money as a creditor, for a judgment declaring any such rights or judgments to be inferior to AIA and AIA Services' innocent minority shareholders (including those holding shares through the ESOP and 401(k) Plan), under an equitable subordination theory or such other theory Plaintiff may assert at or before trial;

THIRD AMENDED COMPLAINT - 77

# Exhibit - A

**13.**     For a declaratory judgment for the relief specified in this Third Amended Complaint and any other declaratory relief requested at or before trial, including, without limitation, setting aside obligations, notes, guarantees, settlement agreements, agreements, contracts, transfers of assets, amendments to AIA's bylaws, and repurchase or the issuance of shares;

**14.**     For an award of the attorneys' fees and costs incurred in this action as allowed by statute, contract, or recognized grounds of equity, including, under I.C. § 12-121; and

**15.**     For any such further relief or remedy, including preliminary and/or permanent injunctive relief, equitable subordination, or other relief Plaintiff may request and/or as this Court may find just and equitable.

DATED:  This ___ day of _____, 2016.

RODERICK BOND LAW OFFICE, PLLC


By: ___*/s/ Roderick C. Bond*_____
          Roderick C. Bond
          Attorney for Plaintiff

THIRD AMENDED COMPLAINT - 78

# Exhibit - A

## VERIFICATION OF DALE L. MIESEN

STATE OF TEXAS                )
                              ) ss.
COUNTY OF TARRANT             )

    I, Dale L. Miesen, being first duly sworn on oath, depose and say:

    I am the Plaintiff in the above-entitled action. I have read the contents of this Third Amended Complaint, know the contents of this Third Amended Complaint, and believe that the facts set forth in this Third Amended Complaint are true and accurate to the best of my knowledge and belief.

_____
Dale L. Miesen

SUBSCRIBED AND SWORN to before me this _____ day of _____, 2016.

_____
Notary Public for Texas
Residing at: _____
My commission expires: _____

THIRD AMENDED COMPLAINT - 79

# Exhibit - A

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the ___ day of _____, 2016, I filed the foregoing electronically through the CM/ECF system, which caused the following parties or counsel to be served by electronic means, as more fully reflected on the Notice of Electronic Filing:

James D LaRue:    jdl@elamburke.com, sd@elamburke.com

Jeffrey A Thomson:    jat@elamburke.com, nlp@elamburke.com

Loren C Ipsen:    lci@elamburke.com, nlp@elamburke.com

Shawnee S Perdue:    sperdue@wielandperdue.com, admin@wielandperdue.com, tmooney@wielandperdue.com

Steven P Wieland:    swieland@wielandperdue.com, admin@wielandperdue.com, tmooney@wielandperdue.com


AND I FURTHER CERTIFY that on such date I served the foregoing on the following non-CM/ECF Registered Participants in the manner indicated:  Via first class mail, postage prepaid addressed as follows:

AIA Services Corporation
P.O. Box 538
Lewiston, ID  83501

AIA Insurance, Inc.
P.O. Box 538
Lewiston, ID  830501


_/s/ Roderick C. Bond_
Roderick C. Bond


THIRD AMENDED COMPLAINT - 80

# Exhibit - A