# Transcript of Teleconference Meeting

Date: July 23, 2018

Case: Miesen vs. Henderson, et al.

Case No: 1:10-CV-00404-DCN-CWD

*Reporter: Andrea J. Couch, CSR, RDR, CRR, CRC*



## ASSOCIATED REPORTING & VIDEO

The Owyhee
1109 Main Street, Suite 220
Boise, Idaho 83702

Phone: (208) 343-4004
Facsimile: (208) 343-4002
production@arvboise.com
arvboise.com

Exhibit - 3

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO


DALE MIESEN, et al.,          )
                              )
            Plaintiff,        )
                              )
vs.                           ) Case No.
                              ) 1:10-CV-00404-DCN-CWD
CONNIE TAYLOR HENDERSON,      )
et al.,                       )
                              )
            Defendants,       )
                              )
and related actions.          )
_____)




TRANSCRIPT OF TELECONFERENCE MEETING

July 23, 2018

3:00 p.m.













Reported by:
Andrea J. Couch, CSR #716, RDR, CRR, CRC

```
APPEARANCES:

For the Plaintiff:      RODERICK BOND LAW OFFICE
                        By:  Roderick C. Bond, Esq.
                        601 108th Avenue Northeast
                        Suite 1900
                        Bellevue, Washington 98004
                        Telephone:  (425) 591-6903
                        Facsimile:  (425) 321-0343
                        rod@roderickbond.com


For the Defendants:     ANDERSEN SCHWARTZMAN WOODARD &
                        BRAILSFORD
                        By:  Alyson Anne Foster, Esq.
                        101 South Capitol Boulevard
                        Suite 1600
                        Boise, Idaho 83702
                        Telephone:  (208) 342-4411
                        Facsimile:  (208) 342-4455
                        aaf@aswblaw.com


For the Defendants:     MICHELMAN & ROBINSON
                        By:  Peter L. Steinman, Esq.
                        17901 Von Karman Avenue
                        10th Floor
                        Irvine, California 92614
                        Telephone:  (310) 299-5500
                        Facsimile:  (310) 299-5600
                        psteinman@mrllp.com
```

```
 1              P R O C E E D I N G S
 2        MR. BOND:  So I think I'll just start off
 3   with the newest issue on the 289 files that you
 4   guys produced the other day on July 13th of 2018.
 5             So I'm trying to get --
 6             And I guess you just e-mailed me,
 7   Alyson, which I responded to your --
 8             Now you're telling me those documents in
 9   your e-mail, those particular documents are not
10   privileged, so they're not subject to the -- your
11   alleged clawback of the 289 files, correct?
12        MS. FOSTER:  Yes.  As I told you, we clawed
13   them back because we are still reviewing them, and
14   we've completed the review of those and determined
15   they're not privileged.
16        MR. BOND:  Okay.  So is there some reason
17   why the review hasn't been done for the last year?
18   Is there some reason for that?
19        MS. FOSTER:  Yes.  So as you know, we've
20   engaged in months-long meets and confers and agreed
21   to productions on a rolling basis.  We've engaged
22   in that, and this is a cache of documents that we
23   thought had been reviewed and then we realized had
24   not been, so now we are doing that.
25        MR. BOND:  So how many other documents have
```

Exhibit - 3

1  you not reviewed to determine what's privileged and
2  what's not privileged?
3       MR. STEINMAN:  Rod, this is Peter Steinman.
4            I don't like the tone of that question,
5  so we're going to --
6       MR. BOND:  No, I'm not --
7       MR. STEINMAN:  Rod, I'm -- let's not
8  interrupt each other.
9            So here's where we are:  We have
10  produced over either 730,000 pages or 750,000 pages
11  of documents.  You admitted about ten days ago that
12  you hadn't reviewed the bulk of those.  I think it
13  was over 650,000.  So we are trying to review the
14  documents in as timely and a rapid sense as we can.
15            As we've stated on numerous occasions,
16  the documents contain both confidential or -- or
17  documents marked confidential in the underlying
18  cases.  And so that we're all on the same page,
19  "underlying" means the Q&B litigation and the Crop
20  litigation.
21            And, Ms. Couch, if I'm talking too
22  fast -- which I tend to -- just tell me to slow
23  down.
24       THE REPORTER:  You're just fine.  Thank you.
25       MR. STEINMAN:  Okay.  Great.

```
1            So that's one tranche of the documents.
2   The other tranche are documents that may contain
3   attorney/client-privileged communications.  The
4   privilege is owned by John Taylor/Crop or his
5   related entities, and we've been advised by John
6   Taylor, et al.'s counsel that they view the
7   privilege as not being waived in this action.
8            I know we're just going to have to agree
9   to disagree on that point, but I want to make that
10  clear.
11           So those documents, including the
12  deposition transcripts that were inadvertently
13  produced earlier this month, those transcripts are
14  being reviewed.
15           They really should be reviewed by
16  Taylor's office -- Taylor's counsel's office.  We
17  thought that had happened.  I'm not sure if it has
18  or not, but they are the privilege holder.  They or
19  he is the privilege holder.  So that's the issue.
20           In terms of --
21      MR. BOND:  Yeah, yeah.  So --
22      MR. STEINMAN:  Well, hold on.
23           And you asked the question, I think.  We
24  can have the court reporter repeat it back, if
25  necessary, but I think you asked the question of:
```

Exhibit - 3

1    Why haven't all those documents been reviewed?  And
2    the answer, in part, is that you've requested over
3    750,000 pages of documents.
4              And my understanding is that throughout
5    the months, you and Alyson have been engaged in
6    what I think is good-faith meet and confers.  You
7    know, there are so many issues that it's sort of
8    easy to get lost amongst sort of the thicket
9    through no one's fault.  And so that's why this
10   process, I think, has taken some time.
11             But, again, with over 750,000 pages of
12   documents, it's not like, you know, it's an easy
13   task.
14        MR. BOND:  Okay.  Are you done?
15        MR. STEINMAN:  I'm --
16        MR. BOND:  Okay.
17        MR. STEINMAN:  I'm done for now, yes.
18        MR. BOND:  So what is your position then so
19   I'm clear for the record.  Just so there's no -- I
20   don't want any confusion in the motion to compel or
21   any disputes on this documents that were recently
22   produced.
23             So you've now said that the privilege is
24   held by other parties, and I just want to confirm
25   that you're not asserting that you've represented

```
1   any of those parties yourself, right?  So you're
2   not asserting privilege on behalf of them because
3   you're their counsel, correct?
4           MR. STEINMAN:  Rod, I think we've made this
5   point, I don't know, over and over and over again.
6               The privilege is owned by John Taylor
7   and/or his related entities.  We have been told by
8   Mr. Taylor's counsel and related entities' counsel
9   that they view the waiver that Mr. Taylor prepared
10  in -- I don't have it in front of me.  It might
11  have been 2015 or 2016 regarding the
12  attorney/client and other relevant privileges, that
13  those privileges were waived only as to the action
14  that we have called the Q&B action.
15              And, Ms. Couch, for clarity, that's the
16  action that GemCap filed against Quarles,
17  Q-u-a-r-e-l-s, and Brady, B-r-a-d-y, LLP, in the
18  Central District of California.
19              And as a result, because of their
20  instruction that the privilege has not been waived
21  in this action, we feel we are duty-bound not to
22  produce those documents until and unless counsel
23  for Mr. Taylor and the related entities instruct us
24  that can happen.
25              We've also advised you, I think, that
```

