DANIEL LORAS GLYNN, ISB #5113
JONES ◆ WILLIAMS ◆ FUHRMAN ◆ GOURLEY, P.A.
The 9th & Idaho Center
225 N. 9th Street, Suite 820
PO Box 1097
Boise, ID 83701
Telephone: (208) 331-1170
Facsimile: (208) 331-1529
dglynn@idalaw.com

Attorneys for James Beck, Michael Cashman, Connie Henderson, John Taylor, Crop USA
Insurance Agency, Inc., and Crop USA Insurance Services LLC

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| DALE L. MIESEN, an individual who is a shareholder and who is also bringing this action on behalf of and/or in the right of AIA Services Corporation and its wholly owned subsidiary AIA Insurance, Inc.;<br><br>Plaintiff,<br><br>vs.<br><br>CONNIE TAYLOR HENDERSON, an individual; JOLEE K. DUCLOS, an individual; HAWLEY TROXELL ENNIS & HAWLEY, LLP, an Idaho limited liability partnership; GARY D. BABBITT, an individual; D. JOHN ASHBY, an individual; RICHARD A. RILEY, an individual; MICHAEL W. CASHMAN SR., an individual; JAMES BECK, an individual; R. JOHN TAYLOR, an individual; CROP USA INSURANCE AGENCY, INC., an Idaho corporation; AIA SERVICES CORPORATION, an Idaho corporation; AIA INSURANCE, INC., an Idaho corporation; CROP USA INSURANCE SERVICES, LLC, an Idaho limited liability company; and GEMCAP LENDING I, LLC, a Delaware limited liability company,<br><br>Defendants. | Case No. 1:10-CV-404-DCN-CWD<br><br>**AFFIDAVIT OF R. JOHN TAYLOR IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** |

AFFIDAVIT OF R. JOHN TAYLOR IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT - 1

STATE OF IDAHO  )
                :      ss.
County of       )

R. JOHN TAYLOR, first being duly sworn on oath, deposes and says:

1.      I am the President of the Defendant AIA Services Corporation ("AIA Services"), the President of the Defendant AIA Insurance, Inc. ("AIA Insurance"), the Manager of CropUSA Insurance Services, LLC ("CropUSA Services"), the President of CropUSA Insurance Agency, Inc. ("CropUSA Agency"), and named as an individual Defendant in this litigation. I have personal knowledge of all facts stated herein.

2.      I have held the position of President of AIA Services and AIA Insurance (collectively referred to as "the AIA Entities") since at least 1995. I have also held the position of President of CropUSA Agency since its creation in 1999 and CropUSA Services since its creation in 2009 (collectively referred to as "CropUSA Entities"). In my role of President for the AIA/CropUSA Entities I was responsible for all aspects of the operations of these entities, including, but not limited to the assurance of regulatory compliance within the states in which the AIA/CropUSA Entities marketed their insurance products as well as interaction with the Risk Management Agency (RMA), the regulatory agency of the United States Department of Agriculture (USDA) responsible for, among others, the regulation of crop insurance products.

3.      AIA Services has its origins in the combined efforts of myself and my brother Reed Taylor to market and administer group health and life policies to farmers in the northwest through the entity named Agriculture Insurance Administrators, later called AIA Insurance. These group policies were endorsed by the Idaho, Oregon and Montana state wheat grower associations. In time, we expanded our marketing operations into over forty other markets across the United States and were  sponsored by state and national farm commodity associations.

**AFFIDAVIT OF R. JOHN TAYLOR IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT - 2**

Thereafter, we formed AIA Services for the purpose of acquiring other health and life insurance companies to be operated as subsidiaries of AIA Services. At no point has either AIA Services, or any subsidiary it created or acquired, ever been licensed to market property and casualty insurance in Idaho let alone any other state jurisdiction in which it transacted business.

4.    In late 1987, AIA Insurance was made a wholly owned subsidiary of AIA Services to facilitate a resolution of the divorce between Reed Taylor and his then wife, Donna Taylor.  As a consequence of this reorganization, AIA Services issued to Donna Taylor Series A Preferred Shares in AIA Services.  In addition, and as part of the same transaction, AIA Services issued Reed Taylor shares of common stock in AIA Services, which issuance resulted in his ownership of sixty-five (65%) of the then issued common stock in AIA Services.

5.    In 1993 Donna Taylor made demand for the redemption of the Series A Preferred Shares and AIA Services began making payments to Donna Taylor.