Exhibit - 3

```
 1   this fight is really -- you know, we don't have a
 2   dog in this fight, so to speak, so that, you know,
 3   it --
 4           Again, it's Taylor, et al., that own the
 5   privilege, and if there's a dispute and you want
 6   those documents produced, the first place to get
 7   them ought to be Taylor's counsel.
 8           So I don't know if you've met and
 9   conferred with Mr. Taylor's counsel.  And for
10   purposes of this conversation and this transcript,
11   Rod, will you agree that when I say "Mr. Taylor's
12   counsel," I mean Taylor, Crop, and related
13   entities?
14           Is that okay?
15       MR. BOND:  I don't know --
16           No, I don't know because I don't know
17   what counsel you're talking about.  He's had so
18   many that --
19           If you're talking about Mr. Martel, then
20   just say his name if that's who --
21       MR. STEINMAN:  I'm talking for --
22           Sure.  No.  Perfectly reasonable
23   statement.
24           I'm talking about Mr. Martel, whom I
25   understand represents Mr. Taylor and Crop USA and
```

```
1    related entities in this action.
2         MR. BOND:  Okay.  And --
3         MR. STEINMAN:  So --
4         MR. BOND:  -- and when was he first provided
5    notice or --
6         MR. STEINMAN:  I --
7         MR. BOND:  Let me clarify --
8         MR. STEINMAN:  Rod, this isn't a deposition.
9    I don't know when he was first provided notice.
10   Perhaps Alyson does.  But the point is that the
11   dispute should be with the privilege holders.  It
12   shouldn't be with us.  We're the custodian of the
13   records.
14          You have requested literally every
15   single document produced in discovery in the
16   underlying actions, which we feel, as you know, is
17   way overbroad.
18          We've done our best to produce the
19   documents --
20        MR. BOND:  Peter, I'm going to interrupt you
21   because this is my discovery --
22        MR. STEINMAN:  Don't interrupt me, Rod.
23   Rod -- Rod -- Rod --
24          (Inaudible crosstalk)
25        MR. BOND:  It's not --
```

1        MR. STEINMAN:  Rod, we're going to end the
2   conversation if you --
3              (Inaudible crosstalk)
4        MS. FOSTER:  Guys, guys.  Andrea needs to
5   take this down.
6        THE REPORTER:  Thank you.
7        MR. STEINMAN:  Okay.  Rod, don't interrupt
8   me.  Thanks.
9              As I've said, we've done the best we can
10  in producing this mountainload of documents to you,
11  okay?  And we're still meeting and conferring, and
12  we're trying to resolve whatever other disputes we
13  can before you file your motion to compel.
14       MR. BOND:  Okay.  Are you done now?
15       MR. STEINMAN:  I am.
16       MR. BOND:  Okay.  I e-mailed Alyson a number
17  of times because I was told that some of the
18  documents that we've requested were subject to the
19  two protective orders that you finally provided to
20  me, okay, just within the last week or ten days.
21  Whenever that was that Alyson e-mailed them to me,
22  okay?
23              I asked:  When were the parties to those
24  protective orders provided written notice that the
25  information was being sought?  And I received no

Exhibit - 3

```
 1   response.
 2        MS. FOSTER:  Okay.  Let me --
 3             I can answer that, Rod.
 4             So that's a little -- I'm answering you
 5   because it's a slightly different question.  It's a
 6   different topic.
 7             So the protective orders were public
 8   documents that I thought you'd had.  I did provide
 9   them to you recently, so you do have them.
10             The written notice, we provided notice
11   twice, and I actually have intended to send you a
12   copy of those letters and will do so today.
13             But they were provided notice last fall
14   when we were first meeting and conferring, I
15   believe, and then again recently when you notified
16   the Court of your intention to pursue a motion to
17   compel.
18        MR. STEINMAN:  And, Rod --
19             I'm sorry.  Go ahead.
20        MR. BOND:  Peter, I'm having a conversation
21   with Alyson.  We're making progress, so I'd just
22   like to focus on what she's explaining to me so I
23   can clarify what she's telling me.
24             So, Alyson, if I get all the written
25   communications, you said I'll get those today on
```

Exhibit - 3

```
1   the notices, then that's fine.  Then we don't have
2   to talk about this issue any further.
3            I just want to make sure that I have an
4   understanding of when that was and so that when I
5   file my motion to compel, I can provide that
6   information to the Court so that the Court knows
7   and we all know what that issue is.
8            So, yeah, if you can get me that, those
9   documents today, that's much appreciated, and that
10  checks a big item -- one of the big items off the
11  list.
12       MS. FOSTER:  Okay.  And just to make sure
13  that I'm clear, these are letters that we sent to
14  the folks who produced documents in the Crop and QB
15  actions pursuant to protective orders --
16       MR. BOND:  Right.  They --
17       MS. FOSTER:  -- in those cases --
18            Wait.  Let me finish.  This is for the
19  record.
20            -- to notify them that those documents
21  were the subject of document requests in this case
22  and to provide them the notice we were obligated to
23  provide them under those orders, that -- those are
24  the letters I'm talking about.
25       MR. BOND:  Okay.
```

July 23, 2018

1          MS. FOSTER:  As we've informed you --

2              And I don't have them in front of me.

3     I'm a little embarrassed.  But at least two of

4     those have informed us --

5              And I think I've put this in prior

6     communications to you.

7              They agree, "Go ahead and produce

8     those," that, "You, GemCap, have permission to

9     produce those documents in this Miesen litigation

10    but only pursuant to a protective order entered in

11    the Miesen litigation that provides sufficient

12    protections that matches those of the prior

13    protective orders."

14             So that is what we will do.  And we've

15    proposed a protective order.  We've had one

16    proposed for many months.  We've recently received

17    revisions from you, and today from Reed Taylor's

18    counsel, we received sign-offs from the Crop folks'

19    counsel, Marty Martel.  And I have not yet received

20    a definitive answer from Hawley Troxell's counsel.

21    End of line.

22         MR. BOND:  Okay.  And then so I'm clear,

23    because Peter had raised an issue of why I'm not

24    asking for these documents, some of the same

25    documents that I'm requesting from you guys from

1    Crop USA and from Mr. Martel's clients.  I am

2    requesting the documents from there, but he raised

3    an issue that I just want to make sure that I'm

4    clear that I understand.

5            When about was it that you gave all of

6    the Quarles & Brady documents that you had in your

7    possession to Mr. Martel so that he could review

8    them?  That was in the past couple weeks, was it

9    not?

10    MS. FOSTER:  Yes.  As you may recall, in a

11    conference with the Court, she gave me a deadline

12    of the following Wednesday.  I don't remember what

13    week that was.  We prepared them for Wednesday.  We

14    had a transmission error, but they went through on

15    Thursday.

16        MR. BOND:  Okay.

17        MS. FOSTER:  So I should --

18        MR. BOND:  And then of all -- so what --

19            Oh, I'm sorry.  Go ahead.

20        MS. FOSTER:  No, go ahead.

21        MR. BOND:  So that I understand because --

22            I'm trying to understand the categories

23    of documents because I've seen reference to -- I've

24    seen references to Bates stamps that are QB, I've

25    seen Q&B, and then I've seen Q&B, I think, Crop

```
1   USA.
2              I'd like to understand the sources of
3   those documents and why they're Bates stamped
4   differently and then which ones were given to
5   Martel so that I know which ones were given to
6   Martel.
7         MS. FOSTER:  Okay.  I believe I gave you the
8   specific Bates range in a prior letter or e-mail of
9   the exact Bates ranges that I gave to Martel.  I
10  will look through to find that.  I don't have it in
11  front of me.
12             I will tell you that the QB Crop and the
13  Q&B Crop productions are both --
14             It's unclear why they started using an
15  ampersand, but it's within the same --
16             My understanding from Peter's office --
17  I don't know if Peter has a different
18  understanding.  I don't think so -- is that those
19  were all marked as part of the same effort to stamp
20  documents that were produced pursuant to the
21  limited waiver that Peter referenced earlier in our
22  conversation.  That is what those documents are.
23             However, there are an additional 30
24  documents that did not have a Q&B Bates stamp that
25  were provided, I think, by -- I think by John
```

```
 1   Taylor also pursuant to the limited waiver, which I
 2   did not give to Marty because I didn't realize
 3   that's what they were.
 4              I'm going to send him those 30 documents
 5   to review, and I think they're moving quickly, so I
 6   should be able to get back hopefully soon on those.
 7              In addition, the transcripts that I
 8   inadvertently produced to you on the 13th before
 9   realizing they had not yet been reviewed, I am
10   going to send some or all of those to Marty Martel.
11   I thought I had already, but I'm going to ensure he
12   has them to review them for the same purpose.
13              So for your understanding, I guess you
14   could think of it in three buckets.  There's the
15   first Q&B Crop bucket that I mentioned that has
16   been provided.  There's second about 32 documents
17   bucket that I will provide.  And there are the
18   deposition transcripts, which I either have
19   provided but, in all events, will provide.
20              So those are the three buckets that I'm
21   giving to Marty for their review.
22              Does that make sense?
23        MR. BOND:  I mean, that helps.
24              But then you're checking yourself for
25   privilege as well as to your client?  Is that
```