6.    However, the growth and profitability that AIA Services had seen in its marketing of health and life insurance products began to decline significantly in the 1990s because of significant legislative changes to health and life insurance at the state and local levels prompted by policies promoted by the Clinton administration.  In addition to prohibiting denial of insurance coverage for pre-existing coverage or waiting periods before coverage application for the type of policies marketed by AIA, legislative changes were made to mandate minimum policy loss ratios which effectively reduced any agency commissions in excess of ten percent , increased a company's capital requirements and restricted the manner and method in which the products offered by AIA Services could be marketed. In other words, throughout the 1990s AIA Services experienced increases in the cost of doing business that it was not able to absorb or pass through in the cost of the products it marketed, destroying the viability of association group sales

**AFFIDAVIT OF R. JOHN TAYLOR IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT - 3**

and the profitability of AIA Services employing full time agents to market its products. I disagreed strongly with Reed Taylor regarding how AIA Services should adapt to these changes. As a result, I ultimately determined that our differences were irreconcilable. I understood Reed Taylor to agree with this conclusion.

7.    Thus in late 1994, early 1995, Reed Taylor and I made purposeful efforts to attract additional investors to AIA Services with the specific purpose of raising sufficient capital to buy out Reed Taylor's interest in AIA Services.    These marketing efforts included negotiations with Defendant Michael Cashman and Defendant James Beck as well as others. These efforts involving myself and Reed Taylor ultimately resulted in Messrs. Cashman and Beck agreeing to become investors in AIA Services through the purchase of Series C Preferred Shares. In this regard Mr. Cashman invested $1,000,000 in AIA Services.  Mr. Beck invested $500,000 in AIA Services. Following their investment in 1995, and continuing through the year 2001, Messrs. Beck and Cashman held positions on the Board of Directors for AIA Services.  At no point did Messrs. Beck or Cashman ever hold an officer position with AIA Services.

8.    As a result, on July 22, 1995, AIA Services and Reed Taylor entered into a Stock Redemption Agreement which provided for the redemption of Reed Taylor's common stock in AIA Services in exchange for an initial $1,500,000 payment to Reed Taylor and an additional $6,000,000, plus interest, to be paid in monthly installments. Incident to this transaction, Reed Taylor agreed to subordinate principal payments to be paid to him by AIA Services in favor of the payments to Donna Taylor.

9.    Unfortunately, the above referenced changes in the insurance industry continued to affect the profitability of AIA Services. In 1996 AIA Services obtained Reed Taylor's assent to a restructuring of the terms of the 1995 Redemption Agreement and providing for interest only

AFFIDAVIT OF R. JOHN TAYLOR IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT - 4

payments to Reed Taylor. Donna Taylor's assent to subordination of AIA Service's payments to her remained unaltered.

10. Despite these changes to AIA Services' bottom line the negative downward trend of AIA Services profitability continued unabated as revenues decreased and expenses increased. Significantly, on or about December 4, 1998, AIA Services was compelled to place one of its subsidiary entities, The Universe Life Insurance Company, into liquidation for reasons of insolvency. Moreover, Trustmark Insurance Company, likewise facing the same regulatory changes and consequences on its operations, began to aggressively increase the rates on its products and ultimately began to discontinue accepting any new entrants into AIA's association plans. As AIA Services was dependent upon the Trustmark products as the main product in its portfolio offerings, Trustmark's actions left AIA Services, essentially, without any nationwide group insurance plan to offer.

11. Accordingly, with the active participation of Reed Taylor, I began to explore the possibility of entering the insurance market pertaining to property and casualty insurance products and specifically crop insurance. Initially, it was my intent for AIA Services to pursue this previous unexplored by AIA Services market of property, casualty and/or crop insurance. However, based on my multiple communications with representatives of the RMA as well as representatives of the various state insurance agencies into which I hoped to market crop insurance that AIA Services could not do so as a result of its existing financial condition.