Exhibit - 3

1  right?  Or are we talking this all relates to
2  Martel's clients?
3      MS. FOSTER:  I will also review them because
4  they are deposition transcripts.  My understanding
5  is that they --
6          I was not involved in that litigation,
7  but my understanding is that there were no
8  productions made by GemCap pursuant to a limited
9  waiver, so it would be cursory for, you know,
10 information that's accidentally in there.  But I'm
11 not anticipating finding anything that will be
12 subject to a privilege held by GemCap.
13     MR. BOND:  Yeah, because I think to clarify,
14 you know, for example, a couple of the files that
15 you're asserting should be clawed back are
16 deposition transcripts of the Ellis brothers, and
17 I -- and obviously, I don't see why Martel would
18 review those for privilege because obviously --
19     MS. FOSTER:  I can explain that.
20     MR. BOND:  What's that?
21     MS. FOSTER:  Yeah.  So just to be clear for
22 the record, I understand you're calling it an
23 asserted clawback.  From our position, it is a
24 clawback.  Not asserted.  It occurred.  The basis
25 of it was these documents are still being reviewed

```
1    by attorneys for privilege.
2            Part of that review is these
3    documents -- and most specifically, the deposition
4    transcripts and potentially exhibits to them -- may
5    contain information that was produced in that
6    litigation pursuant to a limited waiver of
7    privilege that we believe obligates GemCap to not
8    disseminate that information without the permission
9    of the parties who gave the limited waiver.
10           And so if, for example --
11           And I just don't know if he did or not
12   yet, Rod.
13           If, for example, Richard Ellis said
14   something based on an e-mail he was shown in that
15   deposition that had been produced pursuant to the
16   limited waiver, we feel that counsel for the Crop
17   entities needs to review that and say whether or
18   not they think GemCap should or should not produce
19   it or may or may not produce it.  That is the
20   impetus for it.
21           Just to be clear, once again, the
22   clawback is because those documents are still being
23   reviewed and had not finished review.  And it's my
24   fault.  I thought they had been.
25           But we are working as quickly as we can
```

1  so that hopefully this issue can get resolved very

2  quickly and doesn't become a mountain, which it

3  seems to be becoming, I think unnecessarily.

4          But those are the metes and bounds of

5  the issue.  End of line.

6      MR. BOND:  And I know we've talked about

7  this, but I just want to confirm it.

8          So it's your position, just so I

9  understand, that you and your client are going to

10  take action to protect someone else's privileged

11  information, Mr. Martel's clients, right?  Because

12  we're not talking about your own privilege, right?

13  I mean --

14      MS. FOSTER:  So we do --

15      MR. STEINMAN:  So I'm going to answer that,

16  Rod.  Hold on, Alyson.

17      MS. FOSTER:  We understand it differently.

18      MR. STEINMAN:  That's right.

19      MS. FOSTER:  We are --

20          Yeah.  We are not taking quote/unquote

21  action as you say it, for example, by filing a

22  motion or, I don't know, what have you.

23          However, when we have information that

24  we feel we are not -- under law -- allowed to

25  provide, we do not provide it, we tell you why

```
1   we're not providing it, we identify the recourse
2   for going to the party that provides
3   this quote/unquote law, which is consistent with
4   the rules governing discovery which is why I refer
5   to it as law, and it can be brought up with them.
6   I think --
7        MR. BOND:  Well --
8        MS. FOSTER:  Wait.  Let me finish.
9             The important thing is for our purposes,
10  that both you and we understand the nature of the
11  dispute and the method for resolving it.
12            So my understanding of Rule 26 and the
13  rules and the law governing privilege and the
14  waiver of privilege and the creation of it -- and I
15  have looked at this carefully -- is that a party
16  can create a waiver within a single litigation.  It
17  cannot, for example, enforce it selectively within
18  that litigation.
19            Say, for example, "You can have these
20  five documents on this topic that prove I'm
21  innocent but not these five documents that don't
22  because I'm going to say these are privileged but
23  these aren't."
24            That kind of selective waiver is not
25  something that has the force -- is something that
```

Exhibit - 3

```
 1   we would adhere to.
 2            But a limited waiver within a single
 3   litigation we interpret and understand, under Ninth
 4   Circuit law, is binding on GemCap and that we have
 5   to honor it within the bounds of discovery allowed
 6   by Rule 26.
 7            If we are told by a Court we are wrong,
 8   we are happy to give it to you, but we're just not
 9   there yet.
10            Does that make sense?
11       MR. BOND:  Yeah, yeah.  I'm just trying to
12   confirm what I --
13            You know, I hear your position.  I guess
14   I understand your position.  I guess we can just
15   agree to disagree.  There's no reason to go down --
16            I just wanted to make sure there's no
17   new authority that you had other than what you
18   provided to me in that letter, and that's all I'm
19   wanting to make sure is that I have --
20            So in the motion to compel, you know,
21   your position is you're doing all this because
22   it's -- you know, you feel you're compelled to
23   because of -- for the reasons you stated.  And it's
24   not your dog and not your fight and et cetera,
25   et cetera, as you said.
```

Exhibit - 3

1           So I just want to make sure that -- I
2    just want to make sure that you're not asserting
3    that any of this information is somehow a privilege
4    that's to your client because I just want to --
5           Again, when I look at the rule, it says
6    we need to say what the other side's position is
7    and all that.  So I just wanted to make sure --
8    make --
9        MS. FOSTER:  Yeah.
10       MR. BOND:  -- sure that we're very clear on
11   that issue, so --
12       MR. STEINMAN:  Hey, okay, so --
13       MS. FOSTER:  You've captured it perfectly.
14   It is not our dog and, frankly, it would be so much
15   easier for GemCap and us as the attorneys if the
16   waiver had not been limited.  I have no interest in
17   any direction as to how this is resolved.  I just
18   want it resolved.
19           Peter, I think you were going to say
20   something, and I cut you off.
21       MR. STEINMAN:  I think that's absolutely
22   right.  But, Rod, I just want a little
23   clarification from you.
24           So Alyson produced the documents in
25   error.  Alyson sent what we colloquially call a

1    clawback letter.  And I understand that your

2    position under Rule 26 is that you need not either

3    destroy, return, or sequester those documents

4    because you disagree as to their privileged status.

5              Is that right?

6         MR. BOND:  No.  I don't know where you got

7    that, Peter.  Let me clarify for the record.

8         MR. STEINMAN:  Okay.

9         MR. BOND:  I am saying for the record that

10   your asserted privilege is bogus.  Yes, I am.  And

11   it's unsubstantiated.  We don't need to go there.

12   But that said --

13             And I've made it very clear.  I told

14   Alyson right out of the chute, I e-mailed some of

15   the documents to an expert witness and some

16   clients.  And I told her until this issue was

17   resolved, I will not e-mail any more of the

18   documents to anyone, and there you go.

19             So I can't -- obviously, as for me --

20             And I've looked at the rule as well on

21   the sequestering.  My expert had read through

22   things.  I told Alyson that we'll resolve the issue

23   with the Court, and part of the purpose of this

24   conference was I wanted to make sure before I spend

25   a bunch of time and money going and doing this that

Exhibit - 3

1  you guys were really going to assert this position,
2  and I hear you're going to do it.
3          So I've got to --
4      MS. FOSTER:  No.
5      MR. BOND:  My understanding of the rule is
6  I've got to promptly address this with the Court,
7  and I am --
8      MR. STEINMAN:  No, that's --
9      MR. BOND:  -- going to figure -- figure out
10 how I have to do that now.
11         Now, granted, you've -- with the files
12 you gave me --
13         And I would prefer --
14         Alyson, I saw your e-mail.  If you could
15 just give me the Bates numbers of the files so that
16 they're named just as what you gave me so I have --
17         So if there's something you're asserting
18 there is no privilege on and you're not asserting
19 it as to those 289 files, then the sooner you can
20 get me that by the Bates numbers, then I'll know
21 and I won't have to address that.
22         And I'm going to get to how I'm going to
23 address it here in a minute because, you know, I
24 don't -- you know, it's going to be real task to do
25 this --

```
 1          MS. FOSTER:  Yeah.
 2          MR. BOND:  -- because --
 3          MS. FOSTER:  Let me --
 4          MR. BOND:  -- you know, because -- so --
 5          MS. FOSTER:  So on that --
 6          MR. BOND:  Go ahead.
 7          MS. FOSTER:  -- you obviously will and can
 8   do what you want, but I'm going to make a
 9   suggestion.
10          I think you're looking for a fight where
11   there may be none, and I don't think Judge Dale is
12   going to appreciate it.  I think --
13          My proposed solution to this problem
14   which I created with this inadvertent production is
15   let us --
16          So the clawback is because the documents
17   are still being reviewed.  When things get briefed
18   to the Court, the Court is going to want to know,
19   "Well, what's privileged and what isn't?"  And I'm
20   going to say, "Yeah, that's what we're trying to
21   figure out," and she's going to say, "Well, why I
22   am hearing about this?  You're figuring it out,
23   right?"
24          "Right."
25          "And so some of these aren't going to be
```

Exhibit - 3

1    subject to the clawback, right?"