12. Any assertion that that there are no financial restrictions imposed upon an entity to sell property and casualty insurance and that all one has to do to market and administer national crop insurance is to obtain a resident producer license in Idaho lacks a fundamental understanding of the crop insurance generally and the regulatory process applicable to crop

**AFFIDAVIT OF R. JOHN TAYLOR IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT - 5**

insurance specifically. At no point was it ever contemplated that the entity established to market crop insurance programs would be designated as a Managing General Agent (MGA) in Idaho or in any other state for that matter. This is because federal law as overseen by the RMA pre-empts state law regarding crop insurance and therefore approval and appointment of such must be obtained at the federal level. The RMA does require that an entity possess either a property or casualty license, or a license to market crop insurance in those states where such a license exists, in those states in which it intends to market of crop insurance. However, the RMA requires far more than the possession of an appropriate license in the identified state. This is because a Standard Reinsurance Agreement (SRA) is a financial agreement between the Federal Crop Insurance Corporation (FCIC), as administered by the RMA, and the applicant. Thus, an applicant seeking to obtain a SRA with the RMA, among other submissions, is required to submit its financials to the RMA and demonstrate that it is in financial good standing with sufficient financial capacity to provide the RMA with reasonable assurance that it can deliver the product to be offered. In addition, an applicant must also demonstrate that it is in good standing with the regulatory agency in which it domiciled and that it possessed errors and omissions coverage for processing and agency activities. AIA Services could not meet any of these requirements.

13.     Most significantly, AIA Services did not have a sufficient net worth to pursue an application with the RMA.   Between the decreasing profitability resulting from regulatory changes in the health and life insurance market coupled with the liabilities to Donna Taylor and Reed Taylor, AIA Services possessed a negative net worth.  Attached as Exhibit "A" is a true and correct copy of the consolidated financial statement of AIA Services and its subsidiaries for 1998 and 1999. In my capacity as President of the AIA Entities, I reviewed these consolidated

AFFIDAVIT OF R. JOHN TAYLOR IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT - 6

financial statements, as I did for every year's financial statements for the AIA/CropUSA entities, for accuracy prior to publication. As noted therein, in 1998 AIA Services was operating at a net loss with liabilities exceeding assets of more than $6 million (and not including the liability attributable to Donna Taylor's ownership of Series A preferred stock). In 1999, AIA Services again operated at a net loss with liabilities exceeding assets by increasing to more than $7 million.

14.    This negative net worth continued in the years that followed and specifically during the time period in which I explored the opportunity to enter into crop insurance market. Attached as Exhibits "B," "C," "D," "E," "F," and "G" are true and correct copies of the financial statements of AIA Services and its subsidiaries for the years 2000 through 2007.

15.    Moreover, even aside from the clear inability of AIA Services to meet the financial wherewithal, and as noted above, AIA Services was involved in liquidation proceedings concerning its subsidiary entity the Universe Life Insurance Company. Additionally, as a result of AIA Services financial condition evident in its financial statements, AIA Services found itself unable to meet the growing capital requirements of various states in which it was marketing life and health insurance and had its insurance company licenses to do so revoked in those states. Thus, AIA Services, and any subsidiary entity, was simply unable obtain approval from the RMA.

16.    On or about June 18, 2001, AIA Services advised all of its shareholders, including the Plaintiff Dale Miesen, of AIA Services' decision not make CropUSA a subsidiary of AIA Services and that instead that CropUSA would be "an independent property and casualty agency." A true and correct copy of this correspondence is attached as Exhibit "H."

17.    Any doubt about AIA Services inability to obtain approval from the RMA for a

**AFFIDAVIT OF R. JOHN TAYLOR IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT - 7**

SRA was made evident in the efforts to obtain approval of CropUSA as an MGA even without all the attendant issues of AIA Services' negative net worth with liabilities exceeding $8million, the liquidation of AIA Services' subsidiary Universal Life Insurance Company or its issues with other state regulatory agencies. These difficulties were noted in the CropUSA Financial Statements for the years 2002 through 2006, true and correct copies of which are attached as Exhibits "I," "J," "K," and "L." After multiple attempts to obtain approval from the RMA, CropUSA was only able to obtain such approval when I, along with Messrs. Beck and Cashman, agreed to personally guarantee a revolving line of credit with a maximum borrowing of $750,000. In further supplement of these financial commitments, Mr. Beck, with a business partner, contributed $2,000,000 of real estate mortgages to CropUSA. Ultimately, Mr. Beck and I were required to personally guarantee a $2 million loan from Zions Bank.

18.     Coincident in time with establishment of the CropUSA Entities, Jim Beck and Michael Cashman resigned their positions on the Board of Directors of AIA Services in or about March 2001. Although Messrs. Beck and Cashman participated in an group that was called the Advisory Board for CropUSA, along with other individuals including Reed Taylor, this Advisory Board was advisory only as CropUSA possessed its own duly constituted board of directors. Neither Messrs. Beck or Cashman held a position on the CropUSA Board of Directors or as an officer to those entities.