2            "Right."

3            "And is it possible that all of them

4    will not be subject to the clawback?"

5            "Yes, that's possible."

6            "Then why am I hearing about this?"

7            Do what you want.  I get it.  I get it.

8    But I am going to continue our review.  I will

9    identify the Bates labels of the documents that I

10   e-mailed you about saying we had completed our

11   review and determined they're not privileged.

12           I'm going to continue to do that, and

13   I'm going to wait to hear back from Marty's folks.

14   I understand you have a deadline.  You need to move

15   on how you want to move.  I get it.

16           I will say that this issue was not

17   before -- was something that has gone through the

18   Court, Judge Dale's resolution procedures where we

19   had to talk to her clerk first.

20           Do what you want.  I don't think you'd

21   be foreclosed from holding off if you deem that

22   appropriate.  I think it would be appropriate.  I

23   know you may disagree on that.

24           But my proposal is:  I think you should

25   wait until I tell you, "We have now finalized our

1    review and determined that Documents 8 through 10

2    are privileged.  You should move on those, if

3    anything, and the others are not."  End of line.

4         MR. BOND:  Yeah, and I guess one of the

5    problems I have, to be honest, is when this all

6    came up --

7              I can understand -- I mean, I just

8    have -- I can't understand --

9              It's hard for me to understand really

10   anything when it's been over a year.  That's the

11   struggle that I have.

12             But that said, you told me on Monday

13   that -- you provide me this notice, okay, saying

14   that these were clawed back.  I don't understand

15   why I don't have a list right now of what exhibits

16   to those deposition transcripts, which is the bulk

17   of the documents.  It's not -- the transcripts

18   themselves --

19             I don't agree with your position, and I

20   think your -- and we don't have to go that way --

21   go there on the transcripts themselves, but the

22   exhibits to the transcripts, I should have that.  I

23   should --

24             If you're going to assert --

25             And under the rule, my understanding of

Exhibit - 3

the rule is you're going to assert that those are privileged, any of them, and you want them clawed back, you've got to provide a privilege log too. You've got to say --

Because that's the other purpose. The purpose of -- the whole purpose of the privilege log is so that if I wanted to submit the matter to the Court without having to submit a whole bunch of documents, I can do that. And I'm sure you're more -- well aware of the privilege issues as I am on what needs to be in the log, but one of the things is who all has been provided with these documents.

And I know you don't know maybe or maybe you do know. I don't know, Alyson. But I know Peter knows that a bunch of these documents have been provided to a number of expert witnesses in the --

MS. FOSTER: Yeah, I think you're just --

MR. STEINMAN: No, stop. Stop. Stop.

MS. FOSTER: I don't think anything you're saying is wrong.

MR. STEINMAN: Alyson, Alyson, stop.

Rod, here is the issue. It's very easy.

Under Rule 26, if documents are

1  inappropriately produced or inadvertently produced,

2  the receiving party has specified duties.  It has

3  nothing to do with the privilege log.

4          Once you receive the clawback notice,

5  under Rule 26, you must either sequester the

6  documents, destroy the documents, or send them

7  back.  End of story.

8          Now, your position --

9      MR. BOND:  Right, and that's what --

10     MR. STEINMAN:  No, no.  Wait.  Let me --

11          Rod, let me finish, please.  Okay?

12          So the issue of the privilege log, the

13  issue of what you think is privileged and what we

14  think is privileged, I think we're going to have

15  different conclusions there.  That's for another

16  day.

17          As I understand it, you have now

18  refused -- first of all, you refused to identify

19  the documents that you provided your client and

20  your expert.

21     MR. BOND:  I have not refused to do that, so

22  stop putting words in my mouth.

23     MR. STEINMAN:  Rod --

24     MR. BOND:  You are really irritating.

25     MR. STEINMAN:  Let me finish.

Exhibit - 3

```
 1          MR. BOND:  No, no.  I'm not going to --
 2          MR. STEINMAN:  Let me finish.
 3               Then we're going to end --
 4               All right.  We're going to end the
 5   conversation, and the transcript will show it,
 6   okay?  So you're either going to treat each of us
 7   with courtesy and let us finish --
 8               (Inaudible crosstalk)
 9          MR. STEINMAN:  Rod, the court reporter can't
10   take down what we're both saying at the same time,
11   okay?  Just let me finish, Rod.  Can you do that?
12               Thank you.  Okay.
13               So my understanding --
14               And after I finish, you can correct me
15   if I'm wrong.
16               My understanding is you have not
17   demanded that your expert or your client give you
18   back the documents that you provided to them, okay?
19   And as a result --
20          MR. BOND:  Yes, you are correct.
21          MR. STEINMAN:  Let me --
22          MR. BOND:  I told you and I told Alyson --
23          MR. STEINMAN:  Rod, can I finish?  Thank
24   you.
25               As a result, you're in violation of
```

Exhibit - 3

1    Rule 26, and we're going to bring it to the

2    magistrate judge's attention.

3         MR. BOND:  Are you done now?  Thank you.

4         MR. STEINMAN:  I am done.

5         MR. BOND:  Okay.  I told Alyson and I've

6    told you I e-mailed documents to my clients and to

7    the expert, okay?  And I said when I review the

8    rule, it is:  You have to retrieve the documents.

9    So how, Peter, do you expect me to retrieve the

10   documents?

11        The only thing that can be done that I

12   can see is to -- one thing, and that is tell them

13   to delete the e-mails.  I can't have them e-mail

14   them back to me.  It's not like I handed them the

15   documents, Peter.  There's nothing for them to get

16   back to me.  That would just create a whole other

17   trail.

18        MR. STEINMAN:  Okay.  Let me --

19        MR. BOND:  So that's why I told Alyson --

20        Let me finish now.  Let me finish.

21        That's why I told Alyson last week --

22        And there was no objection from anyone.

23        I said, "We have work product in this,

24   and I've looked at this too."  As do I.  I've

25   already been marking things and reading things.  So

Exhibit - 3

```
1   I sequestered them.  My expert, the same.

2           So my understanding is that -- and

3   that's what I told Alyson.  We'll proceed and have

4   the Court decide it before I destroy them.  I'm not

5   destroying anything.  When I read the rule, it says

6   I can submit them all to the Court.

7           And that's what I'm trying to avoid,

8   Peter.  I'm trying to avoid having to submit

9   200-and-some files to the Court because you're

10  putting that on me by what you're doing.  That's

11  what I don't want to do.  I don't want to make the

12  Court have to deal with this.

13       MR. STEINMAN:  Okay.  Well --

14       MR. BOND:  That's why I suggested --

15       MR. STEINMAN:  I don't want to interrupt.

16  Let me know when you're done.

17       MR. BOND:  That's one alternative.

18           Let me finish.  I let you finish.  You

19  ramble on.  Let me finish.

20       MR. STEINMAN:  Hey, Rod, don't be --

21       MR. BOND:  That's why I suggested rather --

22       MR. STEINMAN:  Rod, we're going to end the

23  conversation now.

24           I'm fine with letting you finish as you

25  let me, but don't be insulting, okay?  Don't talk
```

1    about rambling on or any other snide remarks.