19.     In late December of 2006, Reed Taylor purported to issue a notice of default to AIA Services with regard to the agreements between AIA Services and himself.   As evident from the foregoing referenced financial statements, AIA Services clearly did not have the capital to redeem Reed Taylor's shares as demanded and I cannot believe that Reed Taylor and/or Donna Taylor were not aware of this fact.  Given the lack of capital and on the belief that AIA

**AFFIDAVIT OF R. JOHN TAYLOR IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT - 8**

Services was barred from doing so under the Idaho Business Corporation Act, AIA Services refused Reed Taylor's demand. In January 2007, Roderick Cyr Bond, on behalf of Reed Taylor filed *Reed Taylor v. AIA, et al.*, CV07-00208 (Nez Perce County District Court) (hereinafter referred to as "Reed Taylor Case"). The AIA Entities retained the law firm of Hawley Troxell Ennis & Hawley LLP ("HTEH") to defend the AIA Entities in the Reed Taylor Case.

20.    Compounding this state of affairs, I learned that Reed Taylor and Donna Taylor entered into a subordination agreement that essentially reversed the order of the prior agreement that they and AIA Services had reached in 1996. It is my understanding that although the agreement between Reed and Donna Taylor purports to be effective December 1, 2006, it was not actually signed until some point in February of 2007. I was not advised of any discussions concerning this agreement nor advised of its existence at the time of its execution. Reed Taylor and Donna Taylor's agreement was made without any regard for AIA Services as it had the immediate effect of purporting to accelerating AIA Services' approximately $8 million redemption obligation to Reed Taylor and subordinating the company's then $450,000 redemption obligation to Donna Taylor. The other consequence of Donna Taylor and Reed Taylors conduct was to force AIA Services into the financial position that it could no longer make payment to Donna Taylor and be in compliance with the Idaho Business Corporation Act. AIA Services ceased payments to Donna Taylor in May of 2008. On June 2, 2008, Michael Bissell, now counsel for Reed Taylor in the Miesen matter, filed *Donna Taylor v. R. John Taylor, et al.*, CV08-1150 (Nez Perce County District Court). Attached as Exhibit "M" hereto is the Complaint filed in this action. Subsequently, on May 24, 2013, Mr. Bond filed another action on Donna Taylor's behalf, *Donna Taylor v. AIA Services, et al.*, CV-13-1075 (Nez Perce County District Court). Attached as Exhibit "N" hereto is the Complaint in the 2013 action. The

AFFIDAVIT OF R. JOHN TAYLOR IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT - 9

2013 action was consolidated with the 2008 (hereinafter referred to as "Donna Taylor Case"). The original complaint filed by Donna Taylor included specific allegations asserting "violation of the corporate opportunity doctrine" as concerned the relation between AIA Services and CropUSA.

21.    Although the original complaint filed in the Reed Taylor case was a two-count complaint seeking relief against the AIA Entities and myself personally with regard to the Stock Redemption Agreement within a year that original complaint had been amended five times to add my ex-wife Connie Taylor, Jim Beck and his wife Corrine, the CropUSA Entities and others and to assert many of the identical issues that are present in this litigation. Attached as Exhibit "O" hereto is the Fifth Amended Complaint in the Reed Taylor Case. As I confirmed to Mr. Bond during his questioning in the course of a during a four day deposition "at issue" in the Reed Taylor Case was (1) the formation and ownership of CropUSA, (2) the business relationship of the AIA entities and the CropUSA entities in terms of assets, employees, master marketing agreements and administrative agreements, (3) the 2001 exchange of Series C preferred shares of AIA Services that were converted to common shares of CropUSA, (4) 2001 purchase of a parking lot, (5) the transactions between AIA Services and Pacific Empire Radio Corporation ("PERC"), (6) assertions of conflicts of interest, (7) issues pertaining to the Trustmark Settlement, (8) CropUSA asset sale to Hudson Insurance, (9) consulting payments received by me, (10) my compensation from AIA Services, (11) the attorney fees paid on behalf of the individual defendants in the Reed Taylor case, (12) the loans between CropUSA and AIA Services, and (13) compensation of the AIA Services' directors. Based on these allegations, in addition to the assertion of a breach of the stock redemption agreement, Reed Taylor asserted, among other, claims for fraud, director liability, breach of fiduciary duty, and conspiracy of all

AFFIDAVIT OF R. JOHN TAYLOR IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT - 10

named Defendants.