2    There's no place for it.  It doesn't serve our

3    clients' interest.  It doesn't serve the Court's

4    interest.

5              Can we agree not to do that?

6         MR. BOND:  Just keep in mind, Peter, that

7    I've been waiting over a year, so just remember

8    that if I'm upset --

9         MR. STEINMAN:  I did.

10        MR. BOND:  I apologize, but --

11        MR. STEINMAN:  I understand that.  I

12   understand you're upset, but that doesn't mean that

13   you should go beyond the rules of civility.

14        MR. BOND:  Well, I'm not going beyond the

15   rules of civility.  I'm tired of getting jacked

16   around.  That's the problem.  That's the problem.

17   And that's what this is, in my view.  It's just

18   more of the same.

19             What I'm trying to do is short-circuit.

20   Because when I read the rule, my understanding of

21   the rule is that if we don't agree on something,

22   that I have to promptly submit the documents to the

23   Court sealed and have the Court decide the matter.

24             And I really don't want to have to do

25   that, Peter.  I don't think any of us want to do

1   that.

2            And so there's two ways that we do it.

3   We either have some other agreement that I'm not

4   waiving anything by not doing it right away and

5   that, you know -- because I'm not, quote, promptly

6   doing it and that I can keep the status quo.  I'm

7   not going to give any more --

8            Even though I don't agree with your

9   position, I get the rule.  That's why I told Alyson

10  I wasn't sending any more to anybody else.  And

11  what's there, I mean, is there.  My expert has

12  already looked at stuff and already got work

13  product in it.  You know, I can --

14           You know, to me, before I destroy that

15  or tell him, "Destroy your work product," and

16  before I destroy my work product, I'm going to

17  submit the stuff to the Court.  And I don't think

18  the Court is going to be very happy with anyone,

19  but I think it's going to be less happy with your

20  side because this isn't your privileged stuff.

21           So I'm trying to --

22       MS. FOSTER:  Okay.  So I have a proposal.

23       MR. BOND:  So to me, the one thing --

24           You know, if you're not going to produce

25  a privilege log for them and that's what --

Exhibit - 3

```
1              You know, to me, I've got a motion I've
2    got to file on Friday.  This issue is intertwined
3    with that.  There's documents --
4              I've looked at some of the -- you know,
5    I looked through those documents and, Peter,
6    respectfully, sure, you've given me a half a
7    million documents, and most of them mean nothing to
8    me because they're just worthless.
9              The documents that I really need and
10   really want are the ones that we're fighting over
11   now.  Those are the real documents at issue.
12   That's the bulk of the stuff that I'm after, and
13   everybody knows that.
14             And so --
15        MS. FOSTER:  Okay.
16        MR. BOND:  -- what we need to do is --
17             So, yeah, I think we can all agree that
18   if the Court -- if I file the motion to compel and
19   the waiver, you know, if the Court rules in my
20   favor on that issue for whatever reason, then this
21   issue is eliminated, okay?  You know, that's it.
22        MR. STEINMAN:  Okay.
23        MR. BOND:  So --
24        MR. STEINMAN:  Are you --
25             Sorry.
```

1        BY MR. BOND:  So --
2        MS. FOSTER:  I think it's my turn next.
3        MR. BOND:  Yeah.  So we have to have -- we
4   have to have an agreement, if we're going to, or an
5   offer by you guys at least that I'm not going to --
6   you know, for promptly not doing it, that I
7   don't -- you know, I'm not going to be penalized
8   for that.  Because I will submit them all before I
9   start deleting my work product and before I, you
10  know, destroy stuff.  And the same with my expert.
11          And I'm happy to provide you with the
12  Bates numbers of the files that were provided to my
13  expert and my clients.  There's not a lot of --
14  it's not a ton, an overly large amount.  So --
15        MR. STEINMAN:  Okay.  Hold on.
16        MS. FOSTER:  I think --
17          (Inaudible crosstalk)
18        MR. STEINMAN:  Rod, let me just say I
19  appreciate that.  I think that's a good-faith
20  offer.  I think, nevertheless, my understanding
21  under Rule 26 is that some of the stuff you've
22  done, I think you've said that you've sequestered
23  or you're no longer --
24          Well, first of all, I think you said
25  you're no longer transmitting any other documents

1  from that list or from that group of documents to

2  anyone, including your client or experts.

3          Do I have that right?

4      MR. BOND:  I have not transmitted any of the

5  289 files or whatever it is, the 289 files, to

6  anyone since Alyson provided me notice.

7      MR. STEINMAN:  Okay.  I appreciate that.

8      MR. BOND:  So --

9      MR. STEINMAN:  And your position is --

10         And we're probably just going to agree

11  to disagree, but at least we can frame the issue.

12         Your position is that as to whatever

13  number of those files that you have sent to your

14  expert and to your client -- and I don't know if

15  those are the same or different -- that you've not

16  asked either your client or your expert to either

17  transmit those documents back, via e-mail or

18  otherwise, or destroy those files.

19         Is that right?

20     MR. BOND:  I have told both parties that --

21  or the parties that the documents may have to be

22  deleted.  No, I have not told them --

23         As I told you before, that is a complete

24  red herring.  I have not told them to e-mail the

25  documents back to me.  So, no. I --

Exhibit - 3

1    MS. FOSTER:  Here's what needs to happen.

2         (Inaudible crosstalk)

3    MR. BOND:  -- the documents.  So --

4    MS. FOSTER:  Okay.  Here's what needs to

5  happen.  All right.

6         Number one, Rod, I appreciate you

7  offered to let us know the Bates numbers of the

8  documents you've sent.  That will meet one of my

9  concerns.  I take you up on that offer.

10         Two, can you please --

11         If you've covered this and I missed it,

12  apologies to you both.

13         Have you instructed your client and the

14  expert to not disseminate the documents they've

15  received any further?

16    MR. BOND:  Yes, I have.

17    MS. FOSTER:  If not --

18         Okay.  Thank you.

19         Three, in terms of whether they --

20         They need to sequester them.  We prefer

21  they destroy them, but they need to sequester them.

22         Is that what they're doing?

23    MR. BOND:  Let me --

24         Because this brings us to one of the

25  issues that I have and one of the purposes of

Exhibit - 3

1    calling this conference was, okay?

2            I read the rule, and there's retrieval,

3    okay?  The rule says sequester also, and I've seen

4    discussions about work product and how it

5    doesn't --

6            Now, to me, it -- the one thing that

7    I'm -- the one thing that I'm not going to do is

8    I'm not going to risk anything.  If you guys are

9    going to take some literal or not literal, you

10   know --

11      MS. FOSTER:  I don't want your work product.

12      MR. BOND:  (Inaudible) -- that I'm violating

13   the rule by not telling them not to delete them,

14   then what I'm going to do is I'll tell them to

15   delete them, and then I'm going to have my expert

16   add up all the time that he had marking them and

17   everything, and then I'll submit that in addition

18   for when I ask for fees when this is resolved.

19           So to me, that's why I told you, Alyson,

20   that I suggested that we keep the status quo.

21           Now, yeah, I had also e-mailed you and

22   said that I was considering using additional ones,

23   and that's why I wanted this conference as well,

24   because when I looked at the issue and, you know,

25   I've looked over all the documents, I don't see

1    anything that qualifies.

2              Now, I understand -- and you've made it

3    perfectly clear what your position is.  And I don't

4    agree with your position, but that's fine.  I'm not

5    going to --

6              The only thing that I would do is if we

7    can't come to agreement on how to resolve this,

8    then I may submit some or all of them in camera in

9    connection with the motion that I'm filing on

10   Friday.  But, you know, I'd prefer to figure out

11   some resolution --

12        MS. FOSTER:  Here's my proposal.

13        MR. BOND:  -- that wouldn't require me to do

14   that.

15        MS. FOSTER:  I think we can.  I do think

16   this can be resolved simply, but it will require

17   the following:

18             Okay.  First, you've already provided

19   written assurance on the record that you have

20   instructed them not to disseminate the information

21   further.  Awesome.

22             You've provided written assurance on the

23   record that you yourself will not and have not

24   disseminate them further.  Awesome.