22.    I also note that the Fifth Amended Complaint, like the present litigation, sought to challenge AIA Services' guarantee of CropUSA's loan. In this regard, in October 2006 HTEH prepared an attorney opinion letter regarding a loan transaction involving the CropUSA Entities and Lancelot Investors Fund, L.P. and to which AIA Insurance was to be a guarantor to the loan transaction. A true and correct copy of this attorney letter is attached as Exhibit "P." With regard to this attorney opinion letter, I relied upon the opinions expressed therein in proceeding with the loan transaction.

23.    In addition, during the course of HTEH's representation in the Reed Taylor case, HTEH provided me with certain correspondences regarding engagement letters, conflict waivers and tolling agreements. With regard to the matters contained in these letters I relied upon the advice given by HTEH.

24.    At the time of the filing of the Reed Taylor Case, the Board of Directors for AIA Services consisted of myself, Jolee Duclos and Bryan Freeman. Upon the filing of the Reed Taylor Case which named Ms. Duclos and Mr. Freeman as defendants, these two individuals resigned their directorship from AIA Services. As such, I requested, and upon their consent, appointed Connie Henderson and James Beck as directors for AIA Services. Connie Henderson and I were once married, but we were separated in 2002 and divorced on December 16, 2005. Prior to 2005, I had no discussions with Ms. Henderson, then Mrs. Taylor, regarding the operations or affairs of the AIA Services/CropUSA. I did not consult with her in this time period regarding her opinions on any business matters nor did I seek her approval. Ms. Henderson remained on the AIA Services Board of Directors until early September of 2014. In this regard, I have reviewed the Affidavit of Connie Henderson in Support of Motion for Summary Judgment

AFFIDAVIT OF R. JOHN TAYLOR IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT - 11

and agree with her recollections as expressed therein.

25.    Likewise Mr. Beck remained on the AIA Services Board of Directors from April of 2007 through September of 2014.  Mr. Beck was not involved in the negotiations which led to the ultimate resolution of the litigation between the Defendant GemCap Lending I, LLC and AIA Services, and others, as pending in the U.S. District Court of California, Case No. CV13-5504 nor was his consent obtained with regard to any resolution terms with GemCap.

26.    Upon the filing of the Reed Taylor Case, AIA Services directed correspondence to the AIA Services' shareholders, to include Mr. Miesen, of the fact of the Reed Taylor lawsuit and requesting shareholder approval to advance funds for the defense to the corporate directors. The letter also advised the shareholders that in addition to alleging a default of the obligations owed to him Reed Taylor had asserted that the company and its directors have taken actions which diminished the value of the company.  The letter also advised the shareholders of their right to obtain a copy Reed Taylor's Complaint.  A true and correct copy of this correspondence is attached as Exhibit "Q."

27.    Thereafter, on March 28, 2007, AIA Services held a special meeting of the shareholders with regard to the request for advancement of funds for attorney fees to be incurred by the directors of AIA Services in defense of Reed Taylor litigation.  A true and correct copy of this special meeting of the AIA Services shareholders is attached as Exhibit "R."

28.    Thereafter, in a letter dated July 21, 2008, Donna Taylor in her identified capacity as a Series A Preferred Shareholder in AIA Services made demand upon AIA Services for corrective action pursuant to Idaho Code 30-1-742.  Like the Complaint in Reed Taylor's case, Donna Taylor's letter asserted the existence of 27 matters to which she asserted liability existed including, but not limited to the alleged usurpation of a corporate opportunity with regard to the

AFFIDAVIT OF R. JOHN TAYLOR IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT - 12

CropUSA Entities, illegal loan guarantees as well as assertions of fraud, misappropriation and breach of fiduciary duties. A true and correct copy of this correspondence is attached is attached as Exhibit "S." As the docket in this matter reflects, this present action purporting to be a derivative case was not commenced until August 11, 2010.

29. On June 17, 2009, the District Court in the Reed Taylor Case granted the Defendants' Motion for Summary Judgment, dismissing Reed Taylor's Fifth Amended Complaint. Reed Taylor moved for reconsideration, which motion was denied on August 13, 2009. Reed Taylor appealed and the decision was affirmed by the Idaho Supreme Court on September 7, 2011. Upon remand, and as to the remaining claims, the District Court granted Defendants' Motion for Judgment on the Pleadings as to the claims for fraudulent conveyances, director liability, breach of fiduciary duties, and civil conspiracy on December 28, 2011. A true and correct copy of the Opinion and Order on Plaintiff's Amended Motion to Supplement and Amend Complaint and Defendants' Motion for Judgment on the Pleadings is attached hereto as Exhibit "T."