25             We require you -- the rule says "cannot

```
 1   use them" while the claim is pending.  So that
 2   means that you, your expert, and your client need
 3   to stop working on them for now, okay?  And you
 4   need to sequester them and they need to sequester
 5   them.  I need that to happen.
 6            Finally --
 7       MR. BOND:  Okay.  But I'm going to tell you
 8   something.
 9            Let me interrupt you --
10       MS. FOSTER:  Okay.  But I have --
11       MR. BOND:  I need to be clear on this.  I am
12   not --
13            I don't know how you take the position
14   that something that's already been filed is --
15   somehow should not be produced.  So we need to --
16       MS. FOSTER:  But you're not --
17            Rod, that's not the issue.  That's not
18   the issue.
19       MR. BOND:  Okay.
20       MS. FOSTER:  The issue is you've made a
21   claim --
22       MR. BOND:  The documents (inaudible) --
23       MS. FOSTER:  Yeah, I know, but you're not
24   listening to me.
25       MR. BOND:  Okay.
```

Exhibit - 3

```
 1        MS. FOSTER:  What I'm saying is they were
 2   clawed back because we're reviewing them for
 3   privilege, okay?  So it may --
 4            So this is not the situation where
 5   something has been reviewed for privilege, marked
 6   privileged, and then a document that's been
 7   privileged was inadvertently produced.  We're way
 8   before that.  We are still --
 9            So you may be absolutely right that some
10   of these documents are not privileged, and, in
11   fact, I've confirmed to you today some of them are
12   not.
13            But, you know, at a minimum, as a
14   professional courtesy, you know, let me just finish
15   looking at them, you know?  And this may be
16   nothing.  And wouldn't you rather know --
17            Let me give you a privilege log.  These
18   are the pages that are privileged.  Here's the
19   documents that I'm going to go to the bat on, and
20   that's what we go to the Court on.  But let me
21   finish that process.
22            I understand you're frustrated.  I get
23   it.  But the solution to this is so
24   straightforward.  But in the meantime, because
25   we've made this claim, the rule is very clear.
```

```
 1   Sequester, return, or destroy.  One of the three.
 2           You've raised some issues with returning
 3   electronic documents.  It is possible to do it.
 4   It's really more of a destruction in electronic.
 5   You said they've put work product on it.  Okay.  So
 6   sequester them and stop working on them because the
 7   next phrase in the rule is "cannot use them."  And
 8   let me just finish reviewing the stuff, and then
 9   we'll know what to do and we can keep moving
10   forward.  That's my proposal.
11           And when I say I'm reviewing --
12           Sorry.  Addendum --
13           I need to give them -- or make sure that
14   Marty is reviewing them as well, and I will cc you
15   on that e-mail.  But I won't, obviously, cc you
16   with any of the documents.
17           I'll stop talking now.
18      MR. BOND:  Okay.  And then -- which leads me
19   to another issue.  So the --
20           Okay.  Well, I guess, let me focus on
21   this.  So I'm not -- so here's what, you know --
22   what seems to me to probably be the easiest way,
23   but I -- I'll need to research this to make sure
24   too because I'm looking at it.
25           It just seems to me that if the waiver
```

```
 1   issue is decided in this motion, then that prevents
 2   having to waste a lot more time and money on this
 3   issue, and then, you know --
 4              So as long as you're agreeing that
 5   you're not going to --
 6              I mean, I just want you to tell me that
 7   you're not going to penalize me --
 8              That, A, it's okay to keep the status
 9   quo.  If you're going to tell me that I've got to
10   delete them or that I've got to have my client
11   delete them -- or not my client.  Yeah, my client
12   and my expert, then -- then I'm happy to do that
13   because I'm not going to risk it.  But I'm going
14   to -- you know, like -- as I mention, I'm going to
15   add that to the cost to the extent my expert did.
16              But I don't -- you know, but if you're
17   okay with just the -- you know, the status quo --
18              And at least my expert is -- I don't --
19              As far as my client, I didn't -- I don't
20   think he's bookmarked it.  I don't know.  I'd have
21   to double check if he's done any work.  If he
22   hasn't done anything like that, then I don't care
23   if he deletes it, you know, pending the outcome.  I
24   mean, I don't want --
25              Again, I'm not going to -- I don't want
```

Exhibit - 3

1  to create an argument for something that I can
2  eliminate easy by just -- if your position is that
3  it's got to be -- your position is it's got to be
4  deleted by him, you know, and my expert.  So I --
5  that's --
6          So are we -- are we okay --
7      MS. FOSTER:  Okay.  Rod, I --
8      MR. BOND:  (Inaudible)
9      MS. FOSTER:  Sorry.  I was going to say:
10 Let me just confirm with the client as to how they
11 interpret "sequester, return, or destroy."
12          For now, don't destroy them.  Just keep
13 them, but do keep them sequestered.  Do send me, if
14 you don't mind, the list of the Bates numbers that
15 you provided to them and written confirmation --
16 which I guess is from this record.  It was a good
17 idea to have Andrea here, you poor thing -- that
18 you're not going to disseminate them further and
19 that you have instructed your client and your
20 expert not to disseminate them further.
21          And I'm also -- I don't think that --
22          I don't interpret the rule to require
23 you to somehow file a motion immediately when I
24 haven't been clear as to which documents I've
25 ultimately decided contain privileged information.

Exhibit - 3

 1   The Court is not going to know what she's being

 2   asked to decide.

 3           So to the extent you're asking me --

 4       MR. BOND:  I think that's the problem,

 5   Alyson.

 6       MS. FOSTER:  -- for assurance that I'm not

 7   going to say you waived the argument until I

 8   identify precisely which material is privileged,

 9   there's nothing for you to make, so there's no

10   waiver.

11           But the clawback rule still applies

12   because it's --

13           (Inaudible crosstalk)

14       MS. FOSTER:  I'm sorry?

15       MR. BOND:  All I would like is assurance

16   that you're not going to assert that against me; if

17   I don't promptly address this with the Court, that

18   you're not going to --

19       MS. FOSTER:  Yeah, it's not time.

20       MR. BOND:  That's what I want assurance.  I

21   appreciate -- or I understand your position.

22       MS. FOSTER:  You got it.

23       MR. BOND:  Again, I don't agree with the

24   position, but I -- that's all I want to make sure

25   is that I'm not going to be penalized in any way

Exhibit - 3

```
 1   for not submitting these things in camera or sealed
 2   to the Court to determine the privilege issues.
 3   That's what I want.
 4              So is that acceptable then?
 5        MS. FOSTER:  Yes.  Because what the --
 6              Absolutely, Rod.  Because the way it's
 7   going to work is I'm going to finish my review, I'm
 8   going to have Marty do this review, I'm going to
 9   tell you, "Nothing is privileged, clawback off."
10   "This is privileged.  Clawback is on for those
11   only," and then we'll know what we're talking
12   about.
13        MR. BOND:  Yeah.
14        MS. FOSTER:  You know what I'm saying?
15        MR. BOND:  Yeah, yeah.  But the problem is
16   is you've already asserted the clawback, so that's
17   the problem.  That's what I'm struggling with.
18   You've asserted, so it's like now we're here --
19        MS. FOSTER:  Absolutely.
20        MR. BOND:  -- but I understand you're going
21   to tell me soon --
22              Do you know when you'll be able to tell
23   me what -- you know, what exhibits are, you know --
24        MS. FOSTER:  No, but I'll check with Marty.
25   I've got to get it from Marty, so let me ask him.
```

```
 1              And I understand the reason this is
 2   confusing is because the rules don't anticipate
 3   someone like me who produces documents before
 4   they're even reviewed.  So I've really done
 5   something very special here.  But I'm confident
 6   that the clawback applies to this.
 7        MR. BOND:  Okay.  Well, again, we don't have
 8   to agree on that.  I just want to make sure that
 9   I'm not going to be penalized.
10              So that's my main -- that's my main
11   concern on that.  So I'm -- so as --
12              Until you get back to me, then I'll --
13   I'm just going to keep the status quo as far as
14   what my clients have and what my expert has and
15   then, you know, if you're going to take --
16        MS. FOSTER:  And can you agree to sequester?
17        MR. BOND:  That I --
18              What's that?
19        MS. FOSTER:  I just want to make sure in all
20   of this that I have --
21              Do you agree to sequester the documents
22   and to have your client and expert sequester them?
23        MR. BOND:  They were instructed to not do
24   anything with them, so, you know, that's their --
25        MS. FOSTER:  All right.  I have to think
```

Exhibit - 3

1    about if that's enough for a sequestration.