30. Plaintiff's Third Amended Complaint also challenges the authority of AIA to guarantee certain loans. In particular, Plaintiff challenges a guarantee given incidental to a loan transaction involving the CropUSA Entities and GemCap Lending I, LLC in 2011 as well as a subsequent guarantee given to GemCap Lending I, LLC in 2013. With regard to each of these transactions I received an attorney opinion letter indicating that these transactions were permissible. Specifically, I also relied upon Robert Van Idour's attorney opinion letter of November 21, 2011, Mr. Van Idour's attorney opinion letter of February 7, 2013 as well as an attorney opinion letter prepared by James Gatziolis of the firm Quarles & Brady dated November 23, 2011.

AFFIDAVIT OF R. JOHN TAYLOR IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT - 13

31. As should be evident from the preceding, over the course of the last fourteen years, I have been involved in various lawsuits directed at me individually as well as the AIA Entities and CropUSA entities. In these cases, while the named plaintiff differed, each case was prosecuted by Mr. Bond representing the party pursuing the claims. These cases include, but are not limited to the Reed Taylor Case, the Donna Taylor Case which remains pending, and this present litigation on behalf of Mr. Miesen. In each of these cases, Mr. Bond, on behalf of whichever client he happens to be representing in the proceedings, has alleged, and continues to allege similar allegations of wrongdoing and malfeasance against myself, the AIA/CropUSA entities, and the former directors of AIA Services. However, these are not the only litigations that Mr. Bond has initiated and/or otherwise involved himself in the representation of various clients against myself personally, the AIA entities, the CropUSA entities, or the various attorneys who have represented me or the AIA/CropUSA Entities in the past. By my count over the last fourteen years Mr. Bond, on behalf of his various clients, has initiated or sought to involve himself in no less than thirteen different lawsuits not including the foregoing, including two separate suits alleging similar aiding and abetting claims as present in this lawsuit on behalf of Reed Taylor against the firm of Hawley Troxell Ennis & Hawley and Clements Brown in 2008, a malpractice claim on behalf of Reed Taylor against Eberle, Berlin, Kading, Turnbow & McKlveen in 2009, a malpractice claim on behalf of Reed Taylor against CairnCross & Hempelmann in 2012, and a malpractice claim on behalf of Dale Miesen as a derivative plaintiff against John Munding in 2019. In many of these cases, although not named as a Defendant, I was required to respond and provide information relative to the AIA entities. The financial toll on the AIA/CropUSA entities, as well as myself individually, cannot be understated and easily exceeds millions of dollars. Moreover, the foregoing has had a consequential chilling effect on

AFFIDAVIT OF R. JOHN TAYLOR IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT - 14

the ability of the AIA/CropUSA entities to operate as a going concern and has made the ability to secure, and retain, attorneys to represent the interests of these entities challenging. Thus the damage caused to these entities in these multiple litigations cannot be overstated.

FURTHER YOUR AFFIANT SAYETH NAUGHT.

DATED This 29th day of January, 2021

_____
R. John Taylor

SUBSCRIBED AND SWORN TO before me this 29 day of January, 2021.

_____
Notary Public for
Residing at clarkston   w A
My Commission Expires: 12/30/202

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 29th day of January, 2021, a true and correct copy of the foregoing document was filed with the Clerk of Court using the CM/ECF System which sent a Notice of Electronic Filing to the following persons:

| | |
|---|---|
| Roderick Cyr Bond | rod@roderickbond.com |
| Michael S. Bissell | mbissell@campbell-bissell.com |
| Tyler S. Waite | twaite@campbell-bissell.com |
| Jeffrey A. Thomson | jat@elamburke.com |
| Loren C. Ipsen | lci@elamburke.com |
| Joyce A. Hemmer | JAH@ElamBurke.com |
| Bradley S. Keller | bkeller@bryneskeller.com |
| William E. Adams | bill@weadamslaw.com |
| Alyson Anne Foster | alyson@dempseyfoster.com |

/s/ Daniel Loras Glynn
Daniel Loras Glynn