2        MR. BOND:  Well, and so -- so I guess if --

3    you know, and that's a --

4            You just need to tell me.  And you can

5    send it to me by e-mail.  I'm not going to play

6    games over this.  All this adds to fees and stuff

7    for my expert.  I'd rather just tell people to

8    delete them.  So if you're going to --

9            You just need to e-mail back after you

10   talk to Marty and you tell me what you want me to

11   do on those documents.

12           I'm not -- until -- and then that --

13   which gets me into the next thing I'm going to

14   confirm.

15           Since I don't -- since I -- I'm not

16   going to be promptly moving to have this issue

17   addressed with the Court per our agreement, then --

18   but I still plan on holding on myself to what we

19   have pending the resolution of the issue, so --

20       MS. FOSTER:  Yes.  And to be clear, I have

21   not asked you to ask anyone to destroy anything

22   yet.  I have asked you --

23       MR. BOND:  Okay.  That's --

24       MS. FOSTER:  -- to sequester, and I've asked

25   you to have your clients and your expert sequester.

Exhibit - 3

1          MR. BOND:  Yes, and that's already been

2    done.  You just need to confirm back to me then in

3    writing ASAP what -- if your position is they have

4    to be deleted and sequester is not enough.

5               See, I know the rule is odd.  It says

6    that I can sequester, so I'm comfortable with my

7    situation.  And the rule is odd where it says

8    "retrieve but not destroy" as to other parties.

9    Then, you know, it --

10              Because if it was a paper that I handed

11   to my expert and he had written on it, flagged it,

12   I could grab it from him, pull it back, say, "Okay.

13   I'm going to keep it here until the issue is

14   resolved," and I can give it back to him, but I

15   can't do that with the situation at hand.

16              So that's why, you know, what --

17              You know, it's the clients and the

18   expert are the one that you need to confirm back to

19   me in writing on whether -- what your position is

20   so that I can take the appropriate measures.

21              Because, again, I'm not going to risk

22   it.  I'm not going to give an argument to you on

23   something like that and say that I'm violating the

24   rule or something.

25              So that's -- you know --

Exhibit - 3

```
 1        MS. FOSTER:  Okay.  Well my current
 2   position --
 3            Okay.  Well, I don't want to be -- I
 4   don't want you to say, "Gosh, you never e-mailed
 5   me," so I am going to tell you our current
 6   position, and it is the position.
 7            They need to sequester the documents.
 8   You need to sequester the documents.  Full stop.
 9   If that position changes, I will e-mail you.  But
10   as of right now, that's our position, and there's
11   nothing else I need to confirm.
12        MR. BOND:  Okay.  Okay.  That's perfect.
13   Unless you tell me otherwise.  Great.  Okay.
14            So these documents, again, are included
15   in the ones that you gave back to Marty to review
16   and --
17            So you're not -- you didn't e-mail these
18   documents.  These are all part of the documents you
19   already had?  Or did you have to extend these to
20   him too?  I mean, I'm just trying to understand
21   what he has or what he doesn't have.
22        MS. FOSTER:  So I told you there are three
23   buckets.
24        MR. BOND:  Yeah.
25        MS. FOSTER:  The QB Crop ones, he's
```

1   reviewing.  The 32 that were not Bates labeled, I

2   have to send him.  These documents that are subject

3   to the clawback, I thought I'd sent them to him.  I

4   need to double check.  But it doesn't matter.

5   Either way, he will review them.

6        MR. BOND:  Okay.  And then as far as the

7   documents, these privileged documents that are at

8   issue --

9            And there's been a misunderstanding on

10  my part or something -- you know, along the way,

11  something has been -- I didn't understand it or

12  it's not been conveyed correctly to me.  One of the

13  two.

14           But it was initially told to me -- and I

15  think Peter is going to know the answer to this --

16  that the documents, the Quarles & Brady privileged

17  documents, were obtained from Quarles & Brady's

18  files and copied by GemCap, and that was why you

19  guys had to turn around and give them to Marty as

20  well.

21           Is that true with respect to all the --

22       MR. STEINMAN:  The documents --

23       MR. BOND:  (Inaudible) -- those documents or

24  is that --

25           What's that?

1        MR. STEINMAN:  I'm sorry.  I interrupted

2   you.

3        MS. FOSTER:  (Inaudible).

4        MR. BOND:  Well, so what I'm trying to

5   understand, Peter, is --

6             And I guess I can be more clear.

7             Your client obtained copies and obtained

8   the privileged documents that are now in dispute,

9   correct?

10       MR. STEINMAN:  Our clients obtained the

11  documents in the Q&B litigation.  They were

12  produced by Quarles & Brady after Mr. Taylor

13  sent -- and I think you have a copy of it --

14  sent -- and I don't have the dates of it in front

15  of me, but anyway, sent a letter waiving the

16  privilege, the attorney/client privilege and

17  related privileges, I think, as to this case only.

18            So, yes, those documents were produced

19  by Quarles & Brady to this office.  I think what

20  they produced was John Taylor's file.  So I imagine

21  but I don't know -- you'd have to find out from

22  John Taylor -- that at some point, currently or in

23  the past, he had the same documents.

24            In other words, these are documents that

25  were transmitted to Taylor and the transaction

1  documents themselves in the loan transactions as

2  well as before that.

3           And so the transaction documents you

4  have, but the other documents obviously included

5  privileged communications between Q&B and its

6  lawyers, including Mr. Gatziolis, and John Taylor

7  and other members of his staff.

8           So hopefully that clears that up.

9       MR. BOND:  Well, so here's what I'm trying

10  to understand.

11          I know that GemCap was provided

12  unfettered access to all of AIA's records and Crop

13  USA's in Idaho.  So are there also privileged

14  documents relating to AIA and Quarles and other

15  parties that were obtained by GemCap when it had

16  access to those documents?

17      MR. STEINMAN:  Okay.  So I don't know what

18  you mean by "unfettered access."

19          I know that in the Crop action and in

20  the Q&B action that -- particularly in the Crop

21  action, that there were productions made by Crop in

22  that action which included AIA documents, and some

23  of those documents were produced by Q&B.

24          There were other productions in the Q&B

25  action by Q&B that included, for whatever reason,

1    the documents that were produced in the Crop

2    action, and those did include AIA documents.  I

3    don't know -- when you say "unfettered access," I

4    don't know what that means.

5            Whatever documents that we have

6    regarding AIA or Crop or Mr. Taylor have been

7    produced other than the documents that Mr. Martel,

8    Crop, and Mr. Taylor's counsel are reviewing on

9    privilege grounds.  So --

10        MR. BOND:  Okay.  So you didn't --

11        MR. STEINMAN:  -- whatever --

12        MR. BOND:  I'm sorry.

13        MR. STEINMAN:  I'm sorry?

14        MR. BOND:  Go ahead.  Sorry.

15        MR. STEINMAN:  Okay.  So, again, whatever it

16    is that was produced in the Crop and QB actions

17    regarding AIA or Crop or Mr. Taylor have been

18    produced or, as Alyson has previously said and I

19    think there's correspondence too, that the

20    documents that include communications between --

21    again, between Quarles & Brady and its then client,

22    Mr. Taylor and/or Crop or whatever related entities

23    there may be, those are the ones that Mr. Martel

24    has and they're being reviewed, to my

25    understanding.

Exhibit - 3

1      MR. BOND:  Okay.  So on the Quarles & Brady
2  case, GemCap did not go and obtain the Quarles &
3  Brady -- whatever Quarles & Brady files that the
4  Crop entities and John had, or AIA, directly from
5  those parties as well as whatever they got from
6  Quarles & Brady?
7      MR. STEINMAN:  No, they were --
8          Well, when you say "as well as what they
9  got from Quarles & Brady," that's the same party.
10         So there were repetitive document
11  productions by Quarles & Brady.
12     MR. BOND:  Okay.
13     MR. STEINMAN:  Why that was, I don't know.
14     MR. BOND:  This is what I'm asking, okay?
15         For example, some of the documents that
16  are at dispute that you're asserting the clawback
17  for were a bunch of just billing statements, okay?
18  Billing statements aren't privileged themselves.
19  Maybe some content in them can be, but --
20         So those -- so the billing statements,
21  for example, if I understand you correctly, you got
22  them from Quarles & Brady.  Quarles & Brady gave
23  you all their billing statements, right?
24     MR. STEINMAN:  Well, when you say they
25  produced them --

```
 1          MR. BOND:  Also --
 2          MR. STEINMAN:  I'm sorry.  So they produced
 3     them -- they also --
 4               They produced them --
 5          MR. BOND:  Yeah.
 6          MR. STEINMAN:  -- pursuant to an RFP.
 7          MR. BOND:  Correct.  Okay.  Sorry.  Thank
 8     you for the clarification.
 9               So did GemCap also obtain documents such
10     as billing statements or whatever it might be
11     directly from Crop USA, AIA, John as to some of
12     those matters?
13               So, in other words, you guys could have
14     got some of the same ones directly from AIA or
15     Crop USA as well as the ones from Quarles & Brady?
16     Or was Quarles & Brady the sole source for all of
17     the privileged documents?
18          MR. STEINMAN:  Well, okay.  I don't know if
19     they were the sole source -- when you --
20               I'm going to take it out of the realm of
21     privilege.  I can tell you that documents were
22     produced by Mr. Taylor as well as by Quarles &
23     Brady.  I think there was a lot of overlap.
24               In fact, I think it was almost all
25     overlap because, you know, again, these were
```

```
 1   transaction documents and/or communications between

 2   John Taylor and other people on his staff and the

 3   law firm, Quarles & Brady.

 4            So, you know, can we differentiate

 5   those?  I don't think so.  I think they're mostly

 6   the same documents, if that answers your question.

 7        MR. BOND:  And --

 8        MS. FOSTER:  What's the relevance of --

 9            (Inaudible crosstalk)

10        MS. FOSTER:  -- that way, Rod?

11        MR. BOND:  What's that?

12        MS. FOSTER:  Why are you asking this?

13   What's the relevance?

14        MR. BOND:  Well, because I'm trying to

15   understand where the documents came from so that

16   when I move to compel, it --

17            For example, if what Peter is saying is

18   that, okay, anything that -- of the billing records

19   or whatever, we only got it from Quarles & Brady,

20   then, okay, then, according to you guys, then I

21   know that's the only place it came from.  But I

22   think --

23        MS. FOSTER:  Oh, got it.

24        MR. BOND:  -- I understand from Peter that

25   John and some other people or the other parties may
```

Exhibit - 3

1   have produced documents to them as well for that

2   lawsuit, so there could be duplications and

3   probably are a lot of duplications.

4            I'm trying to understand where the

5   documents came from that are these privileged

6   documents, the billing statements and all of those

7   sorts of things.

8        MS. FOSTER:  So that you can figure out

9   where to go --

10       MR. STEINMAN:  Hold on.  Wait one second.

11           Rod, as I said before, there were

12  repetitive productions of documents, okay?  And

13  when I say "repetitive productions," in other

14  words, the same documents, maybe even the billing

15  statements, were produced by Quarles & Brady,

16  although the billing statement certainly would only

17  have been produced in the Q&B action and not in the

18  Crop action unless they had some inadvertent

19  production.

20           But there were certainly multiple

21  production of some of the same documents in the

22  Crop action and the Q&B action.  And in addition,

23  Mr. Taylor produced some of the same documents.

24  But regardless, I mean, I -- I'm not really

25  understanding the difference.

Exhibit - 3

```
 1              We have this voluminous, as you know,
 2    set of documents.  And you mentioned earlier that a
 3    lot of it is not what you're looking for.  All I
 4    can it tell you is your requests were
 5    necessarily -- I'm sure you would argue broad.  We
 6    think they're unbelievably overbroad, but that's
 7    something the Court is going to have to decide.
 8              But in any event, you threw what we
 9    consider an overly broad net.  What was caught up
10    in that were, again, all of the documents at issue
11    that were produced in discovery in the Crop action
12    and in the Q&B action.
13         MR. BOND:  Right.
14         MR. STEINMAN:  It's a huge universe of
15    documents.  And I can't tell you, you know, were
16    there multiple copies of the same document
17    produced?  I can tell you I think so.  I can't tell
18    you exactly which ones.
19         MR. BOND:  I'm not --
20              We don't -- we don't need to go over
21    this any further, Peter.
22         MR. STEINMAN:  Okay.
23         MR. BOND:  I'm just trying to get an idea.
24         MR. STEINMAN:  All right.
25         MR. BOND:  Because at one point in time,
```

```
 1   either I was told or I understood, whether
 2   correctly or incorrectly, that all of the
 3   privileged documents relating to Quarles & Brady
 4   came from Quarles & Brady pursuant to the RFPs that
 5   you did in that case.
 6            I know that's not the case now.  That's
 7   all I needed to know is that --
 8        MR. STEINMAN:  Okay.
 9        MR. BOND:  -- some of those documents could
10   have came from elsewhere, and that's all I needed
11   to know.
12            So I -- you know, we don't --
13        MR. STEINMAN:  Okay.
14        MR. BOND:  I know you're saying it's
15   overbroad.  You know, we don't need to beat that
16   horse anymore.  And I know there's duplicates.
17   There's probably some documents that have been
18   duplicated four or five times.
19            But as we all know, sometimes when you
20   get productions from some new party, you might get
21   a thousand of the same documents and then you have
22   another 100 that are ones that you haven't seen
23   before.
24            So that's -- you know, that's my
25   position is I'm just trying to make sure I get all
```

Exhibit - 3

```
 1   of the documents.
 2          MR. STEINMAN:  Okay.  Understood.
 3          MR. BOND:  Anyway --
 4          MR. STEINMAN:  I've got to get off the call
 5   soon, so are there other issues --
 6          MR. BOND:  Okay.
 7          MR. STEINMAN:  -- that we need to talk about
 8   right now?
 9          MR. BOND:  Well, I don't --
10              Alyson, are you going to Bates stamp
11   those additional -- you said there was 30 more
12   documents or something?  I mean, are those -- I
13   mean, that you're giving to Marty, I mean, what --
14   is there some --
15          MS. FOSTER:  There's some (inaudible).
16          MR. BOND:  Yeah, I mean -- I don't --
17              You see my problem is it's just
18   impossible for me to really assess anything because
19   I don't have, you know, identifiers.
20              So let me just look my notes, Peter.  I
21   know you've got to go and there were some other
22   issues.
23              Just a second.
24              Okay.  I think that that covers what the
25   main issues that I needed to --
```

Exhibit - 3

```
1              So I guess I think that -- I think that
2    that --
3              Yeah, let me check one more list here.
4              Okay.  Yep.  I think I've covered
5    everything.
6              So, I guess, Alyson, I'll just wait to
7    hear from you on if you're going to change your
8    position on the sequestering part until we resolve
9    the issue, and then we'll go from there.
10        MS. FOSTER:  Okay.
11        MR. STEINMAN:  All right.  Great.
12             Well, Ms. Couch, my sincere appreciation
13   and apologies at the same time.  Thanks for your
14   help.
15        THE REPORTER:  You're very welcome.
16        MR. BOND:  Yep, thanks, Andrea.  Thanks
17   everyone.
18        MS. FOSTER:  Thanks everyone.  Bye-bye.
19          (Teleconference ended at 4:10 p.m.)
20
21
22
23
24
25
```

Exhibit - 3

July 23, 2018

REPORTER'S CERTIFICATE

STATE OF IDAHO    )
                  )  ss.
COUNTY OF ADA     )

   I, ANDREA J. COUCH, Certified Shorthand Reporter and
Notary Public in and for the State of Idaho, do hereby
certify:

   That said teleconference was taken down by me in
shorthand at the time and place therein named and
thereafter reduced to typewriting under my direction,
and that the foregoing transcript contains a full, true
and verbatim record of said teleconference.

     I further certify that I have no interest in the
event of the action.

     WITNESS my hand and seal this 24th day of July,
2018.

                                   _____
                                   ANDREA J. COUCH
                                   RPR and Notary
                                   Public in and for the
                                   State of Idaho.

My Commission Expires:  2-14-23